## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | | |
|---|---|---|
| H & L FARMS, LLC; | * | |
| SHAUN HARRIS and AMIE HARRIS, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | CIVIL ACTION FILE |
| v. | * | |
| | * | NO. _____ |
| SILICON RANCH CORPORATION; | * | |
| SR LUMPKIN, LLC; INFRASTRUCTURE | * | |
| AND ENERGY ALTERNATIVES, INC.; | * | JURY TRIAL DEMANDED |
| IEA CONSTRUCTORS, LLC; and, | * | |
| WESTWOOD PROFESSIONAL | * | |
| SERVICES, INC., | * | |
| | * | |
| Defendants. | * | |

## COMPLAINT FOR DAMAGES

Plaintiffs in the above-styled action file this their Complaint for damages and show this Honorable Court as follows:

## PREFACE

1.

The damage done by defendants to Plaintiffs' property as described herein was foreseeable to defendants.

2.

The damage done by defendants to Plaintiffs' property was actually foreseen by defendants.

3.

What is foreseeable can be avoided; refusing to avoid the foreseeable makes the conduct irrefutably intentional.

## I.  **THE PARTIES**

4.

H&L Farms, LLC is a Georgia corporation whose stock is owned by Shaun and Amie Harris of Stewart County, Georgia.  H&L Farms, LLC owns land in Stewart County, Georgia formerly known as "Kawikee Refuge."

5.

Mr. Harris is a native of Stewart County, Georgia.  He is in the reforestation business, planting and supporting the growth of trees, and in the firefighting business in western states.  Mr. and Mrs. Harris are currently remodeling a home on the subject property they own and plan to reside there permanently.

6.

Plaintiffs' property is downstream from and adjoins the property owned by Silicon Ranch Corporation ("Silicon Ranch") on which defendants are building a solar facility, which they call the "Lumpkin Solar Farm."

2

7.

The "Lumpkin Solar Farm" is not remotely any kind of "farm" at all. It is instead a solar power generating facility, on which defendants plan to install thousands of solar power panels (hereinafter "Lumpkin solar facility").

8.

Defendants are partners in developing the Lumpkin solar facility in Stewart County, Georgia.[1]

---

[1] *See* Exhibit 1, 12/19/19 "Press Release" posted on Walton EMC website by Walton EMC and Silicon Ranch. (referring to Walton EMC and Silicon Ranch as "partners" five times, including "the growing partnership that includes Facebook, Walton EMC, and Silicon Ranch;" Facebook's "head of renewable energy Uvi Parekh quoted as saying "we are thrilled to have strong partners such as Walton EMC and Silicon Ranch" and "[w]e are proud to partner with them again for these new projects.") *See* Exhibit 2, https://www.siliconranch.com/infrastructure-and-energy-alternatives-inc-selected-by-silicon-ranch-to-construct-100-mw-solar-project-in-georgia/ (1/14/20 press release by IEA on the Silicon Ranch Corporation website); ("said Silicon Ranch Co-Founder and CEO Reagan Farr. 'Silicon Ranch is pleased to partner again with IEA . . .'"; "'IEA is very pleased to again partner with Silicon Ranch to bring additional renewable energy sources to Georgia," 'said Joe Broom, IEA's Senior Vice President of Solar Construction Operations.") *See* Exhibit 3, 1/14/21 press release from Silicon Ranch and IEA (similar quotations by Broom and Farr, plus Farr quotation stating ""we thank our partners at Walton EMC and Facebook for making the Lumpkin solar facility and this meaningful investment possible.")

9.

The Lumpkin solar facility is one of six projects being developed by Silicon Ranch Corporation and Walton EMC to provide energy to Facebook for its data center in Newton County Georgia.[2]

10.

The Lumpkin solar facility is being developed by Silicon Ranch in a partnership which includes Facebook, Walton EMC, and Silicon Ranch.[3]

11.

From a video dated May, 2021 posted on the Silicon Ranch website about the Lumpkin solar facility:



---

[2] *See* Exhibit 3, 1/14/21 press release from Silicon Ranch and IEA.
[3] *See* Exhibit 1, 12/19/19 "Press Release" posted on Walton EMC website by Walton EMC and Silicon Ranch.

12.

The land on which the Lumpkin solar facility is being developed is owned by Silicon Ranch.

13.

Silicon Ranch is the owner of the Lumpkin solar facility.

14.

From a photograph taken July 12, 2021, on the site of the Silicon Ranch property where the Lumpkin solar facility is located (bottom left corner—"Silicon Ranch Owner"):



15.

Silicon Ranch is the operator of the "Lumpkin solar facility."

16.

Defendant Silicon Ranch Corporation is the U. S. solar platform for Royal Dutch Shell Plc of the Netherlands, Europe.

17.

Silicon Ranch is itself a Delaware corporation headquartered in Nashville, Tennessee.

18.

Silicon Ranch is one of the largest independent power producers in the country.

19.

Silicon Ranch has more than 140 operating facilities in 15 states.

20.

Defendant SR Lumpkin, LLC is a shell corporation established by Silicon Ranch Corporation and incorporated in the state of Delaware.

21.

SR Lumpkin, LLC is being used by Silicon Ranch Corporation for the sole purpose of attempting to deflect liability to Plaintiffs away from Silicon Ranch Corporation.

22.

On June 11, 2021 in a document entitled "Solar Ground Lease", Silicon Ranch Corporation purported to "lease" to its shell corporation subsidiary "SR Lumpkin, LLC" the entirety of the land purchased by Silicon Ranch Corporation for the Lumpkin solar facility.

23.

Signing the "Solar Ground Lease" for "landlord" Silicon Ranch Corporation

was "D. Reagan Farr, President and Chief Executive Officer." Signing the "Solar

Ground Lease" for "tenant" SR Lumpkin, LLC was "D. Reagan Farr, President and

Chief Executive Officer."[4]

24.

Defendant Infrastructure and Energy Alternatives, Inc. ("IEA, Inc.") is a

Delaware corporation headquartered in Indianapolis, Indiana.  IEA is in the

business of building solar projects and has built some "240 wind and solar projects

across 36 states,"[5] including at least two with Silicon Ranch and Walton EMC.

25.

IEA, Inc. is "responsible for the engineering, procurement, and construction

of the Lumpkin solar facility in Stewart County."[6]

26.

Defendant IEA Constructors LLC ("IEAC") is one of several "IEA

Companies"[7]—a subsidiary formed by IEA, Inc.

---

[4] *See* Exhibit 4, "Memorandum of Solar Ground Lease" executed 6/11/21 and filed of record with the Stewart County Superior Court Clerk on 6/16/21.
[5] *See* "IEA 2020 ESG Report", p. 2, Exhibit 5.
[6] *See* Exhibit 6, 1/19/21 article, https://constructionreviewonline.com/news/usa/construction-set-to-start-at-georgia-solar-farm-atlanta/.
[7] *See* Exhibit 5, "IEA 2020 ESG Report", p. 3.

27.

According to IEA's own press releases, the contract to construct the

Lumpkin solar facility was awarded *to IEA*.[8]

28.

The work done on the Lumpkin solar facility *has been done by IEA*, and the

hiring of workers *has been done by IEA*.[9]

29.

Defendant Westwood Professional Services, Inc. is a Minnesota corporation

with offices in 17 U.S. cities and 12 states.[10]  Westwood is in the business of

signing off on engineering plans to enable its clients to obtain permits for land

disturbance activities.

---

[8] *See* Exhibit 2, https://www.siliconranch.com/infrastructure-and-energy-alternatives-inc-selected-by-silicon-ranch-to-construct-100-mw-solar-project-in-georgia/ (1/14/20 press release by IEA on the Silicon Ranch Corporation website) (**"**Infrastructure and Energy Alternatives, Inc. (NASDAQ: IEA) ("IEA" or the "Company") . . .  today announced that the Company has been awarded a 100-megawatt (MW) solar contract to construct the Lumpkin Solar Farm in Stewart County, Georgia.")

[9] *See* Exhibit 2, https://www.siliconranch.com/infrastructure-and-energy-alternatives-inc-selected-by-silicon-ranch-to-construct-100-mw-solar-project-in-georgia/ (1/14/20 press release by IEA on the Silicon Ranch Corporation website). (**"**IEA's scope of work includes the installation of owner furnished modules and full balance of system EPC construction . . ."  "To construct the facility, IEA will hire approximately 300 craft workers . . .").

[10] *See* Exhibit 7, www.westwoodps.com/locations.

30.

Defendant Westwood was charged by Silicon Ranch with the responsibility for designing the development plans for the Lumpkin solar facility and had responsibility, along with the other defendants, to "ensure" that no damage be done to Plaintiffs' downstream property.

## II. THE FACTS

31.

On March 16, 2021 Plaintiffs purchased a 1,630 acre property formerly known as Kawikee Refuge in Stewart County, Georgia.

32.

Kawikee Refuge had been managed for 30 years as a hunting and fishing preserve.

33.

The single greatest feature of Kawikee was a large 21 acre lake that was an exceptional fishing lake for bass and bream.

34.

In the 'big lake' at Kawikee it was routine to catch numerous bass over 5 pounds—the record was 12½ pounds, and numerous bream up to 2½ pounds.

35.

The big lake at Kawikee was beautiful and blue-green. It had been superbly maintained.  This is what the lake looked like when the Plaintiffs bought their property on March 16, 2021:

 

 



36.

The lake was pretty and its water was free from discoloration when Plaintiffs

bought the Kawikee property.

37.

From a photograph taken by Plaintiff Shaun Harris on March 27, 2021:



38.

From the time it was built in 2007-2008 the lake had virtually always been clear and green; it was never before the color of mud:



Google Earth 3/29/10



Google Earth 12/21/12

 

Google Earth 11/18/14                    Google Earth 12/03/19

39.

After Plaintiffs bought Kawikee defendants and their subcontractors began grading hundreds of acres upstream of Plaintiffs' property and lake for the Silicon Ranch solar panel facility.

40.

On April 1, 2021 it rained in Stewart County, Georgia.  Immediately increased volumes of water from the Silicon Ranch site traveling at increased velocity brought silt, sediment, and muddy water onto Plaintiffs' property which polluted the big lake, starting at the upper end, where a stream flowed into the lake from the Silicon Ranch property:



41.

The silt, sediment, and muddy water was obviously coming from the site of

defendants' land grading activities, shown upstream and in the background here:



42.

By Easter Sunday, April 4, 2021, the big lake was a mud hole:

14



43.

When defendants started grading the Silicon Ranch site they raced to clear it all as quickly as possible, without phasing the grading process so that erosion controls could keep pace with the land clearing.

44.

From a photograph of the Silicon Ranch site taken April 2, 2021:



45.

For the Lumpkin solar facility defendants have graded all vegetation away from at least 849 acres of land.[11]

46.

Defendants' land grading activities have increased both the volume and velocity of water leaving the Silicon Ranch property onto Plaintiffs' property, in

---

[11] *See* Exhibit 2, https://www.siliconranch.com/infrastructure-and-energy-alternatives-inc-selected-by-silicon-ranch-to-construct-100-mw-solar-project-in-georgia/ (1/14/20 press release by IEA on the Silicon Ranch Corporation website); Exhibit 8, 1/22/21 "Notice of Intent" (NOI) (GA EPD form) for "Lumpkin Solar". In that NOI the defendants, or some of them, represented to the State of Georgia that the "owner" of the project was "SR EPC, LLC, a Tennessee Limited Liability Company." "SR EPC, LLC" has never been the owner of the project, or of the land, or of anything at the site in Stewart County: that land has always been titled in the name of Silicon Ranch Corporation, which is the corporation that first obtained an option to purchase the land on April 19, 2018 and then bought the land on November 16, 2020.

addition to polluting Plaintiffs' property with silt, sediment, trash, and discolored water.

47.

Increasing the volume and velocity of the water leaving the Silicon Ranch property transposes the erosion *on* the Silicon Ranch property *to* Plaintiffs' own property, causing increased damage there.

48.

Defendants haste in grading hundreds of acres without real efforts to control erosion resulted from pressure applied by Walton EMC driven by that corporation's need to fulfill its obligations to Facebook.

49.

Defendants obviously believed that because there was no local issuing authority in Stewart County to regulate their activities, leaving only the Georgia EPD as the regulator, there was no need to worry about complying with the conditions of the Permit issued for the Silicon Ranch project or with the Georgia Water Quality Control Standards.

50.

 Defendants absolutely knew it was their duty not to pollute Plaintiffs' property and lake.

51.

Seven days before Plaintiffs bought Kawikee the Senior Vice President of defendant Silicon Ranch had stated in an email to the prior owners that the duty of Silicon Ranch and its contractors was to "*ensure* that your property and lakes are being adequately protected from *any* runoff" and that defendant IEA had the duty of "*ensuring no impact* to your property."[12]

52.

"Ensure" means "make sure that (a problem) does not occur."

53.

In their haste to quickly clear hundreds of acres and install their solar power project defendants had utterly failed to design *or* install adequate erosion controls.

54.

The paltry settlement ponds and silt fences defendants installed were overwhelmed by any and every rain event, sending muddy silt-loaded water and sediment down onto Plaintiffs' property and into the Plaintiffs' lake:

---

[12] *See* Exhibit 9, 3/9/21 email from Paul Russell, "Senior Vice President" of Silicon Ranch (emphasis added).










55.

The defendants' so-called 'erosion control' measures were nothing but a charade—an attempt to make it *look like* they were compliant with their duty to "ensure" no damage to their downstream neighbors, while avoiding the expenditure of time and money that would be required to actually "ensure" no damage was done.

56.

On April 24, 2021 another rain event turned the Plaintiffs' lake into a mud hole, with silt, sediment, and muddy water flowing from the Silicon Ranch project onto Plaintiffs' property and into Plaintiffs' lake:



57.

Once again defendants' paltry and insufficient erosion controls were overwhelmed:

 

58.

The water in Plaintiffs' once beautiful lake had been turned the color of mud:



59.

On May 3, 2021, yet another rain event turned the Plaintiffs' lake into a mud hole again.



60.

   In between the rain events the Plaintiffs' lake remained muddy, discolored, and filled with silt as a direct result of the defendants' land grading activities and failure to do that which was necessary to "ensure" no impact on Plaintiffs' property and no pollution of their lake.

61.

   On May 4, 2021, the Georgia Environmental Protection Division (EPD) declared that Silicon Ranch was in violation of the NPDES[13] Permit because of its discharge of silt and turbidity on to the property of Plaintiffs.

62.

   That Notice of Violation followed an April 27, 2021 inspection of the Silicon Ranch site by EPD.[14]

---

[13] "National Pollutant Discharge Elimination System."
[14] *See* 5/4/21 EPD letter to Silicon Ranch (emphasis added).

63.

The "violations" declared by the EPD included:

"Violation- The inspection revealed that sediment basins at the Site *have not been properly designed, installed or maintained* as required by the Erosion and Sedimentation Pollution Control Plan (ESPCP). Significant portions of the Site bypass these sediment basins and *have resulted in the discharge of sediment into state waters* during recent heavy rainfall events.[15] Additionally, silt fence installed in areas of concentrated flow along the southern property line *have become inundated with sediment and have failed resulting in a discharge of sediment from the Site."*

(Emphasis added.)

64.

The issuance of a Notice of Violation to a developer in this state by the

Georgia EPD is a remarkable and relatively unusual thing.

65.

In response to the EPD's Notice of Violation, the primary contractor for

Silicon Ranch, defendant IEA, *admitted the violations.*

---

[15] In that reference to "during recent heavy rainfall events" the EPD could not be more incorrect.  Silt, discolored water, and sediment has been discharged onto Plaintiffs' property whether it rained or not, as the photographic evidence shows.

66.

On May 7, 2021 IEA wrote to EPD that it had "observed failures of BMPs (best management practices) *resulting in the release of sediment to waters of the State.*"[16]

67.

Those "state waters" flow directly onto Plaintiffs' property and into Plaintiffs' lake.

68.

Those "state waters" flow from Plaintiffs' lake into Pataula Creek, a tributary of the Chattahoochee River, which flows into the Gulf of Mexico.

69.

In its May 7, 2021 letter response to EPD, sent by IEA on behalf of IEA and Silicon Ranch, IEA claimed that "repairs" would be made to the so-called "BMPs."[17]

70.

On May 12 another rain event occurred, this time less than ¾ inches of rain.  Silt, sediment, and muddy water continued to flow on to Plaintiffs' property and into the Plaintiffs' lake:

---

[16] *See* Exhibit 10, 5/7/21 letter to EPD from IEA (emphasis added).
[17] *See* Exhibit 10, 5/7/21 letter to EPD from IEA.



71.

On June 7, 2021, yet another minor rain event occurred; silt, sediment, and muddy water continued to flow on to Plaintiffs' property and into the Plaintiffs' lake:



72.

On June 11, 2021, Silicon Ranch filed with the Stewart County Superior

Court Clerk a document entitled "Memorandum of Solar Ground Lease."[18]

73.

In that "Memorandum of Solar Ground Lease" Silicon Ranch Corporation

revealed that it had attempted to offload all liability for the violations and the

damages to Plaintiffs onto a shell corporation owned by Silicon Ranch Corporation

and named "SR Lumpkin, LLC."

74.

Silicon Ranch took that action *after* the EPD had declared Silicon Ranch in

"violation" of the Permit because of the conduct addressed herein.

75.

On June 13, 2021, yet another minor rain event occurred, this time with

about ½ inch of rain.  Silt, sediment, and muddy water continued to flow from the

Silicon Ranch site on to Plaintiffs' property and into the Plaintiffs' lake:

---

[18] *See* Exhibit 4, ("Memorandum of Solar Ground Lease" executed 6/11/21 and
filed of record with the Stewart County Superior Court Clerk on 6/16/21).



76.

On the weekend of June 19-20 about 3 inches of rain fell.  This was *a month and a half after* the EPD had declared defendants in "violation" of the permit and defendants had pledged to "repair" their erosion controls.

77.

Once again defendants' erosion control measures were overwhelmed and silt, sediment, and muddy water continued to flow on to Plaintiffs' property and into the Plaintiffs' lake:






78.

The deposition of silt, sediment, and muddy water on to Plaintiffs' property and into the Plaintiffs' lake on the weekend of June 19-20 was so bad trash and sediment was deposited *on top* of a dock in the lake:

28



79.

On June 27, 2021, there was a rain of 7/8".  This was the result to Plaintiffs'

lake (6/27/21 photograph):



80.

It no longer matters whether there's rain or not:  Plaintiffs' lake is always

turbid, afflicted by silt, and discolored to a reddish-brown color, the color of the

red clay laid bare on the Silicon Ranch property by the defendants' grading

activities (6/25/21 photographs):





81.

There is no doubt where ***all*** of the mud, silt, turbidity, and red discolored water is coming from—the Silicon Ranch property and project (6/25/21 photograph):

 

82.

Not just Plaintiffs' lake has been damaged—the stream on Plaintiffs' property that leads into Plaintiffs' lake from Silicon Ranch's property has been devastated—with sediment buildup and trash washed from the Silicon Ranch site.

83.

From photographs taken June 27, 2021:

 

84.

The stream flowing from the defendants' development tract into Plaintiffs' lake had never before looked so muddy and strewn with sediment.

85.

Photograph taken June 30, 2021 at a point over one mile downstream from the Silicon Ranch tract:



86.

Shown in the above photograph is Scott Badcock of Columbus, who for 25 years was the Manager of Kawikee Refuge. Mr. Badcock can attest that the stream never looked anything remotely like that before defendants began their project upstream.

87.

Tributaries of that stream that flow from Plaintiffs' own property flow clear.

88.

From a photograph taken on April 8, 2021:



89.

From a photograph taken June 30, 2021 showing Plaintiff Shaun Harris:



90.

Piles of sediment from the Silicon Ranch project have been deposited in the stream going into Plaintiffs' lake a full mile from the Silicon Ranch tract.

91.

From a photograph taken June 30, 2021 showing sediment on both sides of the stream and in the woods, far above where the top of the water in the stream was on that date:



92.

From a photograph taken June 30, 2021, showing Plaintiff Shaun Harris pointing to a pile of sediment fully one mile downstream from the Silicon Ranch tract:



93.

At that same location, this June 30, 2021 photograph depicts a tributary

flowing into the stream from Plaintiffs' property, with water that is clear:



94.

The photographs in the following paragraphs 95 through 97 show comparisons of the same sites in the stream on Plaintiffs' property, and depict the buildup of sediment in the stream in just a couple of months.

95.

On the left is a photograph taken April 25, 2021; on the right a photograph taken two months later, on June 27, 2021.  Note the small log under the larger log —in two months it was nearly inundated by sediment from the Silicon Ranch site:

 

96.

On the left is a photograph taken April 8, 2021—note the complete absence of any sediment in the woods along the stream.  On the right is a photograph taken June 27, 2021—sediment from the Silicon Ranch site has filled the stream bank and been deposited far into the adjoining woods:

 

97.

On the left is a photograph taken April 10, 2021, showing a pool in the stream made muddy by defendants, downstream from the Silicon Ranch property, and hay bales that have washed far downstream from the Silicon Ranch site.  On the right is a photograph of the same location taken June 21, 2021—the pool has disappeared, filled in by a sea of sediment from the Silicon Ranch site.

 

98.

The defendants have described what has happened to Plaintiffs' land and lake as a "temporary inconvenience."

99.

The defendants have steadfastly refused to even admit to Plaintiffs that there is a problem.

100.

The defendants have refused to admit to Plaintiffs that they, the defendants, caused the problem.

101.

The defendants have proposed that Plaintiffs spend their own money to install and constantly clean and maintain a "turbidity curtain" on their property at the headwaters of their lake.

102.

The problem defendants have created will not go away absent intervention by the Court.

103.

Plaintiff Shaun Harris took this drone photograph of Plaintiffs' lake on July 13, 2021:



104.

In late July, 2021 defendants sent trucks and crews to the stream flowing

from the Silicon Ranch property to *pressure wash* sediment and attempt *to vacuum*

*up the evidence of sediment* sent downstream by defendants:



 

105.

The above two photographs show crews sent by defendants trespassing on Plaintiffs' property without defendants ever even asking permission or contacting Plaintiffs.

106.

That activity created a muddy mess and sent more sediment downstream onto Plaintiffs' property and into the stream and lake on Plaintiffs' property:



107.

That activity was intended solely to create the appearance that defendants were doing *something* about the problem they had created.

108.

That activity was an admission that there was a sediment problem and that the problem *was created by defendants*.

109.

That pressure washing and vacuuming activity left roots of trees exposed, meaning those trees will die which will further destabilize the stream banks causing yet more erosion and sedimentation onto Plaintiffs' property:



110.

None of the defendants had any kind of permit from anyone to do that pressure washing and vacuuming activity.

111.

The NPDES Permit issued to Silicon Ranch requires that defendants sample storm water discharges and test them for turbidity.

112.

Defendants should be measuring the Nephelometric Turbidity Units (NTUs) of those samples and keeping records of those levels.

113.

The defendants have refused to provide any sampling records to Plaintiffs.

114.

The obvious reason defendants have refused to provide sampling records to Plaintiffs is because those records prove defendants have polluted Plaintiffs' property and violated the law.

### III.   SILICON RANCH'S ATTEMPTED EVASION OF RESPONSIBILITY

115.

The June 11, 2021 filing with the Clerk of Court of the document entitled "Memorandum of Solar Ground Lease" was nothing but an attempt by Silicon Ranch to evade responsibility for the damage it knew it had caused and was causing to Plaintiffs' property.

116.

The "Memorandum of Solar Ground Lease" was signed for the "landlord" Silicon Ranch Corporation by "D. Reagan Farr, President and Chief Executive Officer".

117.

That same person—"D. Reagan Farr, President and Chief Executive Officer" of Silicon Ranch Corporation—also signed that document for the "tenant", SR Lumpkin, LLC:

LANDLORD:

SILICON RANCH CORPORATION,
a Delaware corporation

By:
Name: D. Reagan Farr
Title:  President and  Chief Executive
Officer

TENANT:

SR LUMPKIN, LLC,
a Delaware limited liability company

By:
Name:  D. Reagan Farr
Title:  President and Chief Executive  Officer

118.

In that June 11, 2021 "Memorandum of Solar Ground Lease", Silicon Ranch
sought to disavow any responsibility for the solar project.

119.

The "Memorandum of Solar Ground Lease" stated that "[t]he Site shall be
used by Tenant for constructing, installing, repairing, removing and operating a
solar electric generating system and all uses in connection therewith."[19]

120.

That was false:  prior to June 11, 2021 "SR Lumpkin, LLC" had had nothing
to do with the Lumpkin solar facility solar project.

---

[19] *See* Exhibit 4, ¶4 ("Memorandum of Solar Ground Lease" executed 6/11/21 and
filed of record with the Stewart County Superior Court Clerk on 6/16/21).

121.

After June 11, 2021, "SR Lumpkin, LLC" had had nothing to do with the Lumpkin solar facility solar project.

122.

"SR Lumpkin, LLC" owned no property in Stewart County, Georgia.

123.

Prior to June 11, 2021, "SR Lumpkin, LLC" had no interest in any property in Stewart County, Georgia.

124.

After June 11, 2021, "SR Lumpkin, LLC" had no employees working at Silicon Ranch's Lumpkin solar facility.

125.

"SR Lumpkin, LLC" has done no "constructing, installing, [or] repairing" of any "solar electric generating system."

126.

"SR Lumpkin, LLC" had and has no contract with IEA or IEAC to build the Lumpkin solar facility.

127.

"SR Lumpkin, LLC" had and has no contractual relationship with IEA or IEAC.

128.

"SR Lumpkin, LLC" had and has no contract with Westwood.

129.

"SR Lumpkin, LLC" had and has no contractual relationship with Westwood.

130.

"SR Lumpkin, LLC" has had no involvement with the Georgia EPD.

131.

"SR Lumpkin, LLC" had not applied for nor received any permit to engage in land disturbing activities in Stewart County, Georgia.

132.

"SR Lumpkin, LLC" has no employees.

133.

"SR Lumpkin, LLC" has no assets.

134.

"SR Lumpkin, LLC" is entirely controlled by the executives of Silicon Ranch.

135.

The pretense Silicon Ranch sought to create that "SR Lumpkin, LLC" was responsible for the Lumpkin solar facility is totally contrary to all public representations made by Silicon Ranch before the damage was done to Plaintiffs' property.

136.

For example, in a 12/19/19 press release on its website Walton EMC represented that "Silicon Ranch will fund, construct, own, operate, and maintain" the Lumpkin Solar Farm."[20]

137.

For example, in a 1/14/21 press release Silicon Ranch represented that "Silicon Ranch is funding the installation of the Lumpkin solar facility  and *will own and operate* the solar array for the long-term"  and that *"Silicon Ranch owns and operates every project in its portfolio . . ."*[21]

---

[20]  *See* Exhibit 1, 12/19/19 "Press Release" posted on Walton EMC website by Walton EMC and Silicon Ranch.
[21] *See* Exhibit 2, https://www.siliconranch.com/infrastructure-and-energy-alternatives-inc-selected-by-silicon-ranch-to-construct-100-mw-solar-project-in-georgia/ (1/14/20 press release by IEA on the Silicon Ranch Corporation website). (Emphasis added).

138.

In that June 11, 2021 "Memorandum of Solar Ground Lease" the "parties" thereto—"landlord" Silicon Ranch Corporation, with Reagan Farr signing for it, and "tenant" SR Lumpkin, LLC, with Reagan Farr signing for it—'agreed' "that the Project . . . will be deemed personal property owned by Tenant and Landlord disclaims any interest therein" and that "Tenant is the exclusive owner of the Project . . ."[22]

139.

In that June 11, 2021 "Memorandum of Solar Ground Lease" the "parties" further agreed that "[a]ny repair or maintenance of the Project will be completed by and for Tenant, at its sole cost and expense, for Tenant's benefit as legal and beneficial owner of the Project."[23]

140.

The crucial words in that "Memorandum of Solar Ground Lease" are "repair" and "repairing."[24]

---

[22] *See* Exhibit 4, "Memorandum of Solar Ground Lease" at ¶6.
[23] *Id.* at ¶ 6.
[24] The "parties" agreed that "[a]ny repair or maintenance of the Project will be completed by and for Tenant, at its sole cost and expense, for Tenant's benefit as legal and beneficial owner of the Project." (Memorandum of Solar Ground Lease at ¶6.)  The parties further agreed that "[t]he Site shall be used by Tenant for constructing, installing, repairing, removing and operating a solar electric generating system and all uses in connection therewith." (*Id.* at ¶4.)

141.

Those words are an admission by Silicon Ranch that defendants' conduct had damaged Plaintiffs, and that Silicon Ranch had obligations to "repair" that damage.

142.

By that "Memorandum of Solar Ground Lease" Silicon Ranch sought to escape those obligations, or at least throw a hurdle in the way of Plaintiffs' attempts to enforce those obligations.

143.

The conduct of Silicon Ranch viz "SR Lumpkin, LLC" is a classic corporate shell game.

144.

There was no legitimate reason or excuse for the conduct of Silicon Ranch CEO Reagan Farr in attempting to "lease" the Lumpkin solar facility to a subsidiary "LLC."

145.

If defendant Silicon Ranch claims there was any legitimate excuse for that conduct and for that "Memorandum of Ground Lease" then surely Silicon Ranch will explain that excuse to this Court in its answer to this Complaint.

146.

Clearly by June 11, 2021, the defendants, and especially Silicon Ranch, had

been told by the experts retained by their lawyers what the cost would be to fulfill

Silicon Ranch's pledges to "ensure" that Plaintiffs' property and lakes "are being

adequately protected" and "ensuring no impact to your property."

147.

Clearly then on June 11, 2021 Silicon Ranch had no intention of undertaking

the effort and expense of repairing the damage done and "ensuring" no further

damage was done.

148.

That is why after June 11, 2021 the defendants continued to deny that there

was any problem, and continued to deny that they had caused any problem.

149.

Clearly defendants had and have no intention of doing what is necessary to

permanently abate the nuisance they have created which continues to damage

Plaintiffs' property.

150.

Clearly Silicon Ranch had made the corporate decision to try to offload its

responsibility and liability on to a shell corporation with no assets and no

employees, rather than trying to do the right thing—to "ensure" no damage to their downstream neighbors, the Plaintiffs.

151.

The "solar ground lease" whereby Silicon Ranch Corporation set up an LLC and attempted to offload its liability onto that LLC was also an admission that Silicon Ranch Corporation and its contractors had no intention of complying with the Permit or of remedying the "violation" found by the EPD.

152.

Defendant Silicon Ranch Corporation is in the habit of trying to shield itself from liability that it anticipates will result from its own conduct by offloading supposed 'ownership' and repair/remediation duties on to shell corporations it creates which have no assets and no employees.

153.

*Silicon Ranch has registered at least* **thirty** *such "LLCs" with the Georgia Secretary of State*.[25]

---

[25]*See* Exhibit 11, Silicon Ranch and "SR" Corporations registered with the Georgia Secretary of State.

154.

There's only one reason for a corporate developer to have such a pattern and practice of establishing empty shell subsidiary corporations—to escape liability for conduct the corporate developer *expects to result in liability*.

155.

That pattern and practice necessarily means that the corporate developer, here Silicon Ranch Corporation, knew that its conduct would damage others.

156.

Silicon Ranch Corporation's use of asset-less LLC subsidiaries is a fraud, intended to try to escape expected liability for grievous misconduct by fraudulent transfers of assets.

## IV. <u>NO ENTITY HAD A LEGITIMATE PERMIT TO ENGAGE IN THE ACTIVITIES THAT HAVE DAMAGED PLAINTIFFS' PROPERTY</u>

157.

The pretense Silicon Ranch sought to create that "SR Lumpkin, LLC" was responsible for "repairing" past and future damage done to Plaintiffs and their property is akin to the false representation Silicon Ranch made to the State of Georgia when Silicon Ranch sought an NPDES (land disturbance) Permit for the Lumpkin solar facility project.

158.

In the "Notice of Intent" ("NOI") form required by the Georgia EPD Silicon Ranch represented that the "owner" of the project was "SR EPC, LLC, a Tennessee Limited Liability Company."

159.

That representation was false.

160.

"SR EPC, LLC" has never been the owner of the project, or of the land, or of anything at the site in Stewart County.

161.

The land on which the "Lumpkin Solar Project" is located has always been titled in the name of Silicon Ranch Corporation, which is the corporation that first obtained an option to purchase the land on April 19, 2018 and then bought the land on November 16, 2020.

162.

On May 26, 2021, Silicon Ranch caused the NOI to be changed to show that IEA Constructors, LLC was the "owner" of the property on which the Lumpkin solar project is located.

163.

That representation was false:  IEA Constructors, LLC has never been the "owner" of the property on which the Lumpkin solar project is located.

164.

No one who is an "owner" of the property on which the defendants' solar project is located *has ever had a permit* to engage in grading/land disturbing activities there.

165.

No one who is or would ever be an actual "operator" of the Lumpkin solar facility has ever had a permit to engage in grading/land disturbing activities there.

166.

Up until June 4, 2021 no entity that even claimed to be the "operator" of the Lumpkin solar facility had any permit to engage in land disturbing activities on the property owned by Silicon Ranch Corporation.

167.

On June 4, 2021 Silicon Ranch caused the NOI to be changed to show that IEA Constructors, LLC was the "operator" of the Lumpkin solar facility.

168.

The representation was false.

169.

IEA Constructors, LLC was never the "operator" of the Lumpkin solar facility; at most it was merely the contractor for Silicon Ranch (the actual contractor, according to the defendants' own public representations, was defendant IEA, not its subsidiary IEAC).

170.

No named defendant, and no other person or entity, has ever had a legal permit to engage in grading/land disturbing activities on the property on which Lumpkin solar project is located.

171.

The defendants' grading/land disturbing activities on the property on which the defendants' solar project is located are entirely illegal, that is to say, not permitted.

172.

From the inception of grading and land disturbing activities by the defendants until June 4, 2021, no one who defendants even claimed was an "operator" had a permit to engage in those activities.

173.

Plaintiffs bought their property during that time period—on March 16, 2021.

174.

During that time period prior to June 4, 2021 Plaintiffs complained to defendants about the damage defendants were causing to Plaintiffs' property.

175.

The only part of the Lumpkin solar facility site that is properly permitted is the small ten acre tract occupied by the power substation.

176.

The only part of the Lumpkin solar facility site that *has ever been* properly permitted is the small ten acre tract occupied by the power substation.

177.

The power substation occupies only ten acres of the approximately 1,460 acres bought and owned by Silicon Ranch.

178.

Silicon Ranch made application for an NPDES permit for the ten acres where that power substation is located *in its own name*—on June 16, 2021.  Silicon Ranch made that application just five days *after* it had attempted to dodge responsibility and liability by execution on June 11, 2021 of the "Solar Ground

Lease" whereby Silicon Ranch sought to offload liability on to its wholly owned subsidiary corporation "SR Lumpkin, LLC".[26]

179.

The only difference between the land where that substation is located and the rest of the property owned by Silicon Ranch is this:  the ground where the substation is located is not in the watershed that flows onto Plaintiffs' property and into Plaintiffs' lake; much of the rest of the land bought and owned by Silicon Ranch is in that watershed.

180.

The significance of the contrast *between* Silicon Ranch itself applying for the NPDES permit for the ten acre power substation site which is outside the watershed that flows on to Plaintiffs' property *and* Silicon Ranch misrepresenting to the Georgia EPD that the "owner" of the rest of the 1,460 acre Silicon Ranch property was an asset-less subsidiary LLC ("SR EPC, LLC") is obvious:  Silicon Ranch knew that its grading activities *would cause* damage to downstream property owners and Silicon Ranch was playing its corporate shell game to deflect liability and responsibility.

---

[26] *See* Exhibit 12, 6/16/21 "Notice of Intent" (Georgia EPD form), application for NPDES permit for the substation at the Lumpkin solar facility.

## V.  **DAMAGES**

### 181.

It is well established by law and environmental science that turbidity is a pollutant that causes harm to water quality, ecological productivity, recreational values, and habitat quality.

### 182.

Causing turbidity in the waters of and deposition of silt and sediment into an aquatic habitat like Plaintiffs' lake creates much more than a "temporary inconvenience."

### 183.

The U.S. Environmental Protection Agency states that

"[H]igher turbidity increases water temperatures because suspended particles absorb more heat.  This, in turn, reduces the concentration of dissolved oxygen (DO) because warm water holds less DO than cold.  Higher turbidity also reduces the amount of light penetrating the water, which reduces photosynthesis and the production of DO.  Suspended materials can clog fish gills, reducing resistance to disease in fish, lowering growth rates, and affecting egg and larval development.  As the particles settle, they can blanket the stream bottom, especially in slower waters, and smother fish eggs and benthic macroinvertebrates."[27]

---

[27]*Turbidity: What is turbidity and why is it important?*, U.S. Environmental Protection Agency, https://archive.epa.gov/water/archive/web/html/vms55.html.

184.

These are serious concerns for the owner of an established and exceptional fishing lake like Plaintiffs' lake had been before defendants commenced their grading and land disturbance activities.

185.

Part I.D.4 of the NPDES Permit issued to Silicon Ranch specifically incorporates the Georgia Water Quality Standards into the Permit and explicitly prohibits discharges that cause violations of "Georgia's in-stream water quality standards as provided by the Rules and Regulations for Water Quality Control."

186.

Rule 391-36-6-.03.(5)(d) of the Georgia Water Quality Standards addresses "Turbidity" and requires that "[a]ll waters *shall be free from turbidity which results in a substantial visual contrast* in a water body due to a man-made activity."  (Emphasis added.)

187.

Defendants cannot honestly deny that there is "turbidity" in the stream and lake on Plaintiffs' property that is in "substantial visual contrast" to the condition of those waters prior to defendants commencing their grading activity.

188.

Defendants cannot honestly deny that they have caused the turbidity that afflicts the state waters flowing through Plaintiffs' property and afflicts Plaintiffs' lake.

189.

Rule 391-3-6-.03 of the Georgia Water Quality Standards contains two subparagraphs within paragraph (5) "General Criteria for All Waters" which address discharges of discolored water.

190.

Rule 391-3-6-.03(5)(c) states "All water shall be free from material related to municipal, industrial or other discharges *which produce turbidity, color*, *odor or other objectionable conditions* which unreasonably interfere with the designated use of the water body."  (Emphasis added.)

191.

"Designated Uses" include "protection and propagation of fish, shellfish and wildlife", and "recreation."  Ga. Comp. R. & Regs. 391-3-6-.03(4).

192.

Defendants cannot honestly deny that their conduct and their pollution of Plaintiffs' property has interfered with and will continue to interfere with those uses of that property.

193.

Defendants cannot honestly deny that they are in violation of the Georgia Water Quality Standards.

194.

Defendants cannot honestly deny that *it is their own activities* which have caused turbidity, discoloration of the water, deposition of sediment onto Plaintiffs' property, and interference with Plaintiffs' full enjoyment and use of their property.

195.

Defendants Silicon Ranch Corporation and IEA have taken the position that it is permissible for them to cause silt, turbidity, and discolored water to be discharged from the Silicon Ranch property onto Plaintiffs' property.

196.

Defendants are wrong as a matter of law, equity, and justice.

197.

Defendants' conduct in damaging the property and lake of Plaintiffs was intentional.

198.

It was foreseeable to defendants that their conduct in grading away topsoil on hundreds of acres, leaving nothing but red clay subsoil, would increase both the volume and velocity of water leaving the Silicon Ranch site.

199.

It was foreseeable to defendants that their conduct in grading away topsoil on hundreds of acres would cause erosion on the Silicon Ranch property that would pollute Plaintiffs' property.

200.

Defendants knew that much of the land owned by Silicon Ranch is classified as highly erodible soil:



Source: 4/13/21 "Web Soil Survey" prepared by the Natural Resources Conservation Service (NRCS), United States Department of Agriculture.[28]

---

[28] *See* Exhibit 13, 4/13/21 "Web Soil Survey", NRCS/USDA.

201.

That NRCS map shows the stream, in blue, that leads from the Silicon Ranch site onto Plaintiffs' property and into Plaintiffs' lake.  The soil depicted as red in color is rated "very severe" in terms of erosion potential, that in orange is "severe," that in yellow is "moderate."

202.

The "description" within the NRCS report states as follows: "'very severe' erosion indicates that significant erosion is expected, loss of soil productivity and *off-site damage are likely, and erosion-control measures are costly and generally impractical.*"  (Emphasis added.)

203.

Defendants knew when they graded the highly erodible soil identified by the NRCS as having "very severe" erosion potential that "off-site damage" was "likely" and that erosion control measures are "generally impractical" with such soil.

204.

Defendants knew when they graded the highly erodible soil identified by the NRCS as having "very severe" erosion potential that the "likely" "off-site damage" would be inflicted upon their downstream neighbors' properties, including the Plaintiffs' property.

205.

The "description" within the NRCS report states as follows: "'severe' indicates that erosion is very likely and that erosion-control measures, including revegetation of bare areas, are advised."

206.

Defendants knew when they graded the highly erodible soil identified by the NRCS as having "severe" erosion potential that defendants' so-called 'erosion control' measures were inadequate.

207.

Defendants knew when they graded the highly erodible soil identified by the NRCS as having "severe" erosion potential that defendants had no intention of revegetating the scraped bare soil quickly enough or well enough to mitigate the ongoing damage to Plaintiffs' property.

208.

Defendants have graded away all vegetative cover on land that is classified by the NRCS as having "very severe" or "severe" erosion potential.

209.

Defendants did that (the conduct referenced in the preceding paragraph) knowingly and intentionally.

210.

Defendants' own hydrology study created before their extensive grading began showed that their grading activities would result in a significantly increased volume of water being discharged from the Silicon Ranch property as compared to natural discharge of water therefrom.

211.

Despite the obvious damage to Plaintiffs' property—evident to anyone who looks—defendants have not revegetated the bare ground they have stripped clean of vegetation.

212.

It was foreseeable to defendants that the haste to grade hundreds of acres of highly erodible soil combined with the absence of stringent and effective erosion control measures sufficient to "ensure" no damage to Plaintiffs' property would inevitably cause severe damage to Plaintiffs' property and lake.

213.

Defendants have refused to acknowledge that they have caused and are causing damage to Plaintiffs and to Plaintiffs' property.

214.

Defendants' misconduct and pollution of Plaintiffs' property and lake has materially and severely diminished the use and enjoyment of that property and lake by Plaintiffs.

215.

Defendants' misconduct has made necessary the future expenditure of extraordinary sums of money to repair and remediate the damage, such as the deposition of sediment and silt on Plaintiffs' property, both in the stream that flows into Plaintiffs' lake and in the lake itself.

216.

Defendants' misconduct has significantly diminished the value of Plaintiffs' property, as the lake and area around it was the most attractive feature of the property Plaintiffs bought and for which Plaintiffs paid $3,311,030.93 on March 16, 2021.

## VI. LAW

217.

"Suggested Pattern Jury Instructions," Fifth Edition 2021, Council of Superior Court Judges of Georgia:

**46.010 Nuisances; Definition**

A nuisance is anything that causes hurt, inconvenience, or damage to another. The fact that the act done may otherwise be lawful shall not keep it

from being a nuisance. The inconvenience complained of shall not be fanciful or such as would affect only one of extraordinary or demanding taste, but it shall be such as would affect an ordinary, reasonable person. O.C.G.A. §41-1-1.

46.030 **Nuisances; Reasonable Use of Property, Duty of**
The privilege of use incident to the right of property must not be exercised in an unreasonable manner so as to inflict injury upon another unnecessarily. To constitute a nuisance, the use must be such as to produce actual, tangible, and substantial injury to neighboring property or such as to interfere sensibly with its use and enjoyment by persons of ordinary sensibilities.
*Holman v. Athens Empire Laundry Co.,* 149 Ga. 345 (1919).
*Gordy v. Armstrong,* 190 Ga. 670, 679 (1940).

218.

"[T]he obligation imposed on every member of society by law [is] to conduct himself and use his property as not to injure others."   A person is under a duty so to use his own property as not to injure another. *Smith v. Clarke Hardware*, 100 Ga. 163, 28 S.E. 73 (1897); *City of Albany v. James*, 39 Ga. App. 379, 147 S.E. 396 (1929).

219.

Every act of another which unlawfully interferes with one's right of enjoyment or possession of her own property is a tort for which an action shall lie. O.C.G.A. § 51-9-1 *et seq*.; O.C.G.A. § 51-10-1 *et seq*.; *Berger v. Plantation Pipeline Co.,* 121 Ga. App. 362, 364, 173 S.E.2d 752 (1970).

220.

Private property cannot be physically harmed or its value impaired, however socially desirable the conduct, without payment being made for the harm done, if the interference that is the consequence of the activity is substantial and considered to be unreasonable.  *Sumitomo Corp. v. Deal,* 256 Ga. App. 703 (2002); *Fielder v. Rice Constr. Co.,* 239 Ga. App 362 (1999).

221.

A trespass is an unauthorized entry on the property of another, without the consent of the owner of the property on which the alleged trespass is committed. *Webster v. Snapping Shoals Electric Membership Corp.*, 176 Ga. App. 265 (1985); *Shaheen v. G & G Corp.*, 230 Ga. 646 (1973); *Kingsley Mill Corp. v. Edmonds*, 208 Ga. 374 (1951); *Gill v. First Christian Church, Atlanta, Georgia, Inc.,* 216 Ga. 454 (1960); *Southern Mutual Investment Corp. v. Langston*, 128 Ga. App. 671 (1973); *Roughton v. Theile Kaolin Co.*, 209 Ga. 577 (1953).

222.

"In the case of a nuisance involving runoff of surface water, 'actual damages as such, i.e., injuries, are evidenced by a showing that the property owners are deprived of the full use and enjoyment of their property by the increased flow of surface waters or sediments on it.'"  *Baumann v. Snider*, 243 Ga. App. 526, 528, 532 S.E.2d 468, 472 (2000).

223.

Pursuant to the *Georgia Water Quality Control Act*, the term 'Waters' or

'waters of the state' means any and all rivers, streams, creeks, branches, lakes,

reservoirs, ponds, drainage systems, springs, wells, and all other bodies of surface

or subsurface water, natural or artificial, lying within or forming a part of the

boundaries of the state which are not entirely confined and retained completely

upon the property of a single individual, partnership, or corporation.  O.C.G.A. §

12-5-22(13).

224.

Pursuant to the *Georgia Water Quality Control Act - Rules and Regulations*

promulgated by the Georgia Department of Natural Resources Environmental

Protection Division:

> All waters of the state *shall be free from* material related to municipal,
> industrial *or other discharges which produce turbidity, color, odor or other
> objectionable conditions* which interfere with legitimate water uses; and
>
> *All waters of the state shall be free from turbidity which results in a substantial
> visual contrast in a water body due to man-made activity.*

O.C.G.A. § 12-5-22(13); Rules and Regulations § 391-3-6-03(5) (emphasis added.)

225.

Compliance with regulations does not prohibit a jury from concluding an

activity is a nuisance.  *Sumitomo Corp. v. Deal*, 256 Ga. App. 703 (2002); *Galaxy*

*Carpet Mills, Inc. v. Massengill*, 255 Ga. 360 (1986); *Stone Man Inc. v. Green*, 263 Ga. 470 (1993).

## VII. SERVICE OF PROCESS

226.

Defendant Silicon Ranch Corporation is a foreign corporation organized and incorporated under the laws of Delaware with its principal place of business located at 222 Second Avenue South, Suite 1900, Nashville, Tennessee 37201. Defendant has been authorized to transact business in the State of Georgia and may be served with process by serving its registered agent CT Corporation System located at 289 S. Culver Street, Lawrenceville, Gwinnett County, Georgia 30046.

227.

Defendant "SR Lumpkin, LLC" is a foreign corporation organized and incorporated under the laws of Delaware with its principal place of business located at 222 Second Avenue South, Suite 1900, Nashville, Tennessee 37201. Defendant has been authorized to transact business in the State of Georgia and may be served with process by serving its registered agent CT Corporation System located at 289 S. Culver Street, Lawrenceville, Gwinnett County, Georgia 30046.

228.

Defendant Infrastructure and Energy Alternatives, Inc. ("IEA, Inc.") is a foreign corporation organized and incorporated under the laws of Delaware with its

principal place of business located at 6325 Digital Way, Suite 460, Indianapolis, Indiana 46278.  Defendant IEA, Inc. has not been authorized to transact business in the State of Georgia and may be served with process by serving its registered agent CT Corporation System located at 334 North Senate Avenue, Indianapolis, IN 46204.   IEA Inc. is the parent company of IEA Constructors, LLC.

229.

Defendant IEA Constructors, LLC ("IEAC") is a foreign corporation organized and incorporated under the laws of Wisconsin with its principal place of business located at 6325 Digital Way, Suite 460, Indianapolis, Indiana 46278. Defendant IEAC has been authorized to transact business in the State of Georgia and may be served with process by serving its registered agent CT Corporation System located at 289 S. Culver Street, Lawrenceville, Gwinnett County, Georgia 30046.

230.

Defendant Westwood Professional Services, Inc. is a foreign corporation organized under the laws of Minnesota with its principal place of business located at 12701 Whitewater Drive, Suite 300, Minnetonka, Minnesota 55343. Defendant has been authorized to transact business in the State of Georgia and may be served with process by serving its registered agent CT Corporation System located at 289 S. Culver Street, Lawrenceville, Gwinnett County, Georgia 30046.

## VIII. <u>JURISDICTION AND VENUE</u>

231.

This case is filed in this Court because there is complete diversity amongst the parties hereto.

232.

There is complete diversity because the defendants have refused to identify those subcontractors for Silicon Ranch and IEA who should be also defendants in this case. Defendants have refused to identify those persons because some of them are residents of Georgia, and inclusion of them as defendants would have eliminated diversity of citizenship and would have prevented removal of this lawsuit to federal court had this case been filed in the Superior Court of Stewart County.

233.

The subcontractors who defendants have refused to identify include those who have been responsible for grading, or erosion & sedimentation controls, or the construction of detention/settlement ponds, or the redesign and reconstruction/repair of detention/settlement ponds.

234.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as no plaintiff shares a state of citizenship with any defendant and the amount in controversy exceeds the sum or value of $75,000.

235.

Venue is appropriate pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claims at issue occurred within this judicial district.

236.

Defendant Silicon Ranch Corporation is subject to the jurisdiction of this Court because it regularly transacts and conducts business in this State, including business related to solar developments such as the Lumpkin Solar Farm.  Silicon Ranch Corporation owns, uses, and possesses property in this State, including property involved in this suit.  Plaintiffs' injuries, which occurred in Georgia, arise out of and relate to Silicon Ranch Corporation's contacts with Georgia and its tortious conduct committed in this State.

237.

Defendant SR Lumpkin, LLC is subject to the jurisdiction of this Court because its owner Silicon Ranch Corporation claims that SR Lumpkin, LLC transacts and conducts business in this State, including business supposedly

related to the Lumpkin Solar Farm.  If such claims by Silicon Ranch Corporation are true then Plaintiffs' injuries, which occurred in Georgia, arise out of and relate to SR Lumpkin, LLC's contacts with Georgia and its tortious conduct committed in this State.

238.

Defendant Infrastructure and Energy Alternatives, Inc. is subject to the jurisdiction of this Court because it regularly transacts and conducts business in this State, including business related to the construction of solar developments such as the Lumpkin Solar Farm.  Plaintiffs' injuries, which occurred in Georgia, arise out of and relate to Infrastructure and Energy Alternative, Inc.'s contacts with Georgia and its tortious conduct committed in this State.

239.

Defendant IEA Constructors, LLC is subject to the jurisdiction of this Court because it regularly transacts and conducts business in this State, including business related to the construction of solar developments such as the Lumpkin Solar Farm.  Plaintiffs' injuries, which occurred in Georgia, arise out of and relate to IEA Constructors, LLC's contacts with Georgia and its tortious conduct committed in this State.

240.

Defendant Westwood Professional Services, Inc. is subject to the jurisdiction of this Court because it regularly solicits, transacts, and conducts business in this State, including business related to the design of the Lumpkin Solar Farm. Plaintiffs' injuries, which occurred in Georgia, arise out of and relate to Westwood Professional Services, Inc.'s contacts with Georgia and its tortious conduct committed in this State.

## IX. CLAIMS FOR RELIEF

## COUNT ONE: NUISANCE

(All Defendants)

241.

Plaintiffs re-allege and reincorporate Paragraphs 1-240 as if fully set forth herein verbatim.

242.

Defendants' land disturbance and development activities on the Silicon Ranch site have resulted in the continuous and excessive discharge of water, eroded soils, silt, sediment, debris, muddy water, and other pollutants from their development site and onto Plaintiffs' property.

243.

These continuous and excessive discharges have caused damage to Plaintiffs and their property and have interfered with Plaintiffs' full use and enjoyment of their property as they see fit.  That damage to the Plaintiffs and their property is substantial, material, and unreasonable.

244.

Defendants' continuous and excessive discharges of water, eroded soils, silt, sediment, debris, and muddy water from their development site and onto Plaintiffs' property constitutes a continuing private nuisance within the meaning of O.C.G.A. § 41-1-1 for which defendants are liable to Plaintiffs.

245.

As a direct and proximate result of defendants' creating and maintaining a continuing nuisance, Plaintiffs and their property have been damaged.  Plaintiffs have suffered pecuniary and property damages and should be compensated in an amount and manner to be determined at trial.

## COUNT TWO: TRESPASS

(All Defendants)

246.

Plaintiffs re-allege and reincorporate Paragraphs 1-245 as if fully set forth herein verbatim.

79

247.

As a result of defendant's land clearing and development activities on the Lumpkin Solar site, defendants have knowingly, willfully and intentionally discharged excessive volumes of water, eroded soils, silt, sediment, muddy water, and other pollutants onto Plaintiffs' property and violated Plaintiffs' right to exclusive possession of their property.

248.

These invasions of Plaintiffs' property and Plaintiffs' property rights caused by defendants' actions and omissions were not in any way sanctioned or permitted by Plaintiffs at any time.

249.

These un-permitted invasions of Plaintiffs' property have resulted in the deterioration of Plaintiffs' property and the watercourses thereon.

250.

Defendants' discharge of excessive water, silt, sediment, muddy water, and other debris and pollutants onto Plaintiffs' property constitutes a trespass within the meaning of O.C.G.A. § 51-9-1.

251.

Defendants' continuous discharge of excessive water, eroded soils, silt, sediment, muddy water, and other debris onto Plaintiffs' property constitutes a continuing trespass for which defendants are liable to Plaintiffs.

252.

As a direct and proximate result of defendants' continuing trespasses, Plaintiffs and their property have been damaged, and Plaintiffs should be compensated in an amount and manner to be determined at trial.

## COUNT THREE: NEGLIGENCE & NEGLIGENCE PER SE

(All Defendants)

253.

Plaintiffs re-allege and reincorporate Paragraphs 1-252 as if fully set forth herein verbatim.

254.

Defendants, as the owners and developers of land, have a duty to use and develop the land in a manner that does not injure the property of downstream landowners.

255.

Defendants have a duty not to create conditions resulting in the continuous and excessive discharge of water, eroded soils, silt, sediment, muddy water, and other debris onto Plaintiffs' property.

256.

Defendants have breached their duties by developing the Lumpkin Solar site in a manner that has caused the continuous and excessive discharge of water, eroded soils, silt, sediment, muddy water, and other debris from their development site and onto Plaintiffs' property.

257.

Defendants' blatant violation of applicable state water quality and erosion control laws and regulations is evidence of negligence *per se*.

258.

Defendants' actions are the proximate cause and cause in fact of damages to Plaintiffs and their property.

259.

As a direct and proximate result of the defendants' actions, Plaintiffs and their property have been damaged, and Plaintiffs should be compensated in an amount and manner to be determined at trial.

## COUNT FOUR: PROFESIONAL NEGLIGENCE/NEGLIGENT DESIGN

(Defendant Westwood)

260.

Plaintiffs re-allege and reincorporate Paragraphs 1-259 as if fully set forth herein verbatim.

261.

Defendant Westwood was hired to provide civil construction design plans for the Lumpkin Solar site as required by the NPDES Permit covering the construction activities at said site. These plans included, *inter alia*, the grading plans and the Erosion, Sedimentation, and Pollution Control Plan for the Lumpkin Solar site that was submitted to the Georgia EPD on or about January 22, 2021.

262.

Defendant Westwood, in performing engineering and professional services for the Lumpkin Solar site, had a duty to exercise a reasonable degree of care, skill, and ability which, under similar conditions and like surrounding circumstances, is ordinarily employed by engineers.

263.

Defendant Westwood breached its duty to exercise a reasonable degree of care, skill, and ability which would be employed by other engineers under these circumstances by designing plans for the Lumpkin Solar site that specifically

directed the discharge of excessive volumes of waters containing eroded soils, silt, sediment, muddy water, and other debris from the Lumpkin Solar site and onto Plaintiffs' property.

264.

Defendant Westwood breached its duty to exercise a reasonable degree of care, skill, and ability which would be employed by other engineers under these circumstances by designing plans that specifically directed the discharge of increased volumes of water traveling at increased velocity from the Silicon Ranch site and onto Plaintiffs' property.

265.

The increased volume and the increased velocity of waters discharged by defendants from the Silicon Ranch site and onto Plaintiffs' property is itself damaging to Plaintiffs' property, and Westwood intentionally designed the site plan to cause that increased volume and velocity.

266.

Defendant Westwood's failure to comply with the professional standards of care required by a company providing design and engineering services falls below the professional standard of care and amounts to negligence as described more fully in the Affidavit of Dr. Brian Wellington, PH.D, P.E. attached hereto as Exhibit 14 and incorporated herein by reference.

267.

Defendant Westwood's failure to comply with all state and federal laws and regulations amounts to a breach of the standard of care as described more fully in the Dr. Wellington Affidavit, Exhibit 14.

268.

As a direct and proximate results of defendant Westwood's negligent actions and omissions, Plaintiffs and their property have been damaged, and Plaintiffs should be compensated in an amount and manner to be determined at trial.

## COUNT FIVE: PUNITIVE DAMAGES

(All Defendants)

269.

Plaintiffs re-allege and reincorporate Paragraphs 1-268 as if fully set forth herein verbatim.

270.

Before doing any land clearing, grading, and other construction activity, defendants all knew that it was foreseeable that the damage that has been caused to Plaintiffs' property would result from these activities.

271.

Defendants intended the results that were foreseeable to defendants.

272.

What is foreseeable can be avoided; refusing to avoid the foreseeable makes the conduct irrefutably intentional.

273.

During the development of their solar project, defendants had knowledge that their activities were causing excessive water, eroded soils, silt, sediment, muddy water, and other debris to be discharged from the Lumpkin Solar site and onto Plaintiffs' property.

274.

Prior to initiating this action, Plaintiffs notified defendants of their concerns about the continuous discharge of water, eroded soil, silt, sediment, muddy water, and other debris onto their property and into Plaintiffs' stream and lake.

275.

Defendants, having knowledge of these problems, refused to engage in actions that would prevent the continuous discharge of water, eroded soil, silt, sediment, muddy water, and other debris from the Lumpkin Solar site and onto Plaintiffs' property.

276.

Defendants' conduct has been and continues to be wanton and reckless, and manifests a conscious indifference to the damaging consequences.

277.

Defendants' conduct as above described warrants and demands the imposition of punitive damages against each and every defendant pursuant to O.C.G.A. § 51-12-5.1 and in an amount to be determined at trial.

## COUNT SIX: INJUNCTIVE RELIEF

(All Defendants)

278.

Plaintiffs re-allege and reincorporate Paragraphs 1-277 as if fully set forth herein verbatim.

279.

Defendants' development activities have created a continuing, abatable trespass and nuisance from which Plaintiffs and their property, including the environment, wildlife, and habitats thereon, will suffer irreparable injury and for which Plaintiffs have no adequate remedy at law.

280.

Plaintiffs are entitled under this Court's powers of equity to a permanent injunction ordering defendants to cease all discharges of excessive water, eroded soils, silt, sediment, discolored, muddy water, and other debris from the Lumpkin Solar site and onto Plaintiffs' property.

## <u>COUNT SEVEN: RECOVERY OF ATTORNEYS FEES AND EXPENSES OF LITIGATION</u>

(All Defendants)

281.

Plaintiffs re-allege and reincorporate Paragraphs 1-280 as if fully set forth herein verbatim.

282.

Throughout the course of the events described within this Complaint, defendants have acted in bad faith, have been stubbornly litigious, and have caused the Plaintiffs unnecessary trouble and expense, entitling Plaintiffs to recover from defendants all costs of litigation, including attorneys' fees and expenses, pursuant to O.C.G.A. § 13-6-11 and all other applicable Georgia law.

283.

Defendants are liable for Plaintiffs' attorneys' fees and litigation expenses under O.C.G.A. § 13-6-11 and other applicable law.

## <u>PRAYERS FOR RELIEF</u>

WHEREFORE Plaintiffs pray for the following relief:

(a)     That summonses issue requiring defendants to appear as provided by law to answer this Complaint;

(b)     That service be had upon defendants as provided by law;

(c)     That this Court enjoin defendants from engaging in any activities at all on the Silicon Ranch site unless and until this Court is satisfied that defendants have "ensured" that all past damages to Plaintiffs' property have been rectified and that defendants have "ensured" that measures have been taken so there will be no further damage to Plaintiffs' property.

(d)     That Plaintiffs have a trial by jury of all issues so triable;

(e)     That Plaintiffs have and recover general damages from the defendants for Plaintiffs' loss of use and enjoyment of their property, in such amount as the jury concludes are appropriate;

(f)     That Plaintiffs have and recover from defendants all damages compensable under Georgia law;

(g)     That punitive damages be imposed against the defendants in such amounts as the jury concludes are sufficient to deter the defendants from the kind of wrongdoing described herein;

(h)     That Plaintiffs have and recover from defendants all of Plaintiffs' expenses of litigation, including attorneys' fees; and,

(i)     For such other and further relief to which Plaintiffs may be entitled at law or equity, as the Court shall deem just and appropriate.

## DEMAND A TRIAL BY JURY

Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Respectfully submitted, this 6th day of August, 2021.

*/s/ James E. Butler, Jr.*
JAMES E. BUTLER, JR.
Georgia Bar No. 099625
Jim@butlerwooten.com
DANIEL E. PHILYAW
Georgia Bar No. 877765
Dan@butlerwooten.com
BUTLER WOOTEN & PEAK LLP
2719 Buford Highway
Atlanta, GA 30324
T:  (404) 321-1800F:  (404) 321-2962

C. FREDERICK OVERBY
Georgia Bar No. 555845
Fredoverby@overbylaw.com
OVERBY LAW OFFICE, P.C.
Post Office Box 1975
Columbus, Ga 31902
T:  (706) 327-0300F:  (706) 320-0053

C. COOPER KNOWLES
Georgia Bar No. 426699
cknowles@cckfirm.com
LAW OFFICE OF C. COOPER
KNOWLES, LLC
750 Hammond Drive
Building 12, Suite 200
Sandy Springs, GA 30328
T:  (770) 668-2081

**ATTORNEYS FOR PLAINTIFFS**

90

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

H & L FARMS, LLC;                        *
SHAUN HARRIS and AMIE HARRIS,            *
                                         *
    Plaintiffs,                          *
                                         *
                                         *    CIVIL ACTION FILE
v.                                       *
                                         *    NO. _____
                                         *
SILICON RANCH CORPORATION;               *
SR LUMPKIN, LLC; INFRASTRUCTURE          *
AND ENERGY ALTERNATIVES, INC.;           *    JURY TRIAL DEMANDED
IEA CONSTRUCTORS, LLC; and,              *
WESTWOOD PROFESSIONAL                    *
SERVICES, INC.,                          *
                                         *
    Defendants.                          *

## **VERIFICATION**

STATE OF GEORGIA
COUNTY OF MUSCOGEE

I, Shaun Harris, being first duly sworn, state that I am a plaintiff in the

above-styled action.  I have read the foregoing Complaint for Damages and know

the contents of it.  I can attest that the contents of these paragraphs of the

Complaint for Damages are true and correct based upon my own knowledge: 1, 2,

3, 4, 5, 6, 7, 12, 13, 14, 22, 23, 31, 32, 33, 34, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45,

46, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 65, 66, 67, 68, 69, 70,

71, 72, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93,

94, 95, 96, 97, 99, 100, 101, 103, 104, 105, 106, 107, 108, 109, 114, 115, 116, 117,

119, 138, 139, 140, 141, 142, 150, 173, 174, 180, 182, 184, 187, 188, 192, 194, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 211, 212, 213, 214, 215, 216, 233, 236, 237, 238, 239, 240, 242, 243, 245, 247, 248, 249, 251, 252, 270, 271, 272, 273, 274, 275.

This ___5th___ day of August, 2021.

_____
SHAUN HARRIS

Sworn to and subscribed before me
this _5th_ day of _August_, 2021.
_____
Notary Public
My commission expires _____