**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | | |
|---|---|---|
| H & L FARMS, LLC; | * | |
| SHAUN HARRIS and AMIE HARRIS, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | CIVIL ACTION FILE |
| v. | * | |
| | * | NO. 4:21-CV-00134-CDL |
| SILICON RANCH CORPORATION; | * | |
| SR LUMPKIN, LLC; INFRASTRUCTURE | * | |
| AND ENERGY ALTERNATIVES, INC.; | * | |
| IEA CONSTRUCTORS,     LLC; and, | * | |
| WESTWOOD PROFESSIONAL | * | |
| SERVICES, INC., | * | |
| | * | |
| Defendants. | * | |

**<u>PRETRIAL ORDER - JURY</u>**

This case is scheduled for a jury trial to begin on Tuesday, April 11, 2023 at 9:00 A.M. at

the federal courthouse in Columbus.  The following constitutes a pretrial order entered in the

above-styled case after conference with counsel for the parties:

**I.       (a) The names, addresses, and telephone numbers of all attorneys who personally**

**appeared at pretrial and who will conduct the trial are as follows:**

**Plaintiffs:**
> James E. Butler, Jr.
> Daniel E. Philyaw
> Caroline W. Schley
> 105 13th Street, P.O. Box 2766
> Columbus GA 31902
> (706) 322-1990
>
> C. Cooper Knowles
> 750 Hammond Drive
> Building 12, Suite 200
> Sandy Springs GA 30328
> (770) 668-2081

**SRC defendants:**
> Alycen A. Moss
> Danielle C. Le Jeune
> Dakota E. Knehans
> The Promenade, Suite 400
> 1230 Peachtree Street, N.E.
> Atlanta, GA  30309
> (404) 572-2052

**IEA defendants:**
> Charles E. Rogers
> Steven J. Stuart
> Brent J. Beaver
> 2700 Marquis One Tower
> 245 Peachtree Center Avenue NE
> Atlanta, GA 30303
> (404) 521-3800
>
> Sarah K. Carpenter
> 5727 Westpark Drive
> Suite 200
> Charlotte, NC 28217
> (704) 334-3459

**Westwood defendants:**
> Kent T. Stair
> Melissa L. Bailey
> Corey R. Mendel
> Copeland Stair Valz & Lovell LLP
> 191 Peachtree Street NE, Suite 3600
> Atlanta, Georgia 30303
> (404) 526-0363

**(b) The names, addresses, and telephone numbers of all nonparty persons including attorneys who have a fixed or contingent financial interest in this case are as follows:**

> James E. Butler, Jr.
> Ramsey B. Prather
> 105 13th Street, P.O. Box 2766
> Columbus GA 31902
> (706) 322-1990
>
> C. Cooper Knowles
> 750 Hammond Drive
> Building 12, Suite 200
> Sandy Springs GA 30328
> (770) 668-2081

II.     (a)  Companion cases pending in this and other federal/state courts are: None.

(b)     Possible derivative claims not now the subject of pending litigation: None.

III.    The estimated time required for trial is: 2-3 weeks.

IV.     The parties agree that the court has jurisdiction of the parties and the subject matter pursuant to 28 U.S.C. §1332(a).

**V.     The jury will be qualified as to relationship with the following:**

**<u>Submitted by Plaintiffs:</u>**

1.  Is there anyone who is related by blood or marriage to Shaun & Amie Harris?

2.  Is there anyone who is related by blood or marriage to James E. Butler, Jr., Ramsey B. Prather, Daniel E. Philyaw, Caroline W. Schley, or C. Cooper Knowles?

3.  Is there anyone who is related by blood or marriage to Alycen A. Moss, Danielle C. Le Jeune, Dakota E. Knehans, Charles E. Rogers, Harry Z. Rippeon III, Steven J. Stuart, Sarah K. Carpenter, Jeanne M. Harrison, Brent J. Beaver, Kent T. Stair, Melissa L. Bailey, or Corey R. Mendel?

4.  Is there anyone who works for, or has family members who work for, or who have ever been represented by:

    a.  Butler Prather LLP

    b.  Law Office of C. Cooper Knowles

    c.  Cozen O'Connor

    d.  Smith, Currie & Hancock LLP

    e.  Copeland, Stair, Valz & Lovell LLP

5.  Is there anyone who is an officer, director, agent, employee, shareholder, or insurance policy holder with:

    a.  Silicon Ranch Corporation;

    b.  SR Lumpkin, LLC;

    c.  Infrastructure and Energy Alternatives, Inc.;

    d.  IEA Constructors, LLC;

    e.  Westwood Professional Services, Inc.;

    f.  GCube Insurance Services, Inc.;

    g.  Indian Harbor Insurance Company; or

    h.  Continental Casualty Company?

Plaintiffs respectfully submit that the jury should *not* be qualified as to Kawikee Refuge, LLC. This Court's Order on motions for summary judgment held that defendants "have failed to produce evidence from which a reasonable jury could conclude that non-party Kawikee Refuge was 'at fault' for purposes of the apportionment statute," that the jury will not be permitted to apportion fault to Kawikee Refuge, LLC, and that Defendants shall not be able to argue that Kawikee Refuge, LLC is somehow responsible for Plaintiffs' damages. Doc. 171 at 9.

**Submitted by SRC/IEA defendants:**

1.  Is there anyone who works for, or has family members who work for, or who have ever been represented by: Butler, Wooten & Peak LLP?

2.  Is there anyone who is an officer, director, agent, employee, shareholder, or insurance policy holder with:

    a.  Kawikee Refuge, LLC;

    b.  Kawikee Two, LLC;

    c.  Wayback Forestry, Inc.;

    d.  Interfor U.S., Inc.; or

       e.   American Forest Management?

3. Are you familiar with or have you ever visited the property known as Kawikee Refuge or Kawikee Plantation?

Defendants recognize the court's ruling as it relates to apportionment of fault to Kawikee Refuge, LLC, and they will abide by the ruling. Kawikee Refuge, LLC (also known as Kawikee Plantation) may be known to jurors as it owned the Kawikee Refuge property which was used as a fishing and hunting plantation that was open to the public at one point. Accordingly, the jury should be qualified as to Kawikee Refuge, LLC in the event that they are familiar with the company that owned the property prior to H&L Farms (not for apportionment reasons).

**VI.** All discovery has been completed. The court will not consider any further motions to compel discovery except for good cause shown. The parties, however, shall be permitted by agreement to take depositions of any person(s) for the preservation of evidence or for use at trial.

**VII.** The names of the parties as shown in the caption to this order are correct and complete, and there is no question by any party as to the misjoinder or non-joinder of any parties.

**VIII.** **The following is the plaintiff's brief and succinct outline of the case and contentions:**

Before Silicon Ranch Corporation ("SRC") started building its solar facility in Stewart County it repeatedly promised the owners of the downstream property that SRC would be a "good neighbor." Document 61-2, Wooten Dep. at 59/15-60/5. When the owners of that property, known as "Kawikee Refuge," were about to sell that property to Mr. Shaun and Mrs. Amie Harris, those owners warned SRC to take precautions not to pollute the property. In response, a Senior Vice President of SRC put in writing SRC's promise "to ensure no impact" to the downstream

property "as a result of our solar development."  Doc. 43-6, PX 1.

SRC's promises were all lies.

SRC had no intention of being a 'good neighbor'; it was in a rush to get the solar development finished and online producing power to satisfy SRC's contract with Walton EMC to provide power for the Facebook facility in Social Circle, GA.  PX 103, 12/19/2019 Walton EMC Press Release.

SRC and its contractor, Infrastructure and Energy Alternatives, Inc. ("IEA") knew of the erosion risk to the downstream property - their own documents showing communications between them prove that.  Doc. 43-10, PX 20.   SRC and IEA knew that the erosion control design plan from Westwood required that construction of the solar development be done in phases with erosion control measures going in ahead of mass grading.  SRC and IEA knew that the erosion control plan – which bore on every page the name and logo of IEA, Inc. – required that "*the escape of sediment from the site shall be prevented* by the installation of erosion and sediment control measures and practices *prior to* land disturbing activities."  Doc. 43-11, PX 21, p. 2, Note 5 (emphasis added).

SRC and IEA ignored the design plan and mass graded areas before erosion control measures were in place.  Both SRC and IEA are experienced in building solar facilities; both have their own engineering departments; both SRC and IEA knew that the result of what they were about to do would be erosion on to and damage of the downstream property.  They did it anyway.

SRC and IEA mass graded almost 1,000 acres, grading away topsoil which left the site vulnerable to erosion which stripped away more topsoil.  Without topsoil and vegetation, the erosion can never be stopped and the damage to the Harris property will never end.  SRC and IEA knew from the moment the first even moderately significant rain came after their mass grading

commenced that pollution was being discharged on to the downstream property that SRC had promised would suffer 'no impact' at all from the SRC solar development.

SRC and IEA knew that the erosion control plan specified and required that if "full implementation of the [erosion control] plan does not provide for effective erosion control, additional erosion and sediment controls measures *shall be implemented to control or treat the sediment source.* Doc. 43-11, PX 21, p. 2, Note 6 (emphasis added). SRC and IEA knew erosion of sediment and pollution on to the downstream property was ***not*** being "prevented" but refused to do what was necessary to stop that erosion and pollution. SRC and IEA also failed to properly maintain the erosion controls they did install at the site, from the inception of their construction activities onward.

In the words of Shaun Harris, spoken on cross examination during his deposition, SRC and IEA "just did not give one damn." Doc. 51-2, Shaun Harris Dep., at 163/13-22, 162/16-163/1, 165/6-10.

Before the damage even started SRC sought, in March 2021, to employ a national engineering firm, S&ME, Inc., not to revise the site plans or assist with the planning and implementation of erosion control measures, but to come up with some "defensible" arguments for SRC and IEA. SRC knew then – before it even started – that the damage was going to happen.

After the damage commenced on April 1, 2021, in that same month SRC and IEA hired a testifying firm, Nutter & Associates, Inc. (Nutter) to come on site to start coming up with arguments to blame others for the damage SRC and IEA were causing.

On May 31, 2022 one of the Nutter testifiers (Erin Harris) admitted in her deposition that the SRC site was not stabilized and would not be stabilized until there was an entire redesign of the erosion control plan and that redesign was executed. The SRC/IEA expert witness also

admitted that SRC and IEA had not even asked Nutter to do such a redesign.

Not until November 30, 2022 did SRC and IEA hire anyone to do that redesign (Long Engineering). Even then, SRC and IEA concealed for a month the fact of that hiring and the identity of witnesses supposedly testifying that they were going to do a redesign sometime in the future, so that the admission the site was still not stabilized could not be used against SRC and IEA in dispositive motions then being briefed to this Court.

By then, November 30, 2022, it had been 609 days since the damage commenced on April 1, 2021, and every rain had brought more damage.  SRC and IEA knew that - they could see it themselves, and multiple witnesses told them about it.

For example, IEA hired One Environmental Group to do weekly site inspection reports for four months; a One Environmental engineer, John Caudill, called the SRC site a "muddy mess." Doc. 43-13, PX 67.

For example, SRC and IEA employed Southern Hydro Vac (SHV) to actually pressure wash sediment on the Harris property into the stream and then try to vacuum it up.   SHV's project planner Austin Fednander told IEA's Project Manager in writing that "every rain brings new mud from the side of the hills.  Areas that we clean will then be muddy again just given that everything runs downhill."  Doc. 130-22, PX 161.

For example, Westwood's engineer Joseph Ridley called what he witnessed at the SRC site "insanity."  PX 317 at p.2.

Plaintiffs' expert, registered forester John Britt, has testified that the SRC site "is the second worst environmental disaster I have ever personally seen," second only to the infamous Copper Hill basin in Tennessee.  Doc. 62-2 at p. 12.

To state the obvious, Plaintiffs' expert Vance Smith has testified there's no point in even

trying to repair the damage to the Harris' lake when the SRC site is not stabilized because more sediment will simply continue to flow downhill every time it rains.  Doc. 66-7 at p. 5, Vance Smith Aff./Report.

SRC and IEA left Mr. and Mrs. Harris with no choice but to file this lawsuit: those defendants not only refused to stop the damage or even seriously attempt to do so, they refused to even acknowledge the fact that the Harris property was being damaged.  On August 6, 2021, Mr. and Mrs. Harris filed this civil action.  In response, SRC and IEA continued to "deny that their conduct caused the pollution," (Doc. 171 at p. 1), continued to "deny that their conduct caused damage to Plaintiffs' property" (*id*. at p. 3), and did nothing to redesign the erosion control plan - even though their own testifying expert witnesses told them that the site could not be stabilized without such a total redesign.  SRC and IEA did not even acknowledge the obvious need for that total redesign until they disclosed on December 27, 2022 that they had hired Long Engineering, supposedly for that purpose.  Instead, SRC and IEA paid a series of law firms to try to blame others for causing the damage to the Harris property - without any evidence to support such attempts to blame others.

The reason SRC and IEA did not, as Mr. Harris put it, "give a damn," is because the SRC development was so valuable to SRC that SRC and IEA figured whatever a jury might do as a result of their wanton and reckless misconduct would not matter much.  SRC has agreed that the Lumpkin solar facility was worth at least $124 million.

On June 11, 2021, in an attempt to try to offload lability and responsibility onto one of its wholly owned subsidiaries, SR Lumpkin LLC (which had no employees and no significant assets), SRC purported to sign a contract with that wholly owned subsidiary whereby the subsidiary assumed full responsibility for the SRC site.  The contract was called a "solar ground lease."  That

9

'contract' was signed for SRC by its CEO Reagan Farr, and signed for SR Lumpkin by its CEO, the same Reagan Farr.   That attempted offloading of responsibility was an admission by SRC that it knew then – on June 11, 2021 – that it was causing damage to the Harris property and that SRC had no intention of trying to stop that damage, which at that time had only been going on for two months.

The CEO of both corporations, Mr. Farr, arranged for Fifth Third Bank of Charlotte, NC to loan the subsidiary SR Lumpkin LLC $124 million secured only by the "solar ground lease" and some inconsequential equipment Mr. Farr claims was owned by the subsidiary. Mr. Farr has admitted that means that bank valued the Lumpkin solar facility to be worth "at least" $124 million.  Doc. 61-22, Farr Dep. at 193/11-21.

SRC and IEA have both tried to hide behind their own wholly owned subsidiaries.  But SRC as owner of the site and permittee under the NPDES General Permit was and is responsible for everything that occurred on its property.  IEA was directly involved in the construction and maintenance of the site, and in the failure to "prevent" discharge of erosion and sediment from the SRC site.

SRC's subsidiary SR Lumpkin LLC had no involvement in the Lumpkin solar facility except as a passive participant in its parent corporation's attempt to offload responsibility to SR Lumpkin LLC via the "solar ground lease."

SRC and IEA each guaranteed all obligations of their subsidiaries under the contracts for construction of the Lumpkin solar facility, meaning they were the real actors and parties at interest.

The very sign erected at the entrance to the Lumpkin solar facility on Trotman Road in Stewart County captured the whole truth:  Silicon Ranch Corporation was the "Owner," and IEA,

Inc. was the "General Contractor."  Doc. 65-6, PX 45.

Rather than accept responsibility, SRC and IEA have also attempted to cast disproportional blame onto the designers of its erosion and sedimentation control plans, Westwood.

SRC and IEA also seek to blame those who were involved in logging the SRC property after SRC bought it, in compliance with the terms of the deal SRC sought when it bought the property.  Those include the prior owner of the SRC property, Kawikee Two LLC; the forestry consulting firm they retained to supervise the logging, American Forest Management, Inc.; the purchaser of the timber, Interfor U.S., Inc.; and one of the three logging companies who did the logging – Wayback Forestry, Inc. of Cuthbert, GA.

But there is no evidence at all that the logging caused any erosion resulting in damage to the Harris property.  Even the expert witnesses jointly hired by SRC and IEA do not present any evidence that the logging on the SRC property caused erosion that caused damage to the Harris property.   There is massive and undisputed evidence that the logging did not cause that damage.  There is also no evidence that SRC, or IEA, or anyone else ever made any complaint that the logging was causing or might cause damage to the downstream Harris property – even though it is undisputed that SRC and IEA both had employees on the SRC property when the logging was taking place.

Defendant Westwood Professional Services, Inc.'s Erosion, Sedimentation & Pollution Control Plan ("design plan") designed for construction activities at the Lumpkin Solar facility was inadequate from the outset, in that it failed to ensure that which it purported to require - "*The escape of sediment from the site shall be prevented* by the installation of erosion and sediment control measures and practices prior to land disturbing activities."  Doc. 43-11, PX 21, p. 2, Note 5 (emphasis added).   The word "shall" means it is mandatory.  That was a key, if not the key,

element of the erosion control plan.  The Westwood design plan had inadequate and undersized

sediment basins, and as a result, SRC and IEA turned Mr. and Mrs. Harris 21-acre lake into their

own sediment basin – without seeking or obtaining permission from Mr. and Mrs. Harris.

Westwood also failed to anticipate that SRC and IEA would ignore the design plan, by,

among other things, conducting mass grading before the installation of perimeter erosion control

measures required by the design plan.  When that happened and became apparent early on to

Westwood, Westwood did nothing about it.   The mandatory seven-day inspection of the SRC site,

which the NPDES General Permit required Westwood to perform in order to certify that erosion

controls--including perimeter erosion controls-- had been installed per the design plan, was

delayed for four months because, as Westwood has admitted, it knew SRC and IEA had not

sufficiently installed the necessary perimeter erosion control measures prior to their rushed mass

grading.

The Westwood design plan required that if "full implementation of the [erosion control]

plan does not provide for effective erosion control, additional erosion and sediment controls

measures *shall be implemented to control or treat the sediment source.*  Doc. 43-11, PX 21, p. 2,

Note 6 (emphasis added).   Westwood knew from its own inspections of the SRC site that erosion

of sediment and pollution on to the downstream property was ***not*** being "prevented", but

Westwood failed to insist that SRC and IEA take action to remedy that erosion and pollution.

Westwood failed to insist that SRC and IEA stop mass grading and stop the construction

until the design plan's requirements were complied with in order to "prevent" the "escape of

sediment from the site".  *Id*.   Westwood should have insisted, or at least tried to insist, that SRC

and IEA shut down all construction activity until the perimeter erosion control measures were

installed as required by law and the design plan.   Westwood should have 'turned them in' - told

the Georgia Environmental Protection Division (EPD) that SRC and IEA were violating the design plan.  Westwood did not do so.

The consequences of the defendants' misconduct has been terrible damage to Plaintiffs' property – to the wetlands and stream downstream from the SRC site and to the 21-acre lake on the Harris property.   The pollution has changed what was the "crown jewel" of the Kawikee property Mr. and Mrs. Harris purchased (Doc. 61-2, Wooten Dep. at 29/24-25) and the "most prominent feature" of the Harris property into an "eyesore" that "stigmatizes" the property and is so bad the value of the property would be enhanced if the lake was just "eliminated."  Doc. 120-3, Walters Dep. at 32/13-20, 55/6, 56/1-4, 71/10-21.

What was before a "great fishing lake" (Doc. 61-2, Wooten Dep. at 30/2) and incomparable "trophy fishing lake" (Doc. 130-7, Badcock Aff. ¶¶9, 14, 21) has basically been destroyed.  Doc. 130-10, Ager Aff./Report at pp. 16-17; Doc. 130-6 at p. 5 ("The continuing high turbidities, siltation, and sedimentation will preclude any improvement of the now desolate fish population.  Without full stabilization of the SRC development site, the fishery will not recover in Mr. and Mrs. Harris' lake.")

The lack of stabilization of the SRC site is not the only problem.   Even were it stabilized, millions of pounds of sediment from the SRC erosion remain in the wetlands on the Harris property which, so even if SRC were to ever finally stabilize its development site, it would take many years to wash into the lake and on through the lake to Pataula Creek.  There is no way to 'fix' that sediment problem in the wetlands; one cannot dredge wetlands without destroying them, which is illegal.

Mr. and Mrs. Harris, as owners of the property who live there are entitled to recover compensatory damages for their loss of use and enjoyment of the property caused by defendants'

interference with their property rights.  Mr. and Mrs. Harris are also entitled to recover compensatory damages for the discomfort, loss of peace of mind, annoyance, and unhappiness caused by defendants' damage to their property and property rights.

The limited liability company owned by Mr. and Mrs. Harris, "H&L Farms LLC," which owns title to the property is entitled to recover for the reduction, or diminution, in value of the property resulting from the conduct of defendants.  H&L Farms LLC is also entitled to recover for the cost to repair the property, but as the record stands now, there is no indication that the property will be, or can be, repaired – since the erosion and pollution is ongoing and there is no indication it will ever stop.

All three Plaintiffs are each entitled to recover punitive damages for the wanton and reckless misconduct of the SRC and IEA defendants., Plaintiffs are entitled to a finding that the SRC and IEA defendants acted with specific intent to cause harm, since those defendants knew that the harms to the Harris property were substantially certain to result from their construction activities. The SRC and IEA defendants knew what was going to happen, knew what was happening, knew the damage would continue to happen, and failed to stop the damage and eliminate the continuing nuisance and continuing trespass.

Plaintiffs collectively are entitled to recover their expenses of litigation, including attorney's fees, pursuant to O.C.G.A. §13-6-11, against all defendants.

If there is a verdict for Plaintiffs against any SRC or IEA defendant, then following that verdict Plaintiffs will make a motion to recover general damages pursuant to O.C.G.A. §9-11-68(e), including expenses of litigation, unless such expenses have already been compensated pursuant to Plaintiffs' claims under O.C.G.A. §13-6-11.  *Showan v. Pressdee,* 922 F.3d 1211 (11th Cir. 2019).

IX.    **The following is the defendant's brief and succinct outline of the case and contentions:**

**Submitted by SRC and IEA defendants:**

This case involves 2 adjacent properties located in Stewart County, Georgia. The more southern tract of land is known as Kawikee Refuge, which is now owned by Plaintiff H&L Farms, LLC ("H&L Farms"). The Kawikee Refuge property was sold to H&L Farms by Kawikee Refuge, LLC ("Refuge"), a closely held 2-member LLC of which Plaintiffs' counsel, Jim Butler ("Butler"), is the Managing Member. The more northern tract of land is known as Kawikee Two, which is now owned by Defendant Silicon Ranch Corporation ("SRC"). The Kawikee Two property was sold to SRC by Kawikee Two, LLC ("Two"), another closely held 2-member LLC of which Butler is the Managing Member.  Prior to the sale, Two was informed that SRC intended to construct a solar facility on the Kawikee Two property.

Plaintiffs, H&L Farms, Shaun Harris ("Mr. Harris"), and Amie Harris ("Mrs. Harris") (collectively, "Plaintiffs"), seek to recover for alleged damage to the Kawikee Refuge property – primarily involving the temporary discoloration of a lake – allegedly caused by the construction of a solar facility (the "Facility") on the upstream property owned by SRC. Defendant SR Lumpkin, LLC, lessee of the SRC-owned land on which the Facility was constructed, performed operational duties essential for the financing and contracting of the subject solar facility in accordance with standard project financing practices of the renewable energy industry. Defendant IEA Constructors, LLC ("IEAC") was hired to perform the design, construction, and installation of the Facility. Defendant Westwood Professional Services, Inc. provided professional engineering services in connection with the design of the Facility pursuant to a contract with IEAC.

Construction commenced on the Facility, which consists of 990 acres of solar modules and

an additional 17.5 acres of associated infrastructure, on or after February 25, 2021. There is evidence that Westwood's design and lack of corrective action is a root cause of the issues complained about by Plaintiffs. There is also evidence that SRC, SR Lumpkin, LLC, IEAC and Infrastructure and Energy Alternatives, Inc. respectively complied (and continue to comply) with permitting obligations and that the alleged actions or inactions to those Defendants do not provide trespass, nuisance or negligence causes of actions. Plaintiffs' claims for punitive damages and attorney's fees are likewise not appropriate relief. IEAC recently contracted with Long Engineering to redesign pertinent aspects of the project site. That redesign work is ongoing and, once finalized, IEAC intends to mobilize and implement the design. Defendants will continue to promptly provide to all parties discoverable information related to Long Engineering's work.

Plaintiffs claim to have suffered pecuniary and property damages as a result of the construction of the Facility. Specifically, Plaintiffs allege Defendants knew their "land disturbance" and "grading activities" would result in increased volumes of water carrying silt, sediment, and muddy water flowing onto the downstream property. Plaintiffs' alleged damages include "destruction of wetlands on Plaintiffs' property, destruction of a stream that flows through Plaintiffs' property, and destruction of a 21-acre trophy bass and bream fishing lake." According to Plaintiffs, those were the most attractive features of the property for which Plaintiffs paid $3.4 million. However, according to the United States Army Corps of Engineer permit, the lake's only permitted and intended use is for irrigation – not for recreational activities. On this basis, Defendants maintain that Plaintiffs' proper usage of the lake is not negatively impacted by action or inaction of a Defendant.

Furthermore, discovery revealed that the lake had experienced temporary discoloration issues in the past following massive rainstorms or whenever "remnants of a hurricane [came]

through." Moreover, in connection with SRC's purchase of the Kawikee Two property from Two, it is undisputed that SRC and Two entered into an "Access Agreement" pursuant to which (i) Two and its contractors, agents and representatives, were granted access to Kawikee Two to conduct timber harvesting activities and (ii) Two agreed to indemnify SRC for any damages or claims incurred by SRC or any indemnified party resulting from acts or omissions of Two or its representatives under the agreement, including any damage to the timbered property. Two, in turn, entered into a "Timberland Services Agreement" with non-party American Forest Management ("AFM") pursuant to which AFM was to handle and supervise the sale of the timber on the property Two was selling to SRC. Two subsequently entered into timber cutting agreements with non-parties Interfor U.S. Inc. ("Interfor") and Wayback Forestry, Inc. ("Wayback") pursuant to which the loggers were to cut, haul, and sell the timber harvested from Kawikee Two.

The agreements between Two and the logging companies each contained provisions requiring the loggers to use best management practices and to meet all forestry association standards. However, there is evidence that Two, AFM, Interfor and Wayback did not use best management practices or meet all forestry association standards. The timbering operations were initiated by Two and/or its representatives on November 16, 2020, and harvesting was completed on March 15, 2021. During the timbering operations, nearly 100% vegetation (trees and any understory) removal occurred, and there were significant areas of exposed soils. By February 20, 2021 – before IEAC started work on the Facility – a majority of the upland portions of the Kawikee Two property had been cut and contained exposed soils. Throughout this time period, elevated turbidity is evident in Kawikee Lake. Additionally, discovery revealed that a different adjoining landowner complained about excessive mud issues caused by the timber harvesting activity. Accordingly, the sediment that Plaintiffs complain of does not necessarily nor solely originate from

the solar facility while evidence suggests that Two and its timbering activities preceding the construction of the Facility were a key contributor to such sedimentation of the Kawikee Refuge lake.

**Submitted by Defendant Westwood:**

Westwood Professional Services, Inc. ("Westwood") is a professional engineering company that provides requested design services for owners and builders of various types of projects. As it relates to this case, Westwood was retained by IEA to provide certain, specified civil engineering services for the construction of the Lumpkin Solar Site. The scopes and limitations of those services were laid out in a contract between Westwood and IEA. Westwood provided all those services in accordance with the professional standard of care and was not negligent in anything it did. If Westwood's design had been built and maintained in accordance with the plans, related legal requirements and customary construction practices, the problems being experienced by the Plaintiffs could have been avoided.

IEA is a Design Builder which has constructed projects like this for SRC all over the country, often using designs provided by Westwood. From those experiences, Westwood had every reason to believe, and in fact know, that IEA was capable of building the Lumpkin Solar Site properly, if IEA provided the required attention, sufficient resources and qualified personnel to do so. Unfortunately for everyone concerned, it does not appear that IEA did those things, with the result being whatever damages the Plaintiffs have suffered.

Included in Westwood's services were lengthy, detailed plans for controlling erosion and sediment onsite via the installation and maintenance of best management practices ("BMPs"). BMPs vary in type and function including, but not limited to, sediment control, runoff control, erosion control. Sediment and runoff controls include sediment basins, silt fence, rock check

dams, berms, baffles, diversion ditches, and skimmers. Erosion controls include straw mulch, erosion control blankets, hydromulch, and temporary and permanent seeding to establish vegetation. The BMPs operate as a system to slow the flow of water onsite, allowing time for sediment to "settle out" of the water before it leaves the site and enters public waterways.

State law typically requires construction of large sites to be phased in fifty-acre increments. IEA's contract with SRC, however, obligated IEA to build this project under a fast-moving schedule that effectively required the entire previously forested site to be cleared at once rather than in smaller increments. As a result, IEA directed Westwood to seek a variance, or waiver, of that rule from the State, allowing IEA to disturb more than 1,000 acres at the same time. Westwood made that request at IEA's direction, and the State granted the request.

Westwood's design was reviewed and approved by IEA and SRC and used by those two companies to obtain the necessary Permit to build the project. The Permit governing the project required IEA to install and maintain the BMPs onsite. The Westwood plans included phasing and timing instructions for installation of the BMPs. Specifically, the plans state that "[t]he discharge of sediment from the site shall be minimized/prevented by the installation of erosion and sediment control measures and practices prior to land disturbing activities."

The plans also required IEA to retain Westwood to "conduct a site inspection to ensure storage requirements are met and perimeter control BMPs have been properly installed" within seven days of completion of BMP installation, commonly referred to as the "Seven Day Inspection". In the performance of this inspection work, Westwood visited the site on multiple occasions, each time notifying IEA of BMP deficiencies which prevented Westwood from completing the required inspection report. The work reached a point in July 2021, allowing Westwood to complete the inspection report, while still noting deficiencies that needed to be rectified by IEA.

During this period of time, and separate from the Seven Day Inspection efforts, Westwood received word from IEA that Plaintiffs were experiencing increased water runoff and siltation, and Westwood visited the Lumpkin Site.   Westwood employee Joseph Ridley noted significant installation and maintenance issues with the BMPs as well as a lack of trained personnel onsite. These concerns were relayed to IEA by Westwood.

In mid-2021, One Environmental was hired by IEA to evaluate the Lumpkin Site.   One Environmental categorized the Site as a "muddy mess" and repeatedly highlighted maintenance and installation issues with the BMPs onsite.   One Environmental's reporting evidences those issues were left unremedied week after week.   Ultimately, IEA terminated the services of One Environmental.

As the permit-holder for the Site, IEA was responsible for troubleshooting any onsite issues and alerting the design professional, Westwood, if IEA believed there were issues that required plan revisions.   On a few occasions, IEA reached out to Westwood for guidance on discrete BMP installation or maintenance issues, and Westwood promptly provided the requested guidance.   At times, IEA chose not to utilize BMPs recommended by Westwood, electing to utilize other options instead.

IEA designated its environmental foreman, Michael Taylor, to be its "certified personnel" in performing certain state-required inspections of the BMPs at daily, weekly, and monthly intervals as well as every time the site received more than half an inch of rain within a 24-hour period. Between March 8, 2021 and May 19, 2022, Mr. Taylor prepared and signed 313 Daily Reports and on each one he was required to answer the question: *"Is an erosion, sedimentation, & pollution Control Plan Revision Required?"* Mr. Taylor's response on 312 of those days was "no." On the one day he responded "yes," the issue involved something totally unrelated to Plaintiffs' property

and, at the request of IEA, Westwood revised the design to resolve that particular concern.

Similarly, between March 18, 2021 and April 18, 2022, Mr. Taylor prepared and signed 13 Monthly Reports and, on each of them, he again repeated his conclusion that there was no need for any revision to the erosion, sedimentation & pollution Control Plan. By responding in that way, Mr. Taylor and IEA continued to assume full responsibility, as the permittee with day-to-day operational control, for the proper installation and maintenance of the erosion and control plan and for making any adjustments they felt were necessary to deal with any problems experienced by the project or its neighbors.

As it was being cleared, the Lumpkin Site was not stabilized with planted ground cover, as should have happened, nor has it been properly stabilized at any time since. Now, approximately two years since construction began, the Lumpkin Site remains unstable.  Plaintiffs contend they are still experiencing excess water runoff and siltation, and the solar facility has been operational for over a year.

To the extent any need has arisen, or currently exists, to redesign any part of the erosion, sedimentation & pollution Control Plan, that need is the result of IEA's failure, in various ways, to build, stabilize and maintain those elements of Westwood's design in accordance with the plans, related legal requirements and customary construction practices and SRC's failure to timely and properly address the problems being experienced by its neighbors. To the extent those neighboring Plaintiffs have suffered the damages being sought in this case, those damages were caused by the actions or inactions of SRC and IEA and not by Westwood.

**X.     The issues for determination by the jury are as follows:**

**Submitted by Plaintiffs:**
WITH RESPECT TO DEFENDANTS SILICON RANCH CORPORATION AND SR LUMPKIN, LLC:

1. Whether defendant Silicon Ranch Corporation controls defendant SR Lumpkin, LLC to such a degree as to render defendant SR Lumpkin, LLC a mere instrumentality of defendant Silicon Ranch Corporation;

2. Whether defendant SR Lumpkin, LLC serves as an alter ego or business conduit of defendant Silicon Ranch Corporation;

3. Whether defendant Silicon Ranch Corporation and defendant SR Lumpkin, LLC were engaged in a joint venture;

4. Whether defendant SR Lumpkin, LLC has acted as the agent of defendant Silicon Ranch Corporation;

5. Whether defendant Silicon Ranch Corporation's actions and/or inactions caused or contributed to a trespass to and upon Plaintiffs and their property and the amount of damages that should be awarded for such trespass;

6. Whether defendant Silicon Ranch Corporation's actions and/or inactions caused or contributed to the creation and/or maintenance of a nuisance to and upon Plaintiffs and their property and the amount of damages that should be awarded for such nuisance;

7. Whether defendant Silicon Ranch Corporation was negligent and the amount of damages that should be awarded for such negligence;

8. Whether defendant Silicon Ranch Corporation was negligent per se and the amount of damages that should be awarded for such negligence;

9. Whether defendant SR Lumpkin, LLC's actions and/or inactions caused or contributed to a trespass to and upon Plaintiffs and their property and the amount of damages that should be awarded for such trespass;

10. Whether defendant SR Lumpkin, LLC's actions and/or inactions caused or contributed

to the creation and/or maintenance of a nuisance to and upon Plaintiffs and their property and the amount of damages that should be awarded for such nuisance;

11. Whether defendant SR Lumpkin, LLC was negligent and the amount of damages that should be awarded for such negligence;

12. Whether defendant SR Lumpkin, LLC was negligent per se and the amount of damages that should be awarded for such negligence;

13. Whether defendant Silicon Ranch Corporation has acted in bad faith, has been stubbornly litigious, or has caused Plaintiffs unnecessary trouble and expense so that Plaintiffs are entitled to an award of attorney's fees and costs of litigation under O.C.G.A. § 13-6-11 and the amount of fees and costs to be awarded;

14. Whether defendant SR Lumpkin, LLC has acted in bad faith, has been stubbornly litigious, or has caused Plaintiffs unnecessary trouble and expense so that Plaintiffs are entitled to an award of attorney's fees and costs of litigation under O.C.G.A. § 13-6-11 and the amount of fees and costs to be awarded;

15. Whether defendant Silicon Ranch Corporation demonstrated willful misconduct, recklessness, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences of those actions such that punitive damages should be awarded and the amount of punitive damages to be awarded;

16. Whether defendant SR Lumpkin, LLC demonstrated willful misconduct, recklessness, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences of those actions and the amount of punitive damages to be awarded;

17. Whether defendant Silicon Ranch Corporation acted, or failed to act, with specific intent to harm Plaintiffs' and/or their property;

18. Whether defendant SR Lumpkin, LLC acted, or failed to act, with specific intent to harm Plaintiffs' and/or their property;

WITH RESPECT TO DEFENDANTS INFRASTRUCTURE AND ENERGY ALTERNATIVES, INC. and IEA CONSTRUCTORS, LLC:

19. Whether defendant Infrastructure and Energy Alternatives, Inc. controls defendant IEA Constructors, LLC to such a degree as to render defendant IEA Constructors, LLC a mere instrumentality of defendant Infrastructure and Energy Alternatives, Inc.;

20. Whether defendant IEA Constructors, LLC serves as an alter ego or business conduit of defendant Infrastructure and Energy Alternatives, Inc.;

21. Whether defendant Infrastructure and Energy Alternatives, Inc. and defendant IEA Constructors, LLC were engaged in joint venture;

22. Whether defendant IEA Constructors, LLC has acted as the agent of defendant Infrastructure and Energy Alternatives, Inc.;

23. Whether defendant Infrastructure and Energy Alternatives, Inc.'s actions and/or inactions caused or contributed to a trespass to and upon Plaintiffs and their property and the amount of damages that should be awarded for such trespass;

24. Whether defendant Infrastructure and Energy Alternatives, Inc.'s actions and/or inactions caused or contributed to the creation and/or maintenance of a nuisance to and upon Plaintiffs and their property and the amount of damages that should be awarded for such nuisance;

25. Whether defendant Infrastructure and Energy Alternatives, Inc. was negligent and the amount of damages that should be awarded for such negligence;

26. Whether defendant Infrastructure and Energy Alternatives, Inc. was negligent per se and the amount of damages that should be awarded for such negligence;

27. Whether defendant IEA Constructors, LLC's actions and/or inactions caused or contributed to a trespass to and upon Plaintiffs and their property and the amount of damages that should be awarded for such trespass;

28. Whether defendant IEA Constructors, LLC's actions and/or inactions caused or contributed to the creation and/or maintenance of a nuisance to and upon Plaintiffs and their property and the amount of damages that should be awarded for such nuisance;

29. Whether defendant IEA Constructors, LLC was negligent and the amount of damages that should be awarded for such negligence;

30. Whether defendant IEA Constructors, LLC was negligent per se and the amount of damages that should be awarded for such negligence;

31. Whether defendant Infrastructure and Energy Alternatives, Inc. has acted in bad faith, has been stubbornly litigious, or has caused Plaintiffs unnecessary trouble and expense so that Plaintiffs are entitled to an award of attorney's fees and costs of litigation under O.C.G.A. § 13-6-11 and the amount of fees and costs to be awarded;

32. Whether defendant IEA Constructors, LLC has acted in bad faith, has been stubbornly litigious, or has caused Plaintiffs unnecessary trouble and expense so that Plaintiffs are entitled to an award of attorney's fees and costs of litigation under O.C.G.A. § 13-6-11 and the amount of fees and costs to be awarded;

33. Whether defendant Infrastructure and Energy Alternatives, Inc. demonstrated willful misconduct, recklessness, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences of those

actions such that punitive damages should be awarded and the amount of punitive damages to be awarded;

34. Whether defendant IEA Constructors, LLC demonstrated willful misconduct, recklessness, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences of those actions and the amount of punitive damages to be awarded;

35. Whether defendant Infrastructure and Energy Alternatives, Inc. acted, or failed to act, with specific intent to harm Plaintiffs' and/or their property;

36. Whether defendant IEA Constructors, LLC acted, or failed to act, with specific intent to harm Plaintiffs' and/or their property.

WITH RESPECT TO DEFENDANT WESTWOOD PROFESSIONAL SERVICES, INC.:

37. Whether defendant Westwood Professional Services, Inc.'s actions and/or inactions caused or contributed to a trespass to and upon Plaintiffs and their property and the amount of damages that should be awarded for such trespass;

38. Whether defendant Westwood Professional Services, Inc.'s actions and/or inactions caused or contributed to the creation and/or maintenance of a nuisance to and upon Plaintiffs and their property and the amount of damages that should be awarded for such nuisance;

39. Whether defendant Westwood Professional Services, Inc. was professionally negligent and the amount of damages that should be awarded for such negligence;

40. Whether defendant Westwood Professional Services, Inc. has acted in bad faith, has been stubbornly litigious, or has caused Plaintiffs unnecessary trouble and expense so that Plaintiffs are entitled to an award of attorney's fees and costs of litigation under

O.C.G.A. § 13-6-11 and the amount of fees and costs to be awarded;

WITH RESPECT TO ALL DEFENDANTS:

41. Whether defendants are joint tortfeasors.

WITH RESPECT TO INJUNCTIVE RELIEF:

42. The nature and scope of injunctive relief, if any, to be granted by the Court.

WITH RESPECT TO NON-PARTIES:

43. Whether any non-party is responsible for Plaintiffs' damages, and if so, what percentage of fault should be assigned to that non-party.

IN THE EVENT PLAINTIFFS PREVAIL, IN WHOLE OR IN PART, AT TRIAL:

44. Whether Silicon Ranch Corporation presented frivolous defenses, and if so, the amount of general damages to be awarded to Plaintiffs pursuant to O.C.G.A. §9-11-68 (e) and whether expenses of litigation including attorney's fees should also be awarded to Plaintiffs.

45. Whether SR Lumpkin LLC presented frivolous defenses, and if so, the amount of general damages to be awarded to Plaintiffs pursuant to O.C.G.A. §9-11-68 (e) and whether expenses of litigation including attorney's fees should also be awarded to Plaintiffs.

46. Whether Infrastructure and Energy Alternatives, Inc. presented frivolous defenses, and if so, the amount of general damages to be awarded to Plaintiffs pursuant to O.C.G.A. §9-11-68 (e) and whether expenses of litigation including attorney's fees should also be awarded to Plaintiffs.

47. Whether IEA Constructors LLC presented frivolous defenses, and if so, the amount of general damages to be awarded to Plaintiffs pursuant to O.C.G.A. §9-11-68 (e) and

whether expenses of litigation including attorney's fees should also be awarded to

Plaintiffs.

Plaintiffs disagree with the SRC/IEA statement of issues for determination by the jury,

below. The SRC/IEA defendants attempt to inject into the case, as issues for the jury, matters that

have not been litigated and/or are bereft of any evidentiary support.

SRC/IEA's first bullet point "with respect to all plaintiffs" refers to "whether Plaintiffs'

actions and/or inactions caused or contributed to the damages." There is no evidence of that. That

accusation necessarily has to be supported with expert testimony, and SRC/IEA have adduced no

such expert testimony.

SRC/IEA's second bullet point "with respect to all plaintiffs" is whether Plaintiffs failed to

mitigate any damages." There is no evidence of failure to mitigate. That accusation has to be

supported with expert testimony, and SRC/IEA have adduced no such expert testimony.

SRC/IEA's third bullet point "with respect to all plaintiffs" refers to the SRC/IEA

accusation that Plaintiffs "assumed the risk," a matter already decided by this Court's Order on

motions for summary judgment. Doc. 171 at 12-13. The defendants "pointed to zero evidence that

Plaintiffs knew and fully appreciated the possibility that Defendants would not take adequate

measures to control erosion or that Defendants would not take action to fix problems once they

came to light." *Id*. at 13.

SRC/IEA's fourth bullet point "with respect to all plaintiffs" attempts to inject a variant of

the assumption of the risk argument already rejected by the Court, and asserts as an issue "whether

plaintiffs came to the nuisance." There is no evidence of this assertion either.

_____

**Submitted by SRC and IEA defendants:**
**WITH RESPECT TO ALL PLAINTIFFS:**

1. Whether plaintiffs' actions and/or inactions caused or contributed to the damages plaintiffs allege were sustained as a result of the actions and/or inactions of any of the defendants.

   **ADDED BY THE COURT: Before Defendants may argue that Plaintiffs are at fault for any of their damages, Defendants must proffer evidence to support this defense outside the presence of the jury.**

2. Whether plaintiffs failed to mitigate any damages plaintiffs allege were sustained as a result of the actions and/or inactions of any of the defendants.

   **ADDED BY THE COURT: Before Defendants may argue that Plaintiffs failed to mitigate their damages, Defendants must proffer evidence to support this defense outside the presence of the jury.**

3. Whether plaintiffs were aware of and assumed the risk associated with purchasing the land downstream from the timber harvesting and construction of the solar facility on an adjacent, upstream property.

   **ADDED BY THE COURT: The Court previously concluded that Defendants may not assert an assumption of the risk defense.**

4. Whether plaintiffs came to the nuisance alleged to have occurred as the result of the actions and/or inactions of any of the defendants.

   **ADDED BY THE COURT: Before Defendants may argue that Plaintiffs "came to the nuisance," Defendants must proffer evidence to support this defense outside the presence of the jury.**

5. Whether plaintiffs are entitled to injunctive relief.

6. Whether plaintiffs are entitled to damages.

7. Whether plaintiffs' claims are barred or diminished by the doctrine of unclean hands.

   **ADDED BY THE COURT: Before Defendants may argue the defense of unclean hands , Defendants must proffer evidence to support this defense outside the presence of the jury.**

**WITH RESPECT TO DEFENDANTS SILICON RANCH CORPORATION AND SR LUMPKIN, LLC:**

8. Whether plaintiffs have proved by a preponderance of the evidence that defendant Silicon Ranch Corporation's actions and/or inactions caused or contributed to a continuing or abatable trespass to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such trespass.

9. Whether plaintiffs have proved by a preponderance of the evidence that defendant Silicon Ranch Corporation's actions and/or inactions caused or contributed to the creation and/or maintenance of a continuing or abatable nuisance to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such nuisance.

10. Whether plaintiffs have proved by a preponderance of the evidence that defendant SR Lumpkin, LLC's actions and/or inactions caused or contributed to a continuing or abatable trespass to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such trespass.

11. Whether plaintiffs have proved by a preponderance of the evidence that defendant SR Lumpkin, LLC's actions and/or inactions caused or contributed to the creation and/or maintenance of a nuisance to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such nuisance.

12. Whether plaintiffs have proved by a preponderance of the evidence that defendant Silicon Ranch Corporation has acted in bad faith, has been stubbornly litigious, or has caused

Plaintiffs unnecessary trouble and expense so that the jury may award attorney's fees and costs of litigation under O.C.G.A. § 13-6-11, and if so, the amount of fees and costs to be awarded.

13.  Whether plaintiffs have proved by a preponderance of the evidence that defendant SR Lumpkin, LLC has acted in bad faith, has been stubbornly litigious, or has caused Plaintiffs unnecessary trouble and expense so that the jury may award attorney's fees and costs of litigation under O.C.G.A. § 13-6-11 and the amount of fees and costs to be awarded.

14.  Whether plaintiffs have proved by a preponderance of the evidence that defendant Silicon Ranch Corporation demonstrated willful misconduct, recklessness, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences of those actions such that punitive damages may be awarded, and if so, the amount of punitive damages to be awarded.

15. Whether plaintiffs have proved by a preponderance of the evidence that defendant SR Lumpkin, LLC demonstrated willful misconduct, recklessness, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences of those actions such that punitive damages may be awarded, and if so, the amount of punitive damages to be awarded.

**WITH RESPECT TO DEFENDANTS INFRASTRUCTURE AND ENERGY ALTERNATIVES, INC. and IEA CONSTRUCTORS, LLC:**

16. Whether plaintiffs have proved by a preponderance of the evidence that defendant Infrastructure and Energy Alternatives, Inc. is a proper party to this action.

17. Whether plaintiffs have proved by a preponderance of the evidence that defendant Infrastructure and Energy Alternatives, Inc.'s actions and/or inactions caused or

contributed to a continuing or abatable trespass to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such trespass.

18. Whether plaintiffs have proved by a preponderance of the evidence that defendant Infrastructure and Energy Alternatives, Inc.'s actions and/or inactions caused or contributed to the creation and/or maintenance of a continuing or abatable nuisance to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such nuisance.

19. Whether plaintiffs have proved by a preponderance of the evidence that defendant IEA Constructors, LLC's actions and/or inactions caused or contributed to a continuing or abatable trespass to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such trespass.

20. Whether plaintiffs have proved by a preponderance of the evidence that defendant IEA Constructors, LLC's actions and/or inactions caused or contributed to the creation and/or maintenance of a continuing or abatable nuisance to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such nuisance.

21. Whether plaintiffs have proved by a preponderance of the evidence that defendant Infrastructure and Energy Alternatives, Inc. has acted in bad faith, has been stubbornly litigious, or has caused Plaintiffs unnecessary trouble and expense so that the jury may award attorney's fees and costs of litigation under O.C.G.A. § 13-6-11, and if so, the amount of fees and costs to be awarded.

22. Whether plaintiffs have proved by a preponderance of the evidence that defendant IEA Constructors, LLC has acted in bad faith, has been stubbornly litigious, or has caused Plaintiffs unnecessary trouble and expense so that the jury award attorney's fees and costs

of litigation under O.C.G.A. § 13-6-11, and if so, the amount of fees and costs to be awarded.

23. Whether plaintiffs have proved by a preponderance of the evidence that defendant Infrastructure and Energy Alternatives, Inc. demonstrated willful misconduct, recklessness, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences of those actions such that punitive damages may be awarded, and if so, the amount of punitive damages to be awarded.

24. Whether plaintiffs have proved by a preponderance of the evidence that defendant IEA Constructors, LLC demonstrated willful misconduct, recklessness, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences of those actions such that punitive damages may be awarded, and if so, the amount of punitive damages to be awarded.

**WITH RESPECT TO DEFENDANT WESTWOOD PROFESSIONAL SERVICES, INC.:**

25. Whether plaintiffs have proved by a preponderance of the evidence that defendant Westwood Professional Services, Inc.'s actions and/or inactions caused or contributed to the creation and/or maintenance of a nuisance to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such nuisance.

26. Whether plaintiffs have proved by a preponderance of the evidence that defendant Westwood Professional Services, Inc.'s actions and/or inactions caused or contributed to a continuing or abatable trespass to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such trespass.

27. Whether plaintiffs have proved by a preponderance of the evidence that defendant Westwood Professional Services, Inc. was professionally negligent, and if so, the amount of damages that should be awarded for such negligence.

28. Whether plaintiffs have proved by a preponderance of the evidence that defendant Westwood Professional Services, Inc. was negligent, and if so, the amount of damages that should be awarded for such negligence.

29. Whether plaintiffs have proved by a preponderance of the evidence that defendant Westwood Professional Services, Inc. was negligent *per se*, and if so, the amount of damages that should be awarded for such negligence.

30. Whether plaintiffs have proved by a preponderance of the evidence that Westwood Professional Services, Inc. presented frivolous defenses, and if so, the amount of general damages to be awarded to Plaintiffs pursuant to O.C.G.A. §9-11-68 (e), and whether expenses of litigation including attorneys' fees should also be awarded to Plaintiffs.

**WITH RESPECT TO NON-PARTIES:**

31. Whether a non-party's actions and/or inactions caused or contributed to a continuing or abatable trespass to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such trespass.

32. Whether a non-party's actions and/or inactions caused or contributed to the creation and/or maintenance of a continuing or abatable nuisance to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such nuisance.

33. Whether a non-party's actions and/or inactions were negligent, and if so, the amount of damages that should be awarded for such negligence.

34. Whether a non-party's actions and/or inactions were negligent *per se*, and if so, the amount of damages that should be awarded for such negligence.

35. Whether a non-party's actions and/or inactions caused or contributed to a trespass to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such trespass.

36. Whether a non-party's actions and/or inactions caused or contributed to the creation and/or maintenance of a nuisance to and upon Plaintiffs and their property, and if so, the amount of damages that should be awarded for such nuisance.

37. Whether a non-party's actions and/or inactions were negligent, and if so, the amount of damages that should be awarded for such negligence.

38. Whether a non-party's actions and/or inactions were negligent *per se*, and if so, the amount of damages that should be awarded for such negligence.

39. Whether a non-party's actions and/or inactions were the proximate or primary contributing cause of damages to be awarded to any of the Plaintiffs.

40. Whether a non-party acted, or failed to act, with specific intent to harm Plaintiffs' and/or their property.

41. If the answer to any of the above is 'yes', the amount of damages that should be assessed against one or more non-parties.

**WITH RESPECT TO ALL DEFENDANTS:**

42. Whether and how to apportion between defendants any damages in accordance with the proportion of fault assessed against each of them.

43. Whether and how to apportion between defendants and non-parties any damages in accordance with the proportion of fault assessed against each of them, respectively.

**Submitted by Westwood:**

1. Whether Westwood breached the standard of care applicable to a professional engineer;

2. If Westwood did breach the standard of care, whether that breach was the proximate cause of any damages sustained by Plaintiffs;

3. Whether Westwood caused a nuisance on the property of Plaintiffs;

4. Whether Westwood committed trespass on the property of Plaintiffs;

5. Whether SRC negligently caused harm to Plaintiffs;

6. Whether SRC caused a nuisance on Plaintiffs' property;

7. Whether SRC committed a trespass on Plaintiffs' property;

8. Whether SR Lumpkin negligently caused harm to Plaintiffs;

9. Whether SR Lumpkin caused a nuisance on Plaintiffs' property;

10. Whether SR Lumpkin committed a trespass on Plaintiffs' property;

11. Whether IEA negligently caused harm to Plaintiffs;

12. Whether IEA caused a nuisance on Plaintiffs' property;

13. Whether IEA committed a trespass on Plaintiffs' property;

14. Whether IEAC negligently caused harm to Plaintiffs;

15. Whether IEAC caused a nuisance on Plaintiffs' property;

16. Whether IEC committed a trespass on Plaintiffs' property;

17. Amount of and apportionment of damages, if any, on Plaintiffs' claim for negligence;

18. Amount of and apportionment of damages, if any, on Plaintiffs' claim for nuisance;

19. Amount of and apportionment of damages, if any, on Plaintiffs' claim for trespass;

20. Whether Plaintiffs are entitled to punitive damages;

21. Amount, if any, of punitive damages to which Plaintiffs are entitled;

22. Parties against whom, if any, punitive damages will be awarded;

23. As to parties who are found liable for punitive damages, whether those parties acted or failed to act with a specific intent to cause harm;

24. Whether Plaintiffs are entitled to attorney fees and litigation costs;

25. Amount, if any, of attorney fees and litigation costs to which Plaintiffs are entitled;

26. Apportionment of attorney fees between Defendants found liable therefor.

XI.    **If a tort action, specifications of negligence, including applicable code sections, are as follows:**

**Submitted by Plaintiffs:**

Defendants have negligently designed, installed, and maintained the erosion controls both during the construction of the Lumpkin Solar facility located on the property owned by defendant Silicon Ranch Corporation and since construction of that facility.   Defendants also failed to install erosion controls ahead of the mass grading by SRC and IEA, which was a violation of the design plan.   Defendants SRC and IEA caused discharges of sediment and pollution on to Plaintiffs' property, which was a violation of the design plan.

"To state a cause of action for negligence in Georgia, Plaintiff must allege: (1) the existence of a duty on the part of the Defendants, (2) a breach of that duty, (3) causation of the alleged injuries, and (4) damages resulting from the alleged breach of the duty." *Johnson v. 3M*, 563 F.Supp.3d 1253, 1319 (2021) (citing *Rasnick v. Krishna Hosp. Inc*., 289 Ga. 565, 713 S.E.2d 835, 837 (2011).  Plaintiffs allege that all defendants were negligent in the development and construction of the Lumpkin Solar facility on land owned by Defendant Silicon Ranch Corporation and their negligence caused damage to Plaintiffs and their property.

Defendant Silicon Ranch Corporation, as the owner of the property where the Lumpkin

Solar facility was constructed, owed a duty of care not to use its property in a manner that caused damage to its neighbors and their property.  "The principle, as it affects the defendant, is this:  no man has the right so to use his own property as to prevent the lawful use, and destroy the lawful profits of the property of his neighbor.  The whole doctrine is found in the familiar maxim – '*sic utere tuo, ut non laedas alienum* – enjoy your own property in such a manner as not to injure that of another person.'  9 Coke, 59.  The principle is so well understood and established, that it is not necessary to support it by authority."  *Bonner v. Welborn*, 7 Ga. 296, 310 (1849).  *See also Sam Finley Inc. v. Russell*, 75 Ga. App. 112, 112 (1947) ("The defendant may have been engaged in an occupation which could be lawfully conducted, but it had no right to so conduct its business as to inflict injury and damage to the owner of the adjacent property.")

"The Georgia Courts recognize a duty not to engage in conduct that will result in pollution of state waters (including non-navigable streams) rendering them unfit for their ordinary purposes by downstream users."  *Johnson*, 563 F. Supp. 3d at 1321.  "Similarly, the Eleventh Circuit recognized that the Georgia legislature 'has expressed a strong interest in deterring environmental pollution and protecting the rights of property owners 'to have water flow upon [their] land in its natural state free from adulteration.' *Johansen v. Combustion Eng'g, Inc*., 170 F.3d 1320, 1333 (11th Cir. 1999) (citing *Kingsley Mill Corp. v. Edmonds*, 208 Ga. 374, 67 S.E.2d 111,112 (1951). This interest in deterring environmental pollution 'is evidenced by Georgia's statutory scheme which provides that pollution of a stream is a trespass, O.C.G.A. § 51-9-7, and for civil penalties O.C.G.A. § 12-5-52 (providing fines of up to $100,000 per day for violators of the Georgia Water Quality Control Act, O.C.G.A. §§ 12-5-20 – 12-5-53).' *Johansen*, 170 F.3d at n.24."  *Johnson*, 563 F.Supp.3d at 1322.  These same interests are additionally protected by the Georgia Erosion and Sedimentation Control Act.  *See Pulte Homes v. Simerly*, 322 Ga.App.699, 705 (2013).

The Georgia Water Quality Control Act ("GWQCA") found at O.C.G.A. §§ 12-5-20 et seq. "is the State's statutory scheme implementing the CWA to regulate the discharge of pollutants into the water of the state."  Id.  "Under the GWQCA, an entity seeking to erect a facility of any type that will result in the discharge of pollutants into the waters of the State is required to obtain a National Pollutant Discharge Elimination System ('NPDES') permit."  Id.  "Generally, any discharge is unlawful unless performed pursuant to an in accordance with the NPDES permit."  Id.  Similarly, a discharge of storm-water runoff from construction activities where best management practices have not been properly implemented violates the Sedimentation Control Act.  O.C.G.A. §§ 12-7-2, 12-7-6(a)."  Id.

"It is well settled that Georgia law allows the adoption of a statue or regulation as a standard of conduct so that its violation becomes negligence per se."  Id.  "'O.C.G.A. § 51-1-6 authorizes a plaintiff to recover damages for the breach of a legal duty even when that duty arises from a statute that does not provide for a private cause of action.  O.C.G.A. § 51-1-6 does not create a legal duty but defines a tort and authorizes damages when a legal duty is breached.'"  Id.  "The legal duties imposed by the GWQCA, Sedimentation Control Act, and the [Clean Water Act] fall within the ambit of O.C.G.A. § 51-1-6."  Id.  Evidence regarding defendants' failure to comply with these statutes provide the basis for Plaintiffs to establish their "negligence per se claims."  Id.

A plaintiff "may assert a claim of negligence per se arising from violations of federal or state statutes as long as (1) that plaintiff falls within the class of persons the statute was intended to protect; (2) the harm complained of was the same harm the statute was intended to guard against; and (3) the violation of the statute proximately caused the plaintiffs injury."  *McLain v. Mariner Health Care, Inc.*, 279 Ga.App. 410, 411 (2006).  *See also Doe v. Fulton-Dekalb Hosp. Auth.*, 628 F.3d 1325, 1339 (11th Cir. 2010) ("In addition to the violation of a statute or ordinance,

'[t]he violation of a regulation … can likewise establish that a defendant breached a duty owed to a plaintiff as a matter of law.'").

In addition to the common law duty described above, Silicon Ranch Corporation, and its agent defendant SR Lumpkin, LLC, owed a statutory legal duty to control and eliminate discharges of pollutants from its property as a result of the construction of the Lumpkin Solar facility.  It is undisputed that Silicon Ranch Corporation is the "primary permittee" as defined by the NPDES Permit applicable to the construction of the Lumpkin Solar facility – NPDES General Permit for Stormwater Discharges Associated with Construction Activity for Standalone Projects GAR100001 ("General Permit").  Doc. 130-5.  As the primary permittee, Silicon Ranch Corporation and its agent defendant SR Lumpkin, LLC had a duty to comply "with all applicable conditions of this permit."  Doc. 130-5 at p. 40, Part V.A. "Duty to Comply."  "Any permit noncompliance constitutes a violation of the Georgia Water Quality Control Act".  Id.

Defendant Silicon Ranch Corporation and its agent defendant SR Lumpkin, LLC failed to properly design, install, and maintain the erosion control measures required by the General Permit. By violating their duty to comply with all of the terms of the General Permit, these defendants illegally discharged polluted stormwater laden with silt and sediment into the stream flowing from defendant Silicon Ranch Corporation's property and on to Plaintiffs' property.  Plaintiffs are downstream property owners with a right to have water flow upon their land in its natural state free from adulteration.  *See Johnson* supra.  Thus, Plaintiffs are within the class of persons the GWQCA is designed to protect, and the pollution of their property by sediment laden stormwater discharges from the Lumpkin Solar Facility is the kind of harm the GWQCA, the Georgia Erosion and Sedimentation Control Act, and the NPDES General Permit were intended to guard against. *See McLain supra*.

In addition, defendant Silicon Ranch Corporation, as the employer of the other defendants, is liable for the negligence of a contractor when "the work … if done in the ordinary manner, would result in a nuisance; if the wrongful act is the violation of a duty imposed by statute; [or if] "the employer ratifies the unauthorized wrong of the independent contractor."  O.C.G.A. § 51-2-5.

With respect to defendant Infrastructure and Energy Alternatives, Inc. and its agent defendant IEA Constructors, LLC, it is undisputed that they were the "operator" of the Lumpkin Solar facility as defined by the General Permit.  Doc. 130-5 at p. 8, ¶ 27.  "'Operator' means the entity that has the primary day-to-day operational control of those activities at the construction site necessary to ensure compliance with Erosion, Sedimentation and Pollution Control Plan ["ESPCP"] requirements and permit conditions."  To this end, defendant Infrastructure and Energy Alternatives, Inc. and its agent defendant IEA Constructors, LLC were responsible for installing and maintaining erosion control measures described in the ESPCP.  These defendants failed to adequately and properly install and maintain the requisite erosion controls.  By violating their duty to comply with all of the terms of the General Permit and the ESPCP, these defendants illegally discharged polluted stormwater laden with silt and sediment into the stream flowing from defendant Silicon Ranch Corporation's property and on to Plaintiffs' property.  Plaintiffs are downstream property owners with a right to have water flow upon their land in its natural state free from adulteration.  *See Johnson supra*.  Thus, Plaintiffs are within the class of persons the GWQCA is designed to protect, and the pollution of their property by sediment laden stormwater discharges from the Lumpkin Solar Facility is the kind of harm the GWQCA, the Georgia Erosion and Sedimentation Control Act, and the NPDES General Permit were intended to guard against. *See McLain supra*.

With respect to defendant Westwood Professional Services, Inc., the design professionals

hired to provide construction and erosion control plans for the other defendants, Georgia law "imposes upon persons performing architectural, engineering, and other professional and skilled services the obligation to exercise a reasonable degree of care, skill, and ability, which generally is taken and considered to be such a degree of care and skill as, under similar conditions and like surrounding circumstances, is ordinarily employed by their respective professions." *Bodin v. Gill*, 216 Ga. 467, 472 (1960).  The *Bodin* case "identified a legal duty of care independent of privity" to the neighboring landowner.  *North American Co. for Life and Health Ins. v. Berger*, 648 F.2d 305, 307 (5th Cir. 1981).

Defendant Westwood Professional Services, Inc. is the "Design Professional", as defined by the NPDES General Permit, and provided the ESPCP that failed to control the discharge of polluted stormwater laden with silt and sediment from the Lumpkin Solar facility construction site.  Defendant Westwood Professional Services, Inc.'s negligence is described in Dr. Brian Wellington's affidavit attached to Plaintiffs' Complaint.  Doc. 1-16.  By violating its duty to carefully and skillfully design the construction plans and the ESPCP, defendants Westwood Professional Services, Inc. caused the discharge of polluted stormwater laden with silt and sediment from the Lumpkin Solar facility construction site and on to Plaintiffs' property. Plaintiffs are downstream property owners with a right to have water flow upon their land in its natural state free from adulteration.  *See Johnson supra*.  Thus, Plaintiffs are within the class of persons the GWQCA is designed to protect, and the pollution of their property  by sediment laden stormwater discharges from the Lumpkin Solar Facility is the kind of harm the GWQCA, the Georgia Erosion and Sedimentation Control Act, and the NPDES General Permit were intended to guard against.  *See McLain supra*.

"Under Georgia law, two or more tortfeasors may be found to have committed 'concurrent'

acts of negligence whether or not they acted in concert or their acts of negligence occurred at the same time.  In this State … it is not necessary that there be intentional concert or simultaneous action among those sought to held jointly liable for injury.  All that is required is that the negligent acts, although separate and independent, be found to have combined naturally and directly to produce a single injury." *Delson v. Georgia Dept. of Transp*., 295 Ga. App. 84, 89 (2008).  "Joint tortfeasors act negligently either in voluntary, intentional concert or separately and independently, to produce a single indivisible injury for which 'a rational basis does not exist for apportionment of damages.'" *Adkins v. Knight*, 256 Ga. App. 394, 395-96 (2002).  Each of the defendants in this case played a role in failing to adequately design, install, and maintain the erosion control measures required by law.  Each of these negligent acts combined to produce the damage to plaintiffs' property.

Other relevant statutes include:  O.C.G.A. § 41-1-1 (nuisance), O.C.G.A. § 41-1-4 (right of action for private nuisance generally), O.C.G.A. § 51-9-1 (trespass), O.C.G.A. § 51-9-7 (pollution of stream as trespass), and O.C.G.A. § 51-12-11 (mitigation of damages not applicable to positive and continuous torts).

**<u>Submitted by SRC and IEA defendants:</u>**

Rather than re-briefing the issues in this case, the SRC & IEA defendants respectfully rely upon its prior briefing and submit the below authority as pertinent authority to a claim of negligence:

- O.C.G.A. § 51-11-7 (Comparative Negligence)

- O.C.G.A. § 51-1-2 (Ordinary Negligence)

- O.C.G.A. §§ 51-12-8 and 51-12-9 (Proximate Causation)

- *Parker v. Scrap Metal Processors, Inc.,* 386 F.3d 993, 1017 (11th Cir. 2004) ("[O]wnership or occupancy is a necessary element of a claim for nuisance under Georgia

law.")

- *Collie Concessions, Inc. v. Bruce*, 272 Ga. App. 578, 582 (2005), (citing O.C.G.A. § 14-11-501(a)). ("A member of [an LLC] does not own property owned by the LLC." )

- *Saulsbury v. Wilson*, 348 Ga. App. 557, 559 (2019) ("The defense of assumption of the risk of danger applies when the plaintiff, with a full appreciation of the danger involved and without restriction of her freedom of choice either by the circumstances or by coercion, deliberately chooses an obviously perilous course of conduct.")

- *Kissun v. Humana, Inc.*, 267 Ga. 419, 421 (1997) (under Georgia law, "[t]here is no question that under appropriate circumstances a parent corporation can set up a subsidiary to promote the parent's purposes yet maintain a separate identity from the subsidiary and avoid liability for the subsidiary's actions.")

- *Ward v. Dickinson Fin. Corp. II*, Civil Action No. 7:14-CV-8 (HL), at *15-16 ("The degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship.")

- *Knieper v. Forest Grp. USA, Inc.,* No. 4:15-CV-0222-HLM, 2016 U.S. Dist. LEXIS 193961, at *38-39 (N.D. Ga. 2016) (Citing *In re: W. States Wholesale Natural Gas Antitrust Litig*., 605 F. Supp. 2d 1118, 1132-33 (D. Nev. 2009) (a parent may provide financing to its subsidiary so long as it maintains corporate formalities and properly documents loans and capital contributions to it.)

- *NEC Techs. v. Nelson*, 267 Ga. 390, 397 (1996) (citations omitted). ("To establish the alter ego doctrine, a plaintiff must show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or by confusing otherwise separate properties, records or control, or by showing that a disregard of the corporate entity made it a mere instrumentality for the transaction of the other entity's own affairs and that there is such unity of interest and ownership that the separate personalities of the corporations no longer exist.")

- *Lowery v. Noodle Life, Inc.,* 363 Ga. App. 1, 4 (2022). ("Where there is no evidence that the corporate arrangement is a sham that was designed to defeat justice, perpetuate fraud, or evade statutory, contractual, or tort liability, the issue of alter ego liability is not a jury question.")

- *Gateway Atlanta Apts., Inc. v. Harris*, 290 Ga. App. 772, 778 (2008) (Citations omitted) ("[a] joint venture arises where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control. Without the element of mutual control, no joint venture can exist. In order for one party to be liable for the negligence of another under a joint venture theory, the party must have had the right to direct and control the conduct of the other party in the activity causing the injury. The mere existence of a business interdependency does not create a joint venture.")

- *Ramcke v. Georgia Power Co.*, 306 Ga. App. 736, 739 (2010) (A parent company is not liable for the conduct of subsidiary companies, absent evidence sufficient to show that the parent company participated in a joint venture with its subsidiaries, or acted as their agent or alter ego.).

**Submitted by Westwood:  Westwood makes no specifications of negligence against another party.**

XII.   If a contract action, the terms of the contract are as follows (or, the contract is attached as an exhibit to this order):

Not applicable.

XIII.   The types of damages and the applicable measure of those damages are as follows:

**Submitted by Plaintiffs:**

(a)   General Damages:  Plaintiffs have alleged damages caused by defendants' creation and maintenance of a nuisance and trespass.  Pursuant to O.C.G.A. § 51-12-2(a), "general damages are those presumed to flow from a tortious act and may be recovered without specific proof of any amount."  *Segars v. Cleland*, 255 Ga. App. 293, 296 (2002).  Pursuant to O.C.G.A. § 41-1-4, "a plaintiff in an action may recover for both personal injury and property damage."  *Id*.  The determination of the amount of general damages to be awarded for "discomfort, loss of peace of mind, unhappiness and annoyance" caused by the nuisance and/or trespass is for the enlightened mind of the jury.  In the case of a nuisance/trespass involving runoff of surface water, 'actual damages as such, i.e., injuries, are evidenced by a showing that the property owners are deprived of the full use and enjoyment of their property by the increased flow of surface waters or sediments on it."  *Baumann v. Snider*, 243 Ga. App. 526, 527-28, 532 S.E.2d 468, 472 (2000); *See also*, O.C.G.A. § 41-1-4 and *City of Atlanta v. Murphy*, 194 Ga. App. 652, 391

S.E.2d 474, 476 (1990).  The amount of such damages are to be determined by the enlightened conscience of the jury and may be recovered without specific proof of any amount.  *Segars*, 255 Ga. App. at 296 (2002).  The general damages to which Plaintiffs are entitled to recover will be proven at trial.

(b)      Costs to Repair and Protect Property:  Plaintiffs allege that defendants are liable for creating and maintaining a nuisance and trespass.  Nuisance/trespass damages are generally measured as "the cost to repair as well as the difference in fair market value before the trespass and the fair market value after the trespass."  *Baumann v. Snider*, 243 Ga. App. 526, 527 (2000).  Georgia law allows recovery of costs associated with repairing or restoring property damaged by the maintenance of a continuing nuisance as long as the restoration would not be an absurd undertaking. *See Georgia Northeastern Railroad, Inc. v. Lusk*, 277 Ga. 245, 247 (2003) and *Royal Capital Dev. LLC v. Md. Cas. Co*., 291 Ga. 262, 265-66 (2012). The costs to repair or restore the property can exceed the diminution in the property's value during the nuisance's existence.  *Id*.

In addition, Plaintiffs allege that defendants' negligence and negligence per se caused general and special damages for which they are entitled to recover.  *See Ingles Markets, Inc. v. Kempler*, 730 S.E.2d 444, 450 (2012) (sustaining the jury's award of damages "to protect the property" where plaintiff proved "both the nuisance and negligence claims.").  O.C.G.A. § 51-12-2 permits the jury to award both general damages and special damages to Plaintiffs.  "Special damages are those which flow from a tortious act; they must be proved in order to be recovered."  O.C.G.A. § 51-12-2(b).  In addition, Plaintiffs are entitled to recover

both "direct" and "consequential" damages caused by defendants' tortious conduct. O.C.G.A. § 51-12-3.  The costs to repair Plaintiffs' property are also "necessary expenses consequent upon an injury [and] are a legitimate item in the estimate of damages."  O.C.G.A. § 51-12-7.  The costs to repair Plaintiffs' property will be proven at trial.

(c)   <u>Diminished Value</u>:

Plaintiff H&L Farms, LLC, as a limited liability, land-holding company, is the owner of the Kawikee property and is thus entitled to recover the amount of diminished value of the property caused by defendants' negligent actions and inactions. "While the owner of the property is entitled to damages for diminution in value, the occupier may recover for deprivation of 'unrestricted use and full enjoyment of the same.'" *Oglethorpe Power Corp. v. Estate of Forrister*, 332 Ga. App. 693, 709 (2015). Plaintiffs allege the diminution in value of their property is due to the pollution of Plaintiffs' property by defendants. Recovery for both past discomfort and annoyance and diminished property value has been consistently allowed" in Georgia courts "for more than a century." T*oyo Tire Mfg. Co. v. Davis*, 299 Ga. 155, 163 (2016) (unanimous). The prospective damages are measured "by how much the market value of the [the Harris's] property has diminished based on the expectation of such continued discomfort and annoyance" prompted by defendants. *Toyo Tire Mfg. Co*., 299 Ga. at 166. The cost of diminution in value of Plaintiffs' property will be proven at trial.

(d)   <u>Attorney's Fees and Other Litigation Expenses Pursuant to O.C.G.A. § 13-6-11</u>: O.C.G.A. § 13-6-11 authorizes attorneys' fees for trespass and nuisance claims

even when only nominal damages are recovered. *See Tyler v. Lincoln*, 272 Ga. 118, 527 S.E.2d 180 (2000); *Savannah College v. Nulph*, 265 Ga. 662, 663(4), 460 S.E.2d 792 (1995). "[E]very intentional tort invokes a species of bad faith that entitles a person wronged to recover the expenses of litigation including attorney fees." *Tyler v. Lincoln*, 272 Ga. 118, 527 S.E.2d 180 (2000). "[A] trespass is an intentional act." Id.

Plaintiffs also allege there is no bona fide dispute as to defendants' liability. Accordingly, Plaintiffs allege the defendants were stubbornly litigious and caused unnecessary trouble and expense, thereby authorizing Plaintiffs to recover litigation expenses, including attorneys' fees and expert witness fees, pursuant to O.C.G.A. § 13-6-11. "Where no defense exists, as in this case, forcing a plaintiff to resort to the courts in order to collect is plainly causing him 'unnecessary trouble and expense.'" *Sawgrass Builders, Inc. v. Realty Co-op. Inc*., 172 Ga. App. 324, 323 S.E.2d 243 (1984). "A recovery for stubborn litigiousness … is authorized where the evidence reveals no bona fide controversy or dispute with regard to the defendant's liability." *Gray v. King*, 270 Ga. App. 855, 857, 608 S.E.2d 320, 323 (2004). "The defendant steadfastly denied liability and therefore it cannot raise the amount of damages as a genuine controversy. In denying any liability to the plaintiff car owner, Beaudry effectively forced Bonds to litigate." *Beaudry Ford, Inc. v. Bonds*, 139 Ga. App. 230, 231, 228 S.E.2d 208, 209 (1976). The amount of attorney's fees and expenses of litigation to which Plaintiffs are entitled to recover will be proven at trial.

(e)     Punitive Damages: Plaintiffs seek punitive damages pursuant to O.C.G.A. § 51-12-

5.1 in an amount sufficient to punish, penalize, and deter defendants from their

harmful conduct in the future.  "Punitive damages may be awarded in tort actions in

which clear and convincing evidence proves that a defendant's 'actions showed

willful misconduct, malice, fraud, wantonness, oppression, or that entire want of

care which would raise a presumption of conscious indifference to consequences."

*Tyler v. Lincoln*, 272 Ga. 118, 120 (2000) (citations omitted).  (Plaintiffs here do

not allege "malice" or "fraud"; Plaintiffs do allege that the conduct of the SRC and

IEA defendants was reckless, in addition to being wanton and evidencing an "entire

want of care.")

"A conscious indifference to consequences relates to an intentional disregard of the

rights of another.  Willful and intentional misconduct is not essential.  But a

trespass is an intentional act.  Thus, a willful repetition of a trespass will authorize a

claim for punitive damages.  So too, will a claim for continuing nuisance.  And

specifically, the failure to adequately ameliorate the runoff of water and silt onto

another's property has been held to justify a punitive damage award."  Id. (citations

omitted); *Ponce de Leon Condominiums v. DiGirolamo*, 238 Ga. 188, (1977)

(affirming an award of punitive damages where appellant acted with "conscious

indifference to consequences, if not in creating, then in failing to correct a drainage

system which was causing damage to the appellee); *Raymar, Inc. v. Peachtree Golf

Club*, 161 Ga. App. 336, 338 (1982) (affirming an award of punitive damages

where the trial judge had instructed the jury that "a conscious indifference to the

consequences may be defined as the failure to correct a silt or drainage problem

after receiving notice of the problem causing the damages for which the defendant

was responsible").

"Punitive damages may be recovered if the circumstances are such from which an inference of conscious indifference to the consequences and to the legal rights of others, or to the ordinary obligation of society might be drawn." *Dow Chemical Co. v. Ogletree, Deakins, Nash, Smoak & Stewart*, 237 Ga. App. 27, 514 S.E.2d 836 (1999). Conscious indifference to consequences is evidenced by situations where a defendant disregards the rights of another. *Id.* "[E]ven where the defendant did not act with conscious indifference in creating the problem that led to the damage, punitive damages may be justified if the defendant acted with such conscious indifference in failing to correct that problem." *Wildcat Cliff Builders, LLC v. Hagwood*, 292 Ga. App. 244 (2008).

According to O.C.G.A. § 51-12-51(f), the statutory cap on punitive damages does not apply "if it is found that the defendant acted, or failed to act, with the specific intent to cause harm". Plaintiffs will request that the jury making a finding the SRC and IEA defendants acted, and failed to act, with a specific intent to cause harm to Plaintiffs' property. *See Action Marine, Inc. v. Continental Carbon Inc.*, 481 F.3d 1302, 1312-13 (2007) (approving district court's jury charge regarding specific intent to cause harm).

**Submitted by SRC and IEA defendants:**

Rather than re-briefing the issues in this case, these defendants respectfully rely upon its prior briefing and submit the below authority as pertinent to the types of damages and the applicable measure of those damages:

(a) <u>General Damages; Cost to Repair and Diminished Value:</u>

- *Alabama Power Co. v. F.C.C.*, 311 F.3d 1357, 1369 (11th Cir. 2002) ("an aggrieved party should be put in as good a position as he was in before the wrong, but not better") (citing Dan B. Dobbs, *1 Law of Remedies 281* (1993))

- *Burleyson v. W. & Atl. R. Co*., 91 Ga. App. 745, 752, 87 S.E.2d 166, 171 (1955) ("Generally, the measure of damages for continuing an abatable nuisance is a diminution of the yearly rental value of the property damaged during the existence of the nuisance and within the statute of limitations, plus any actual damage sustained, and the measure of damages is not the diminution in the market value of the property.")

- *Baumann v. Snider*, 243 Ga. App. 526, 527–28, 532 S.E.2d 468, 472 (2000) ("If the cause of the trespass is an abatable nuisance, and therefore not necessarily permanent in nature, the measure of damages is the loss in fair market rental value plus actual damages.")

- *Sumitomo Corp. of Am. v. Deal*, 256 Ga. App. 703, 707 (2002) (to prove a nuisance cause of action, a plaintiff must prove that a defendant caused the creation, continuance, or maintenance of the nuisance and that it controlled the cause of the harm)

- *Petree v. Dep't of Transportation*, 340 Ga. App. 694, 702 (2017) (to prove a trespass cause of action, a plaintiff must prove that a defendant wrongfully interfered with plaintiffs' right to the exclusive use and benefit of a property right)

- *Walls v. Moreland Altobelli Associates*, 290 Ga. App. 199, 201 (2008) ("One who aids, abets, or incites, or encourages or directs, by conduct or words, in the perpetration of a trespass is liable equally with the actual trespassers.")

- *Weller v. Blake*, 315 Ga. App. 214, 219, *adopted*, (Ga. Super. 2012) (to prove a negligence and negligence per se action, plaintiffs must prove that a defendant had "(1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a causal connection between the conduct and the injury; and (4) damages from the breach of duty")

- *Terry v. Catherall*, 337 Ga. App. 902, 905 (2016) ("[c]ausation is an essential element of nuisance, trespass, and negligence claims")

- *Uniroyal, Inc. v. Hood*, 588 F.2d 454, 462 (5th Cir. 1979) ("Georgia law does not impose strict liability on any party for damage caused by surface water runoff. Liability must be based upon some element of intentional or negligent conduct which proximately causes the water damage.")

(b) <u>Attorney's Fees and Other Litigation Expenses Pursuant to O.C.G.A. § 13-6-11:</u>

- *Rapid Grp., Inc. v. Yellow Cab of Columbus, Inc.*, 253 Ga. App. 43, 49, 557 S.E.2d 420, 426 (2001) (internal citations omitted) ("bad faith cannot be prompted by an honest

mistake as to one's rights or duties but must result from some interested or sinister motive. 'Bad faith' is not simply bad judgment or negligence, but it imports a dishonest purpose or some moral obliquity, and implies conscious doing of wrong, and means breach of known duty through some motive of interest or ill will.")

(c) Punitive Damages:

- *Bartenfeld v. Chick-fil-A,* 346 Ga. App. 759, 769 (2018) ("Under Georgia law, a plaintiff cannot recover punitive damages when the underlying tort claim fails.")

- *General Refractories Co. v. Rogers*, 240 Ga. 228, 230 (1977) (Court denied punitive damages and attorney's fees for the damages from the flow and drainage of water and sediment, because it found no "clear act" on the part of the defendant which would support willful or wanton conduct, malice, oppression, conduct exemplifying conscious indifference to consequences or a succession of tortious acts.")

- *Dillard v. Smith*, No. 1:19-CV-821-MLB, 2022 WL 1452748, at *3 (N.D. Ga. May 9, 2022) (denying punitive damages claim where defendant "did not simply ignore or disregard" issue but had a "plan" to resolve it)

- *Colonial Pipeline Co. v. Brown,* 258 Ga. 115, 118(3b), 365 S.E.2d 827 (1988) ("[n]egligence, even gross negligence, is inadequate to support a punitive damage award")

- *EnduraCare Therapy Mgmt., Inc. v. Drake*, 298 Ga. App. 809, 814 (2009) ("a plaintiff cannot recover punitive damages when the underlying tort claim fails.")

- *Aldworth Co. v. England*, 286 Ga. App. 1, 4 (2007) (evidence that defendants acted with conscious indifference, but not specific intent to cause harm, did not support unlimited punitive damages.)

(d) Attorneys' fees

- *Haney v. Camp*, 320 Ga. App. 111, 114 (2013) ("Finding of bad faith [is] required to determine an award of expenses of litigation pursuant to OCGA § 13-6-11.")

- *Haggard v. Bd. of Regents*, 257 Ga. 524, 527 n.3 (1987) ("Bad faith cannot be prompted by an honest mistake as to one's rights or duties, bad judgment, or negligence; it requires a dishonest purpose, some moral obliquity, conscious doing of wrong through some self-interested or sinister motive.")


Submitted by SRC and IEA defendants:

These defendants respectfully rely on all legal sources listed by other parties in their

portions of the pretrial order, and all other legal sources cited in Defendants' motions and briefs

filed in this case.  These defendants do not otherwise believe this case presents any "peculiar legal questions" at this time, but should any rise, these defendants will bring authority to resolve same to Court's attention.

*Submitted by Westwood:*

In the event the jury finds in favor of Plaintiffs, Westwood submits Plaintiffs are entitled to recover consequential and general damages to the extent permitted by law.  Westwood submits that it is a question for the factfinder if Plaintiffs are entitled to punitive damages, attorneys fees, or litigation costs and, if so, the amount thereof.

**XIV.**  All material undisputed facts established by the pleadings, depositions, or admissions of the parties are attached hereto as Exhibit A, are signed by counsel, and will be submitted to the jury at the beginning of trial [ALL PARTIES MUST STIPULATE TO THESE FACTS - otherwise there are NO undisputed facts].

**XV.**  Pursuant to the court's usual practice, pleadings   will   not be submitted to the jury.

**XVI.**  **Special authorities relied upon by plaintiff relating to peculiar legal questions are as follows:**

Plaintiffs do not believe this case presents any "peculiar legal questions" but provides the following statutes, regulations, and case law that are applicable to issues in this case:

Georgia statutes applicable here include the Georgia Water Quality Control Act, O.C.G.A. § 12-5-20 et seq.; the Erosion and Sedimentation Act, O.C.G.A. § 12-7-1 et seq.; Trespass, O.C.G.A. § 51-9-7, O.C.G.A. § 51-9-1 et seq.; Nuisance, O.C.G.A. § 51-9-1, O.C.G.A. §§ 41-1-1 to 41-2-17; Negligence and Negligence per se, OCGA § 51-12-1 through § 51-1-6 ; Damages, O.C.G.A. § 41-1-4,O.C.G.A. § 51-12-2(a), O.C.G.A. § 51-12-, OCGA § 51-12-11; Attorneys' Fees and Expenses of Litigation, O.C.G.A. § 13-6-11; Punitive Damages, O.C.G.A. § 51-12-5.1,

O.C.G.A. § 51-12-51(f) ; and Attorney's Fees and Expenses of Litigation, O.C.G.A. § 9-11-68.

Applicable regulations include, but are not limited to, the Georgia Department of Natural Resources Water Quality Control Regulations Chapter 391-3-6, Georgia Department of Natural Resources Sediment and Erosion Control Regulations Chapter 391-3-7, and the Manual for Erosion and Sediment Control in Georgia, 2016 Edition; and the Field Manual for Erosion and Sediment Control, 2016 Edition.

Applicable permits include the NPDES General Permit for Stormwater Discharges Associated with Construction Activity for Standalone Projects GAR100001 ("General Permit"). Doc. 130-5.

Applicable theories of Georgia common law include:

(A) Nuisance claims for defendants' construction activities and omissions which have damaged Plaintiffs and their property.

(B) Trespass claims for defendants' construction activities and omissions which have violated Plaintiffs' exclusive possession of their property and for the deleterious effects of the trespass of water, sediment, eroded soil, debris and other pollutants onto Plaintiffs' property and into the stream and lake on Plaintiffs' property.

(C) Negligence and Negligence per se claims arising from defendants' failure to exercise reasonable care with respect to preventing damage to Plaintiffs' property, and defendants' failure to follow applicable permits, statutes, and regulations.

(D) Attorneys' fees premised upon defendants' continuing trespass upon Plaintiffs' property and further premised upon defendants' bad faith dealings with Plaintiffs over the course of this dispute requiring Plaintiffs to incur litigation expenses, defendants' stubborn litigiousness, and defendants' causing Plaintiffs' unnecessary trouble and expense.

The term bad faith, as it is used in O.C.G.A. § 13-6-11, means bad faith connected with the transactions and dealings out of which the cause of action arose.  *Brown v. Baker*, 197 Ga. App. 466, 398 S.E.2d 797, 799 (1990).  The clauses in O.C.G.A. § 13-6-11 relating to stubborn litigiousness and unnecessary trouble and expense refer to forcing a plaintiff to resort to litigation where there is no genuine dispute or bona fide controversy, or where no defense exists.  *Eastern Foods, Inc. v. Forman*, 202 Ga. App. 347, 415 S.E.2d 1 (1991), *Rogers v. Georgia Ports Auth*., 183 Ga. App. 325, 358 S.E.2d 855, cert. denied 183 Ga. App. 906, 358 S.E.2d 855 (1987), *Clements v. Barnes*, 197 Ga. App. 120, 397 S.E.2d 560 (1990).  *Tyler v. Lincoln, et. al*., 527 S.E.2d 180, 272 Ga. 118 (2000).  Where the evidence demonstrates no bona fide controversy as to defendants' liability, stubbornly litigious attorneys' fees pursuant to O.C.G.A. § 13-6-11 are appropriate. *Chapman v. Hepburn*, 191 Ga. App. 909, 910, 383 S.E.2d 352, 354 (1989); *Georgia-Carolina Brick & Tile Co. v. Brown*, 153 Ga. App. 747, 266 S.E.2d 531 (1980).  Similarly, where no defense exists, forcing a plaintiff to resort to litigation to collect is clearly causing that plaintiff unnecessary trouble and expense for which O.C.G.A. § 13-6-11 attorney fees should be awarded. *Clements v. Barnes*, 197 Ga. App. 120, 397 S.E.2d 560 (1990).  An award of damages for trespass, an intentional tort, supports a claim for expenses pursuant to O.C.G.A. § 13-6-11 under the theory that the intention evokes the "bad faith" necessary for recovery under that statute.  *Tanner v. Gilleland*, 186 Ga. App. 377, 378, 367 S.E.2d 257 (1988); *Piedmont Cotton Mills, Inc. v. H.W. Ivey Construction C*o., 109 Ga. App. 876, 881, 137 S.E.2d 528, 532 (1964); *Tyler v. Lincoln*, 527 S.E.2d 180, 272 Ga. 118 (2000).

(E)  Punitive damages premised on defendants' conduct taken in wanton and callous disregard of Plaintiff's protected rights, and defendants' specific intent to cause harm to Plaintiffs and their property as described in O.C.G.A. § 51-12-5.1(f).

(F)  Finally, all applicable Federal and Georgia case law relating to or interpreting the statutes and/or regulations enumerated above, including but not limited to the following cases:

*Parker v. Scrap Metal Processors, Inc*., 384 F.3d. 993 (11th Cir. 2004); *Driscoll v. Adams*, 181 F.3d 1285 (11th Cir.  1999), reh'g and reh'g en banc denied, 196 F.3d 1263 (1999), cert. denied, 529 U.S. 1108 (2000); *Action Marine, Inc. v. Continental Carbon Inc*., 481 F.3d 1302 (11th Cir. 2007), *State of Georgia et al. v. City of East Ridge, TN*, 949 F. Supp. 1571 (N.D. Ga. 1996); *Leak v. U.S. Bank, Ocwen Loan Servicing, LLC*, Case No., 4:20-cv-275, (M.D. Ga. 2021), *Roberts v. Jones*, 390 F.Supp.2d 1333 (M.D. Ga. 2005), *Argonaut Midwest Ins. Co. v. McNeilus Truck & Manufacturing*, 2013 WL 504897 (N.D. Ga. 2018), *American Guarantee and Liability Ins. Co. v. Ruys & Co*., 2013 WL 12123684 (N.D. Ga. 2013), *Johnson v. 3M*, 563 F.Supp.3d 1253 (N.D. Ga. 2021), *Southwestern Emergency Physicians, P.C. v. Quinney*, 347 Ga. App. 410 (2018), *Union Carbide Corp. v. Fields*, 315 Ga. App. 554 (2012), *Duffield v. DeKalb County*, 242 Ga. 432, 434, 249 S.E.2d 235, 237 (1978); *Miller v. Coleman*, 213 Ga. 125, 97 S.E.2d 313, 317 (1957); *Cannon v. City of Macon*, 81 Ga. App. 310, 320, 58 S.E.2d 563 (1950); *City of Macon v. Cannon*, 89 Ga. App. 484, 492, 79 S.E.2d 816 (1954); *Williams v. Harris*, 207 Ga. 576 (1951), *City of Columbus v. Myszka*, 246 Ga. 571, 272 S.E.2d 302 (1980); *Columbus, Georgia v. Smith*, 170 Ga. App. 276, 316 S.E.2d 761 (1984);  *Floyd v. City of Albany*, 105 Ga. App. 31, 123 S.E.2d 446 (1961); *Mayor & City of Savannah v. Palmerio*, 242 Ga. 419, 249 S.E.2d 224, 229 (1978); *Hibbs v. City of Riverdale*, 267 Ga. 337, 478 S.E.2d 121, 122 (1996); *Carter v. Mayor & Alderman of City of Savannah*, 200 Ga. App. 263 (1991); *Town of Fort Oglethorpe v. Phillips*, 224 Ga. 834, 838, 165 S.E.2d 141 (1968); *City of Thomasville v. Shank*, 263 Ga. 624, 437 S.E.2d 306 (1993); *Earnheart v. Scott*, 213 Ga. App. 188, 444 S.E.2d 128, 129 (1994); *City of Rome v. Jordan*, 263 Ga. 26, 426 S.E.2d 861, 862 (1993); *Arvida/JMB Partners v. Hadaway*, 227 Ga. App.

335, 439 S.E.2d 125 (1997); *Sumitomo Corporation of America v. Deal*, 256 Ga. App. 703 (2002).

*Tyler v. Lincoln*, et. al., 513 S.E.2d 6, 236 Ga. App. 850 (Ga. App. 1999), rev'd in part by, 527

S.E.2d 180, 272 Ga. 118 (2000) (on the issues of bad faith attorneys' fees and punitive damages),

*Fielder v. Rice Const. Co*., 239 Ga. App. 362, 522 S.E.2d 13 (1999); *Webster v. Snapping Shoals

Electric Membership Corp.*, 176 Ga. App. 265, 266, 335 S.E.2d 637, 639 (1985), citing 27A EGL

255, Trespass, Sec. 6 (1985 Rev.).   *Saheen v. G & G Corp*., 230 Ga. 646, 648, 198 S.E.2d 853,

855 (1973), *Kingsley Mill Corp. v. Edmonds*, 208 Ga. 374, 67 S.E.2d 111, 112 (1951); *Gill v. First

Christian Church, Atlanta, Georgia, Inc*., 117 S.E.2d 164, 165, 216 Ga. 454 (1960); *Bodin v. Gill*,

216 Ga. 467 (1960), *Southern Mutual Investment Corp. v. Langston*, 128 Ga. App. 671, 197

S.E.2d 775 (1973); *Roughton v. Theile Kaolin Co*., 209 Ga. 577, 74 S.E.2d 844 (1953), *Galanti v.

U.S.*, 706 F.2d 709 (11th Cir. 1983), rehearing denied, 716 F.2d 914, cert. denied, 465 U.S. 1024;

*Burnett v. Stagner Hotel Cts, Inc*., 821 F. Supp. 678, 682 (N.D. Ga 1993), aff'd, 42 F.3d 645,

*Decker v. Gibson Products Co. Of Albany, Inc*., 679 F.2d 212, 214 (11th Cir. 1982), *Georgia

Dep't of Transportation v. Edwards*, 267 Ga. 733, 739, 482 S.E.2d 260, 265 (1997), *Brown v.

Baker*, 197 Ga. App. 466, 398 S.E.2d 797, 799 (1990), *Eastern Foods, Inc. v. Forman*, 202 Ga.

App. 347, 415 S.E.2d 1 (1991), *Rogers v. Georgia Ports Auth*., 183 Ga. App. 325, 358 S.E.2d 855,

cert. denied 183 Ga. App. 906, 358 S.E.2d 855 (1987), *Clements v. Barnes*, 197 Ga. App. 120, 397

S.E.2d 560 (1990), *Chapman v. Hepburn*, 191 Ga. App. 909, 910, 383 S.E.2d 352, 354 (1989);

*Georgia-Carolina Brick & Tile Co. v. Brown*, 153 Ga. App. 747, 266 S.E.2d 531 (1980),

*Roboserve, Ltd. v. Tom's Foods Inc.*, 940 F.2d 1441, 1456 (11th Cir. 1991), citing *Associated

Health Systems, Inc. V. Jones*, 185 Ga. App. 798, 802, 366 S.E.2d 147, 152 (1988), *Ponce de Leon

Condominiums v. DiGirolamo*, 238 Ga. 188, 190, 232 S.E.2d 62, 64 (1977), *Dalon Contracting

Co. v. Artman*, 101 Ga. App. 828, 115 S.E.2d 377 (1960), *DeKalb County v. McFarland*, 231 Ga.

649, 203 S.E.2d 495 (1974); *Lanier v. Ocean Pond Fishing Club, Inc.*, 253 Ga. 549, 322 S.E.2d 494 (1984); *Bridges v. Henson*, 216 Ga. 423, 116 S.E.2d 570 (1960), *Allgood Road United Methodist Church v. Smith*, 173 Ga. App. 28 (1984), *Baumann v. Snider*, 243 Ga. App. 526 (2000), *Brand v. Montega* Corp., 233 Ga. 32 (1974), *Citizens & Southern Trust Co. v. Phillips Petroleum Co., Inc.*, 192 Ga. App. 499 (1989), *Pullen v. Oxford*, 227 Ga. App. 782 (1997), *City of Atlanta v. Landmark Envir'l Indus., Inc*., 272 Ga. App. 732 (2005), *City of Gainesville v. Waters*, 258 Ga. App. 555 (2002), *City of Roswell v. Bolton*, 271 Gal App. 1 (2004), *CSX Transport, Inc., v. West*, 240 Ga. App. 209 (1999), *Great Northeaster R.R. Co., Inc. v. Lusk*, 267 Ga. App. 84 (2004), *Royal Capital Dev. LLC v. Md. Cas. Co*., 291 Ga. 262 (2012), *Hammond v. City of Warner Robins*, 224 Ga. App. 684 (1997), *Multimedia Technologies, Inc. v. Wilding*, 262 Ga. App. 576 (2003), *Stone Man, Inc. v. Green*, 263 Ga. 470 (1993), *Wright v. Wilcox*, 262 Ga. App. 659 (2003), *Ingles Markets, Inc. v. Kempler*, 730 S.E.2d 444 (2012), *Weller v. Blake*, 315 Ga. App. 214 (2012), *Oglethorpe Power Corp., v. Estate of Forrister*, 332 Ga. App. 693 (2015), *Bord v. Hillman*, 335 Ga. App. 18 (2015), *Toyo Tire N. Am. Mfg., Inc. v. Davis*, 299 Ga. 155 (2016), *McDonald v. Silver Hill Homes, LLC*, 343 Ga. App. 194 (2017), *Pulte Home v. Simerly*, 322 Ga. App. 699 (2013), *Segars v. Cleland*, 255 Ga. App. 293 (2002), *Floyd v. Chapman*, 353 Ga. App. 434 (2020), *Osprey Cove Real Estate, LLC v. Towerview Constr., LLC*, 343 Ga. App. 436 (2017), *Plantation At Bay Creek Homeowners Ass'n, Inc. v. Glasier*, 349 Ga. App. 203 (2019), *Walls v. Moreland Altobelli Associates*, 290 Ga. App. 1 (2008), *Wildcat Cliffs Builders, LLC v. Hagwood*, 292 Ga. App. 244 (2008), *Allstate Ins. Co. v. Sutton*, 290 Ga. App. 154 (2008), *Wellstar Health System, Inc. v. Painter*, 288 Ga. App. 659 (2007), *City of Atlanta v. Starke*, 192 Ga. App. 267 (1989), *Davis v. Overall*, 301 Ga. App. 4 (2009), *City of Atlanta v. Murphy*, 194 Ga. App. 652 (1990), and *Green v. Eastland Homes, Inc*., 284 Ga. App. 643 (2007).

All other legal sources listed by other parties in their portions of the pretrial order, and all other legal sources cited in Plaintiffs' motions and briefs filed in this case.  *See* Doc. 43, 50, 51, 53, 65, 72, 74, 92, 99, 100, 102, 103, 130, 131, 132, 133, 138, 142, 144, 147, 156, and 160.

**XVII.**   Special authorities relied upon by defendant relating to peculiar legal questions are as follows:

**Submitted by SRC and IEA defendants:**

These defendants respectfully rely on all legal sources listed by other parties in their portions of the pretrial order, and all other legal sources cited in Defendants' motions and briefs filed in this case.  These defendants do not otherwise believe this case presents any "peculiar legal questions" at this time, but should any rise, these defendants will bring authority to resolve same to Court's attention.

**Submitted by Westwood:**

None other than those outlined in Westwood's Motions in Limine and Requests to Charge.

**XVIII. The following are lists of witnesses the:**

(a)     Plaintiff <u>will</u> have present at trial:
         Shaun Harris
         Amie Harris

(b)     Plaintiff <u>may</u> have present at trial:
         Chase Gibson
         Heather Harris Gibson
         Leslie Harris
         Scott Badcock
         Joel Wooten
         Joe Hill
         John Ferguson
         Jonathan Payne
         John Lee MD
         Stephen Burdette
         Ken Melton
         Phillip Exley
         Sib Fort

Matt Hutchinson
Amy Jackson
Caleb Jackson
Jon Ebert
Mac Moye
Les Ager
Robert Behar
Brian Wellington PhD
Craig Zeller
John Britt
Lee Walters
Stacy Mote
Erin Bouthillier
Vance Smith
Jimmy Brazier
Jim Cawthorne
Charles Money
Reagan Farr
John Thompson
Brian Alfredson
Joseph Ridley
Michael Taylor

BY DEPOSITION – those persons whose deposition testimony has been designated by

Plaintiffs in Exh. B hereto.

(c)     The SRC defendants <u>will</u> have present at trial:
        D. Reagan Farr[1]

(d)     The SRC defendants may have present at trial:
        Luke Wilkinson
        John Thompson
        Connor Echols
        Jennifer Cain
        Paul Russell
        Clint Abrams
        Jeffrey Ames
        Tony Greco
        Erin Harris
        Morgan Mellete
        Sean Miller

---

[1] Mr. Farr will be called as a witness, but he will not be present at the entirety of the trial.

(e ) The IEA defendants will have present at trial:
      Brian Alfredson


(f)      The IEA defendants may have present at trial:
      James Allen
      Joe Broom
      Marlon Orellana
      Michael Taylor
      Dan Bontrager
      David McKenney
      Kevin Butler
      Peyton Herfurth
      Chris Hanson
      Brent Handel
      Joe Alt
      Al Downs
      Omer Akdag
      Lee Bransome
      Tony Greco
      Erin Harris
      Morgan Mellete
      Sean Miller
      Luke Wilkinson
      Jennifer Cain
      Connor Echols
      Reagan Farr
      John Thompson
      Aaron Mlynek
      Andrew Nelson


(g)      Westwood will have present at trial:
      Joseph Ridley


(h)      Westwood may have present at trial:
      Aaron Mlynek
      Andrew Nelson
      Michael Taylor
      James Allen
      Jason Ball
      Dr. Brian Wellington
      Erin Harris
      Tony Greco
      Regan Farr
      Jeffrey Doubrava
      Brian Alfredson

        Austin Fednander
        Bradford White
        John Thompson
        Levi Mitchell

Opposing counsel may rely on representation by the designated party that it will have a witness present unless notice to the contrary is given in sufficient time prior to trial to allow the other party to subpoena the witness or obtain this testimony by other means. Counsel should be prepared to state at the pretrial conference objections to any witness listed.

**XIX.**   Attached hereto as Exhibit B is a list of all depositions that each party intends to introduce at trial. If parties do not intend to read the entire deposition into the record, page and line designations and counter designations should be included.

**XX.**   Attached hereto as Exhibit C is a list of all exhibits that each party intends to tender into evidence at trial. *(Please designate with an asterisk (\*) those Exhibits to which an authenticity objection exists*.)

**XXI.**   Attached hereto as Exhibit D is the form of all possible verdicts to be considered by the jury.

**XXII.**   The possibilities of settling the case are:

Submitted by Plaintiffs: Unlikely.[2]

Plaintiffs respectfully submit that the SRC/IEA defendants' assertions regarding the possibility of settlement are not accurate. Plaintiffs communicated to defendants as recently as January 12, 2023 that "Plaintiffs, and their counsel, would be happy to settle this case." However,

---

[2] On April 21, 2022 the SRC and IEA defendants made an "offer of settlement" pursuant to O.C.G.A. §9-11-68 in the amount of $1.4 million, of which $250,000 was allocated to punitive damages. Plaintiffs have requested that those defendants to withdraw that "offer of settlement," so that settlement negotiations could be conducted. Plaintiffs contend that the purpose of those defendants' "offer" was to try to impose upon Plaintiffs the attorney's fees and expenses of those defendants and Plaintiffs contend said offer was not made in good faith as required by the statute. Those defendants have not responded to that request.

settlement of this case is made more difficult because the damage continues, the SRC/IEA

defendants have done nothing to stop it, and there is no indication that the SRC/IEA defendants

will do anything to stop the damage. Thus, in addition to damages, the injunction issue would need

to be addressed.

Submitted by SRC and IEA defendants:

These defendants made a good-faith offer of settlement in this matter. These defendants

have made several attempts to discuss settlement with Plaintiffs to no avail. These defendants

request the information pertinent to the O.C.G.A. § 9-11-68 offer of settlement remain

confidential.

**XXIII.** A jury of twelve will be selected and all jurors shall participate in the verdict unless

excused from by the court.

**XXIV.** The parties are notified that if this action is settled after jurors have been summoned and it

is too late to notify jurors that it is no longer necessary for them to report for jury service,

the cost of compensating those jurors who report for jury service unnecessarily shall be

taxed as costs upon the parties, as the Court determines appropriate.

**XXV.** Other matters:

Submitted by Plaintiffs:

(a)   The Court ruled during the pretrial conference that the trial would be bifurcated with
liability for compensatory and punitive damages to be determined during the first phase of
the trial, and the amount of punitive damages to be determined during the second phase of
the trial.

The trial must be bifurcated, pursuant to O.C.G.A. §51-12-5.1, with the jury in Phase One
answering the question, "yes" or "no," whether punitive damages should be imposed
against SRC and IEA and/or against any subsidiary of those corporations found by the jury
to be liable.   If the answer is "yes" to any of those defendants then the trial should be
recommenced and in a Phase Two evidence may be submitted to the jury regarding the
amount of punitive damages, including evidence of the financial circumstances of the
defendants found liable to Plaintiffs for punitive damages.

Plaintiffs disagree with the SRC/IEA defendants' assertions regarding evidence submitted during the respective phases of trial in their statement of other matters, below. The law is clear that liability for compensatory damages *and* for punitive damages is to be decided in phase one of the trial, and the amount of punitive damages is to be decided in phase two of the trial. O.C.G.A. § 51-12-5.1(d).

**ADDED BY THE COURT:** The Court addressed these issues in its order on Defendants' motion in limine on financial status.  Order 16 (Feb. 7, 2023), ECF No. 221.

(b)     Because the trial is going to be bifurcated, as the law requires, Plaintiffs respectfully request that in Phase One the jury be asked to answer "yes" or "no" whether Plaintiffs may recover expenses of litigation, including attorney's fees, pursuant to O.C.G.A. §13-6-11, against any defendant.  Then in Phase Two, Plaintiffs request the opportunity to present evidence regarding the amount of their expenses of litigation, including attorney's fees, whereupon the jury may assess an amount against whatever defendant or defendants the jury finds liable therefor.

(c)     The SRC and IEA defendants are not adverse and should not be permitted to cross examine each others' witnesses.  Those defendants have colluded in the defense of this case in all respects, including by jointly naming expert witnesses, jointly submitting trial exhibits and deposition designations as part of the pretrial procedures, and are tied together by indemnification agreements which obligate them to assist each other rather than being adverse to each other.

The position taken by the SRC/IEA defendants regarding whether they are adverse, below, is preposterous. Those defendants have jointly submitted multiple sections of this proposed pretrial order, including their "brief and succinct outline of the case and contentions"; "the issues for determination by the jury"; "specifications of negligence, including applicable code sections"; "the types of damages and applicable measure of those damages"; "special authorities relied upon by defendant relating to peculiar legal questions"; statement about the "possibilities of settling the case"; and statement of "other matters." The SRC/IEA defendants have also jointly submitted a verdict form, proposed voir dire questions, seven motions in limine, and numerous other motions during this case. The SRC/IEA defendants have jointly identified expert witnesses, including Tony Greco and Erin Harris of Nutter & Associates and appraiser Morgan Mellette, and those experts' reports state that they were jointly retained by counsel for SRC and IEA. The SRC/IEA defendants have also conceded that they have a joint defense agreement. When Plaintiffs took the depositions of two SRC executives, four IEA employees, and two IEA vendors, neither SRC nor IEA asked any questions of the others' witnesses. The SRC/IEA defendants are simply not adverse.

**ADDED BY THE COURT:** The Court addressed this issue during the pretrial conference. There shall be no leading of witnesses unless they are determined to be adverse.  As to whether SRC and IEA are adverse, the Court will make a determination for each witness when the witness is called.

(d)     Plaintiffs will prepare for trial consistent with the Court's order during the pretrial

conference that Plaintiffs collectively will have five peremptory strikes, that SRC and SR Lumpkin collectively will have two peremptory strikes, that IEA and IEAC collectively will have two peremptory strikes, and that Westwood will have two peremptory strikes. Plaintiffs had previously submitted that the SRC and IEA defendants are so aligned, as indicated in the preceding paragraph, that they should be required to share peremptory strikes.

(e)   Plaintiffs will prepare for trial consistent with the Court's orders during the pretrial conference on the motions to exclude certain witnesses. The Court ordered that the SRC/IEA defendants' late disclosure of certain witnesses was not substantially justified and that they would not be permitted to testify at trial.  The Court further ordered that, if all parties agreed, the parties could choose to enter a stipulation regarding SRC/IEA's retention of an engineering firm to perform certain work at the site; but, if no stipulation was reached then the Court would allow limited testimony on that subject from witnesses properly disclosed by SRC/IEA.

Plaintiffs had previously stated that they do not agree with the Westwood motion to exclude the witnesses belatedly identified by SRC and IEA on December 27, 2022 – although it would certainly be just to grant those motions.  Docs. 166 & 168. Plaintiffs adamantly oppose any more delay, or 'reopening' of discovery, or yet another extension of discovery, in this already-over-litigated case.  SRC and IEA have gotten two extensions of discovery; they should not be allowed to force yet another by their own misconduct.

Plaintiffs had also previously stated that they do not support striking those belatedly identified witnesses, who, as Westwood contended, were obviously intended to offer expert testimony.   That is because, in Plaintiffs' view, those witnesses cannot help SRC and IEA in this case.  In Plaintiffs' view, those witnesses also cannot harm Westwood. Their documents prove, as their testimony must, that a total redesign of the erosion controls on the SRC site has long been necessary, and that has long been known to SRC and IEA, and that that necessity is the result of the misconduct of SRC and IEA.  However if those belatedly identified witnesses are allowed to testify, or if any reference to them or what they supposedly plan to do (a total redesign, sometime in the distant future) is allowed, then Plaintiffs respectfully submit that the Court should give a curative instruction, advising the jury that SRC and IEA violated the Court's Orders and Rules in concealing the identity of and supposed work done by those four witnesses, and that the conduct by SRC and IEA in this regard has caused Plaintiffs, and Westwood, unnecessary trouble and expense and risked delaying trial or further complicating this case.

**ADDED BY THE COURT:** The Court addressed whether certain witnesses would be permitted to testify in its recent Order.  Order 2 (Feb. 7, 2023), ECF No. 221.

(f)   Plaintiffs wish to show the jury some short video clips in opening statement, which will be in evidence.   Plaintiffs seek permission to do so.
**ADDED BY THE COURT:** The Court recently addressed this issue.  The parties may show evidence to the jury during opening statements if they have a good faith belief that the evidence will be admitted. Order 6-7 (Feb. 7, 2023), ECF No. 221.

(g)     Plaintiffs request confirmation whether a PowerPoint presentation, during opening statement, and/or closing argument, or during the presentation of evidence, will be permissible.
**ADDED BY THE COURT:**
The parties may use presentation software such as PowerPoint during the trial.

(h)     Plaintiffs will prepare for voir dire consistent with the Court's directives during the pretrial conference, in which the Court stated that it will conduct the primary portion of voir dire questioning and that attorneys will be allowed follow up questions. Plaintiffs previously requested direction about how the Court will handle voir dire – whether counsel will be allowed to conduct either a general voir dire, or ask follow up questions, or both.

(i)     Plaintiffs request direction about how strikes for cause will be handled.
**ADDED BY THE COURT:** if the Court finds during voir dire that a juror should be struck for cause, the Court will excuse that juror.  The Court will also ask counsel at the appropriate time if they have any objections for cause.

(j)     The Court ruled during the pretrial conference that Plaintiffs and Westwood are adverse.

Plaintiffs disagree with the SRC/IEA claim that Plaintiffs and Westwood are not adverse. All one has to do is read Plaintiffs' Complaint and Plaintiffs' outline of the case for the paragraphs regarding Westwood. Additionally, one can read SRC's own words. On July 20, 2022, SRC represented to this Court with respect to Plaintiffs and Westwood "[i]t is unequivocal that the two are adverse." Doc. 76 at 4. SRC wrote that "Plaintiffs and Westwood are well aware that they are adverse to one another and they do not share a common interest." *Id*. at 7. SRC has recognized that Plaintiffs seeks damages from all defendants, including Westwood, that Plaintiffs' complaint asserts claims against Westwood, and that Plaintiffs' expert opines that Westwood failed to comply with professional standards of care.

(k)     This Court's December 16, 2022 Order stated:  "At the pretrial conference <u>each party shall</u>: (a) Make any objections as to the authenticity of the exhibits of the other parties. . . . Any authenticity or disclosure objections not made at the pretrial conference shall be deemed waived." (Emphasis in Order.)) Doc. 157 at p. 6.  SRC/IEA have used the asterisk to purport to make 'authenticity' objections *to hundreds* of Plaintiffs' exhibits – *to most of Plaintiffs' exhibits*.  SRC/IEA made no such objections at the pretrial conference; those defendants did not raise any "authenticity" issue or issues.  Since the January 27, 2023 Pretrial Conference  SRC/IEA have jointly added new authenticity objections to 144 Plaintiffs exhibits, which objections were not made when SRC/IEA emailed to the Court the earlier 'joint PPTO' at 10:16 pm on Friday night, January 20, 2023 (those new objections are in what SRC/IEA have denominated their "Supplemental Exhibit C.")  SRC/IEA have not explained the bases for any of their "authenticity" objections, either those made on January 20 or those added after the Pretrial Conference.  In an attempt to resolve those objections, or some of them, without the Court having to intervene, especially after the time this matter was supposed to be raised ("at the pretrial conference"), Plaintiffs' counsel sent an email to SRC/IEA counsel on February 7.  That

email, and the responses from SRC/IEA counsel, are attached as Plaintiffs' "Supplemental Exhibit C – Regarding SRC/IEA 'authenticity' objections."

**ADDED BY THE COURT:** The Court will permit SRC/IEA's supplemental filing dated February 8, 2023 with authenticity objections.  If an authenticity objection has not been made by now, it is deemed waived.  If the parties cannot resolve their disputes on authenticity objections before trial, counsel should be prepared to authenticate the exhibit.

Submitted by SRC and IEA defendants:

(a)     These defendants agree with Plaintiffs that pursuant to O.C.G.A. §51-12-5.1(c)(2,), the trial shall be divided into two phases: Phase One regarding liability and, if necessary, Phase Two, regarding punitive damages. Defendants contend that evidence regarding their financial circumstances is not admissible in Phase One and shall have limited admissibility in Phase Two and have filed a motion in limine on this issue.

(b)     These defendants disagree with Plaintiffs' attempt to improperly align the IEA Defendants with the SRC Defendants regarding cross examination, voir dire, and otherwise. While the IEA Defendants and SRC Defendants may have some joint defenses, they are adverse and should be treated that way at trial.

**ADDED BY THE COURT:** The Court addressed this issue during the pretrial conference. The SRC Defendants and the IEA Defendants will each have their own peremptory strikes and opening statement.  As to whether SRC and IEA are adverse for purposes of questioning a witness, the Court will make a determination for each witness when the witness is called.

(c)     Plaintiffs and Defendant Westwood are not adverse and should not be permitted to cross examine each others' witnesses. Plaintiffs and Defendant Westwood and worked together throughout this case.

**ADDED BY THE COURT:** The Court previously addressed this issue.  Plaintiffs and Westwood are adverse.

(d)     SRC and IEA will prepare for trial consistent with the Court's order during the pretrial conference that Plaintiffs collectively will have five peremptory strikes; SRC and SR Lumpkin will have two peremptory strikes; IEA and IEAC will have two peremptory strikes; and Westwood will have two peremptory strikes. SRC and IEA had previously submitted that, because Plaintiffs and Defendant Westwood are so aligned, they should be required to share peremptory strikes.

(e)     These defendants shall file a response to any pending motions prior to the pretrial conference in this matter.

(f)     These defendants request advance copies and the ability to object to any photos, videos, or power point presentations Plaintiffs intend to present to the jury at any time during the trial.

**ADDED BY THE COURT:** The Court is not going to make the parties submit advance

copies of their trial presentations to each other.  In general, evidence should not be displayed to the jury until it is admitted.

(g)    In response to Plaintiffs' several supplemental disclosure of photos and videos of Plaintiffs' property and Plaintiffs' representation that they will "continue to document that [alleged] damage[of Plaintiffs' property] "right up to the time of trial" these defendants request a site inspection of Plaintiffs' property prior to trial.

**ADDED BY THE COURT:** The Court expects the parties to work out this issue.

(h)    These defendants respectfully request that this matter be specially set for trial for 3 weeks.

**ADDED BY THE COURT:** The Court set the trial to begin on April 11, 2023.  The Court's next scheduled trial is set to begin on May 1, 2023.

(i)    Defendants IEA and SRC respectfully disagree with Plaintiffs' statement above that "[t]he Court ordered that the SRC/IEA defendants' late disclosure of certain witnesses was not substantially justified and that they would not be permitted to testify at trial." SRC and IEA recognize that the Court found that the late disclosure of Long Engineering witnesses was not substantially justified, but it is Defendants' recollection that the Court held that it would allow testimony about Long Engineering regarding its steps to repair and resolve issues at the solar facility.

**ADDED BY THE COURT:** If the parties are confused about the Court's rulings during the pretrial conference, they should order a copy of the transcript.  The Court's recollection is that the Court will permit either a stipulation that SRC/IEA recently hired an engineering firm to evaluate how to remedy the site or the testimony of an IEA employee on this issue.

<u>Submitted by Westwood</u>

(a)    Westwood objects to the following witnesses on the IEA/SRC witness lists as they were not disclosed until December 27, 2022, months after the close of discovery and after the pretrial conference had already been scheduled:  David McKenney, Nick Sauer, Kevin Butler, and Peyton Herfuth.  Those objections are outlined more fully in the briefing at Docket. 166 and 168, and Westwood requests a ruling on those Motions.

**ADDED BY THE COURT:** The Court recently ruled on these motions.  Order 2 (Feb. 7, 2023), ECF No. 221.

(b)    Westwood objects to Erin Harris and Tony Greco being offered as expert witnesses as outlined more fully in Docket 172 and 173, and Westwood requests a ruling on those Motions.
**ADDED BY THE COURT:** The Court addressed these motions in its recent order.  Order 3 (Feb. 7, 2023), ECF No. 221.  The Court directed that any supplemental briefing on this issue be filed at least two weeks before trial.

(c)    Westwood objects to documents produced for the first time by IEA/SRC starting December 27, 2022 and moving forward that relate to the hiring of Long Engineering being introduced into evidence, as more fully outlined in Westwood's motions in limine.

**ADDED BY THE COURT:** The Court recently ruled on this issue.  Order 6 (Feb. 7, 2023), ECF No. 221.

(d) Westwood objects to the presentation of testimony via deposition unless it is demonstrated that the witness is unavailable to provide live testimony as defined by Federal Rule of Evidence 804.

**ADDED BY THE COURT:** The Court recently ruled on this issue.  Order 6-7 (Feb. 7, 2023), ECF No. 221.

(e) The Court ruled during the pretrial conference that Plaintiffs and Westwood are adverse. Westwood disagrees with SRC and IEA's claim that Plaintiffs and Westwood are not adverse. In SRC's own words "[w]ithout question, Plaintiff and Defendant Westwood are adverse to each other." Doc.54-1. On July 20, 2022, SRC represented to this Court with respect to Plaintiffs and Westwood "[i]t is unequivocal that the two are adverse." Doc. 76 at 4. SRC wrote that "Plaintiffs and Westwood are well aware that they are adverse to one another and they do not share a common interest." *Id*. at 7. SRC has recognized that Plaintiffs seeks damages from all defendants, including Westwood. Plaintiffs maintain causes of action against Westwood in this action. And as a result, Westwood and Plaintiffs are adverse.

(f) The SRC and IEA Defendants are not adverse to one another. In their submission, IEA and SRC present to this Court that they are adverse to one another and should be treated that way at trial. Based on the record of this action, and as discussed in detail in Westwood's Motion at Doc. 194, SRC and IEA's own actions belie the notion of their adversity. The IEA/SRC submissions within this document contain each of their joint responses and demonstrate that they are united on every matter in issue. They have submitted joint deposition designations, exhibit lists, and a proposed verdict form. Moving back in time from the pretrial order, the record is replete with evidence of IEA and SRC's joint efforts.  Those parties share their experts, including Erin Harris and Tony Greco who blame Westwood for the damage.  IEA and SRC have routinely made themselves indistinguishable by walking in tandem.  Merely scratching the surface, pleadings and discovery materials submitted jointly by SRC and IEA include:

    i.   Motion to Compel and for Sanctions [Dkt. 45];

    ii.   Response to Plaintiffs' Motion for Protective Order and to Quash Subpoena [Dkt. 48];

    iii.   Motion to Amend Scheduling Order [Dkt. 49, 52, 56]

    iv.   Second Motion for to Compel and for Sanctions [Dkt. 54, 57, 76]

    v.   Motion to Disqualify James Butler as Counsel for Plaintiffs [Dkt. 61]

    vi.   Third Motion to Compel and for Sanctions [Dkt. 63, 78]

    vii.   Fourth Motion to Compel and for Sanctions [Dkt. 89]

    viii.   Motion to Exclude Walters [Dkt. 120, 145]

    ix.   Motion for Summary Judgment [Dkt. 125, 148]

    x.   Motion to Strike Behar Report and Testimony [Dkt. 126, 149]

    xi.   Motion to Exclude Britt [Dkt. 134]

    xii.   Response to Plaintiffs' Motion for Partial Summary Judgment [Dkt. 137]

    xiii.   Motion to Exclude Smith [Dkt. 155, 161]

    xiv.   Response to Motion to Strike [Dkt. 159]

    xv.   Motions in Limine [Dkt. 179-80; 183-87]

xvi.   Proposed Voir Dire Questions  [Dkt. 188]
xvii.   Admission of Joint Defense Agreement [Dkt. 193-2, 193-3].
For all of these reasons, Defendant Westwood submits that SRC and IEA are so intertwined that they should not be permitted to cross-examine eachother's witnesses and they should be required to share peremptory strikes during jury selection.

(g) Westwood requests the opportunity to supplement its authenticity objections through a supplemental pleading for any newly disclosed exhibits. For that reason, Westwood attaches contemporaneously its supplemental pleading with the Court including those objections to newly included documents.
**ADDED BY THE COURT:** The Court will permit Westwood's supplemental filing dated February 8, 2023 with authenticity objections.  If an authenticity objection has not been made by now, it is deemed waived.


Submitted by:

/s/*James E. Butler, Jr.*
Attorney for Plaintiffs


/s/*Melissa Bailey*
Attorney for Westwood


/s/*Charlie E. Rogers*
Attorney for the IEA defendants


/s/*Alycen A. Moss*
Attorney for the SRC defendants

*** ORDER ***

It is hereby ORDERED that the foregoing, including the attachments thereto, constitutes the pretrial order in the above case and supersedes the pleadings which may not be further amended except by order of the court to prevent manifest injustice.

This 9th day of _February, 2023.

S/_Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE
MIDDLE DISTRICT OF GEORGIA