IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

H&L FARMS LLC, SHAUN HARRIS, and &ast;
AMIE HARRIS,
                                      &ast;
     Plaintiffs,
                                      &ast;
vs.
                                      &ast;
SILICON RANCH CORPORATION,              CASE NO. 4:21-CV-134 (CDL)
SR LUMPKIN, LLC, INFRASTRUCTURE  &ast;
AND ENERGY ALTERNATIVES, INC., IEA
CONSTRUCTORS, LLC, and WESTWOOD  &ast;
PROFESSIONAL SERVICES, INC.,
                                      &ast;
     Defendants.
                                      &ast;
_____

O R D E R

Disappointed with the jury's verdict awarding Plaintiffs $10.5 million in compensatory damages plus $125 million in punitive damages, Defendants Silicon Ranch Corporation ("SRC"), Infrastructure and Energy Alternatives, Inc. ("IEA"), and IEA Constructors, LLC ("IEA Constructors") (collectively, "Defendants") filed post-trial motions seeking to overturn the verdict by moving for judgment as a matter of law on certain issues, or in the alternative, a new trial. As explained below, the jury's verdict as to liability is supported by the evidence and the law, but the damages awards are subject to remittitur. Defendants' motions for judgment as a matter of law (ECF Nos. 306 & 307) are denied except the amount awarded as damages are remitted as follows: the compensatory damages award to H&L Farms

is remitted to $296,000.00; the compensatory damages award to Shaun Harris is remitted to $487,754.00; the compensatory damages award to Amie Harris is remitted to $487,754.00; the punitive damages award against SRC is remitted to $1,144,357.20; the punitive damages award against IEA is remitted to $1,525,809.60; and the punitive damages award against IEA Constructors is remitted to $1,144,357.20.  If these remittiturs are not accepted by Plaintiffs within 21 days of today's order, the Court will grant a new trial on compensatory and punitive damages only.  Plaintiffs' motions for judgment as a matter of law (ECF Nos. 298 & 299) and for attorney's fees (ECF No. 291) are denied.

## I.   Introduction

The American tort system seeks to fully and fairly compensate victims for harm caused by the wrongful acts of others and to penalize those whose wrongful conduct is sufficiently egregious to warrant special punishment. Consistent with our foundational values that entrust ordinary people with ultimate authority in a representative democracy, lay juries serve as the factfinders in these cases.  Judges have a duty to respect this important function and give this essential factfinding appropriate deference consistent with the rule of law.  Arrogant second-guessing of jury verdicts cannot be reconciled with the rule of law and is an affront to our

fundamental principles that rest upon confidence in the will of the people. But blind obedience to jury verdicts likewise ignores the will of the people as expressed through their elected representatives in the form of legislation that places guardrails on unbridled jury discretion. These two interests—deference to jury factfinding and limits on unbridled jury discretion-while seemingly in conflict must be balanced to assure that the rule of law is followed and justice is served. It is the judge's job to balance these sometimes-competing interests on a case-by-case basis. Failure to do so is not only a dereliction of judicial duty but will hasten the advancement of ill-conceived one-size-fits-all reforms that could do irreparable harm to a justice system that is the envy of the world.

Substantial non-economic damage awards calculated without a precise standard formula require thoughtful scrutiny to reasonably assure that they are supported by the evidence and are not a product of impermissible factors. This scrutiny, however, should not be performed with skepticism that the jury got it wrong. It has been the undersigned's experience that juries take their oath seriously and almost always get it right. As to the jury in this case, the Court observes that in its twenty-one years of conducting jury trials, it cannot recall a more attentive and conscientious group of jurors.

Notwithstanding the substantial personal sacrifice required by their compelled attendance at a three-week trial, they took their important responsibilities seriously and admirably fulfilled their duty of citizenship. They were diligently attentive throughout the three-week trial, often interrupting the proceedings when an exhibit that had been admitted was not promptly displayed on the screens in the jury box. During the three-week trial that began at 8:00 A.M. each day, only one juror on one day was late and that was only for ten minutes. Otherwise, each day of the trial they reported promptly as directed. They did not rush to judgment, deliberating for more than four hours. And during those deliberations, they sent out a question in which they had parsed one of the Court's instructions, asking whether a disjunctive "or" was intended to separate each term in the series that preceded it or only the last term that followed it. They completed a ten-page verdict form with no inconsistencies. These hard-working Georgians took their duty seriously. Simply put, this was not an irresponsible "run-away" jury; and any attempt to paint them as such is misguided.

The jury was also representative of the community in terms of race, gender, age, and background. It included a school principal, a business manager, an upper-level school district management employee, a retired Army staff sergeant, a

supermarket meat manager, a retail assistant manager, a diesel mechanic, and a counselor at an immigration detention facility. Nothing suggests that they did not have the capacity to understand the evidence or were subject to being placed under some type of spell by Plaintiffs' counsel. Furthermore, they resided in various counties throughout the sprawling Columbus Division, with only one juror having a direct connection to Stewart County, where Plaintiffs' property and Defendants' solar facility were located. And most resided in the more urban area of Columbus, not in the rural areas, which contradicts Defendants' implication that the verdict resulted from retribution by a bunch of "locals" who wanted to send a message to the "out-of-towners."

Nevertheless, the Court recognizes that verdicts delivered by even the most exemplary juries cannot escape careful and thoughtful judicial review. The lens through which an experienced judge must view the evidence is different than the lens of a lay juror. The judge has a special appreciation for how that verdict fits within the applicable law as well as the judge's unique experience with other jury verdicts. It is the judge's job to make sure that jury verdicts are consistent with the law and supported by the evidence in the record. While the judge must resist the temptation to substitute his "personal verdict" for that of the conscientious jury, he does sometimes

have a duty to meddle—just not too much.  The Court evaluates
the verdict in this case accordingly, starting with a
description of the nature of the case, followed by an analysis
of Defendants' evidentiary objections, and concluding with an
evaluation of the amount of damages awarded.

## II.  The Nature of the Case

Defendant SRC purchased approximately 1,400 acres in rural
Stewart County, Georgia adjacent to and upstream from property
owned by Kawikee Refuge, LLC.  The Kawikee Refuge property was
subsequently sold to Plaintiff H&L Farms, a limited liability
company whose members are Shaun and Amie Harris, a married
couple.  According to the evidence at trial, SRC intended to use
the property to construct a large facility that would generate
electricity using solar panels that collected energy from
sunlight.  SRC had a contract to sell that electricity for a
profit to private consumers.  SRC contracted with IEA and IEA
Constructors to build the solar facility.  To construct the
facility, the property, which was previously covered with trees
and vegetation, was mass-graded.  During the construction,
rainfall caused sediment to flow from the SRC property onto
Plaintiffs' property, polluting Plaintiffs' wetlands, streams,
and unique 21-acre fishing lake.  This pollution continued even
after the solar panels were fully operational, and in fact, had

not been abated as of the date of the trial, which was two years after the construction of the solar facility began.

SRC, IEA, and IEA Constructors acknowledge that the construction of the solar facility caused sediment to flow from SRC's property onto Plaintiffs' property during significant rainfall events. At trial, they presented sometimes inconsistent testimony that on one hand sought to diminish the seriousness of the problem and the part they played in creating it while on the other tried to convince the jury that Defendants were truly sorry for polluting Plaintiffs' property. Their trial strategy seemed to be: "all we've got here is a rural farm pond that gets a little muddy when it rains, so if you think we have any responsibility, don't hit us too hard in the pocketbook because we truly are good neighbors and want to make things right." This strategy backfired in spectacular fashion.

The jury instead apparently found Defendants' strategy disingenuous and insincere. Persuaded by the overwhelming evidence and genuineness of Plaintiffs' presentation, the jury saw profit-motivated entities with an arrogant, dismissive attitude that valued this rural property only as a means to generate substantial income and take advantage of sophisticated green energy tax breaks. Any damage caused to their neighbors for whom they had little respect could be addressed later as a cost of doing business.

Defendants underestimated the innate urge that ordinary people have to protect their private property rights, particularly when that property is their home.  For Plaintiffs, this property, which was described as Kawikee Refuge, represented the culmination of a life-long dream.  Hard-working folks, Plaintiffs put everything they had into the purchase of the property.  To them, the place was sacred.  And the 21-acre lake was its centerpiece.  Contrary to Defendants' suggestion, it was more than simply a dammed-up stream.  It was the aesthetic focus of the entire property, with championship, trophy-size bass and bluegills.  Its unique location on the property and bountiful supply of exceptional fish made it the most important feature on the property.  After Defendants began construction, Plaintiffs' dream became a nightmare.  Whenever it rained, the water—in scientific terms—changed turbidity.  To the Harrises, they simply saw their once pristine lake turn muddy orange every single time it rained, causing catastrophic decline to the lake's fishery.  Defendants had effectively taken the most important part of their property from them.  Adding to Plaintiffs' frustration, Defendants seemed to be unmotivated and/or unable to fix the problem.

As the Defendants eventually acknowledged at trial, their liability was clear.  In the end, the question was simply how

much they would have to pay.  They don't like what the jury told them.

## III. **The Jury Verdict**

The jury found SRC, IEA and IEA Constructors liable to Plaintiffs for creating and maintaining a nuisance, trespassing on their property, and for negligence.  The jury decided that the cost of repairing and remediating the damage to the property was $1.5 million and awarded those damages to H&L Farms as the title owner of the property.  The jury determined that Mr. Harris and Mrs. Harris, who occupied the property and made their home there, each suffered a loss of enjoyment and use of the property and awarded each of them $4.5 million for compensatory damages.  Based on the jury's apportionment of fault findings, the compensatory damages were allocated as follows: $1,350,000.00 in favor of Shaun Harris against SRC; $1,800,000.00 in favor of Shaun Harris against IEA; $1,350,000.00 in favor of Shaun Harris against IEA Constructors; $1,350,000.00 in favor of Amie Harris against SRC; $1,800,000.00 in favor of Amie Harris against IEA; $1,350,000.00 in favor of Amie Harris against IEA Constructors; $450,000.00 in favor of H&L Farms against SRC; $600,000.00 in favor of H&L Farms against IEA; and $450,000.00 in favor of H&L Farms against IEA Constructors.  The jury further found that punitive damages should be assessed against SRC, IEA, and IEA Constructors in the

amounts of $25 million, $50 million, and $50 million, respectively. And they separately found that each of these Defendants acted with a "specific intent" to cause harm, as that phrase is defined under Georgia law. Judgment was subsequently entered on the jury verdict. The Court also issued an injunction requiring Defendants to abate the nuisance.

## IV. Evidentiary Issues

In addition to the alleged "excessiveness" of the damages awards, Defendants complain that the Court (1) failed to adequately control Plaintiffs' counsel at trial, (2) allowed counsel for Plaintiffs and Defendant Westwood Professional Services, Inc. to unfairly "team up" against Defendants, (3) erred by finding as a matter of law that Defendants had failed to demonstrate that any fault by any non-party contributed to Plaintiffs' harm, and (4) erred by failing to grant their motions for judgment as a matter of law as to punitive damages and IEA's motion for judgment as a matter of law as to any liability. The Court addresses each issue in turn.

### A.   Plaintiffs' Lawyer Jim Butler

Contentious litigation often makes it difficult for lawyers to balance their duty as legal gladiators to zealously represent their clients with their duty as officers of the court to maintain civility and respect toward each other. Without assessing blame, the Court simply notes that the strained

relationship between Plaintiffs' counsel and counsel for SRC, IEA, and IEA Constructors resulted in most every issue being hotly contested and created a degree of mistrust among counsel that made it a challenge to manage this litigation in a manner that achieved the goal of all judicial inquiry—the "just, speedy, and inexpensive" ascertainment of the truth. *See* Fed. R. Civ. P. 1. One contentious issue involved the attempt to disqualify Plaintiffs' counsel. This issue bled over into the trial with accusations of misconduct. As explained below, none of these complaints by Defendants' counsel warrant a new trial.

After the case had been pending for ten months and substantial discovery and investigation had occurred, counsel for SRC, IEA, and IEA Constructors sought to disqualify Mr. Butler from representing his clients, claiming that he had an interest in the case and was a potential witness. The Court held a hearing on the motion. That hearing disclosed that both SRC and Plaintiffs purchased the properties at issue here from limited liability companies whose members were Mr. Butler and two of his law partners: SRC purchased the land for the solar facility from Kawikee Two, LLC, and Plaintiffs purchased their property from Kawikee Refuge, LLC. One of those partners, Joel Wooten, who was no longer Mr. Butler's law partner at the time of trial, was the managing member of both limited liability

companies and was primarily responsible for the marketing and sale of the properties.

No evidence was presented that Mr. Butler had any ownership or financial interest in either of the properties at any time after the action was filed. The only issue that remained was whether he was an indispensable witness who should be subject to deposition, and if so, how that would affect his continued representation of Plaintiffs. The Court concluded that any relevant information Mr. Butler possessed was duplicative of evidence available from Mr. Wooten. The hearing revealed that Mr. Wooten coordinated the logging on the property that Kawikee Two sold to SRC—logging that Defendants claimed contributed to the pollution of Plaintiffs' property. Mr. Butler had no information that was not available from Mr. Wooten. And Mr. Wooten was deposed by Defendants. Because Mr. Butler had no non-duplicative evidence and was not an essential witness in the case and because Defendants waited ten months to seek his disqualification, which would work an undue hardship on his clients who wished for him to remain as their counsel, the Court denied Defendants' tardy motion to disqualify and/or depose Mr. Butler.

Defendants now maintain that Mr. Butler's personal involvement in the underlying land sales and intimate knowledge of the properties gave him a distinct advantage at trial which

he used to "indirectly testify" as he questioned various witnesses and made his argument to the jury.  Mr. Butler was clearly prohibited from testifying at trial, and the Court instructed the jury on more than one occasion that what the lawyers say is not evidence.  As to Defendants' specific objections at trial, the Court granted some and denied others.[1]  The Court is satisfied that it neither abused its discretion nor committed error that would warrant a new trial.

The Court acknowledges that Mr. Butler and Mr. Wooten's involvement in logging on some of the property in question did become an issue in the trial.  Defendants were allowed to extensively explore that conduct, and as noted previously, Mr. Wooten was primarily responsible for managing the logging.  He testified at trial, as did others who had personal knowledge of those activities.  Mr. Butler's role as trial counsel did not inhibit Defendants from seeking to admit and explore any evidence related to the effect of the logging on the Plaintiffs' property.

As to Mr. Butler's conduct during the trial, the record contains few (if any) specific instances where their legitimate objections were not sustained and/or a curative instruction was

---

[1] For example, SRC objected during Mr. Butler's closing argument, asserting that he was testifying, and the Court overruled that objection.  As the Court instructed the jury, a closing argument is not evidence—it is simply counsel's argument about what counsel believes the evidence showed—and the jury was instructed that it must base its decision on the evidence, not what the lawyers said about it.

not given.  To the extent that any errors were made, the Court is satisfied that they were harmless.  It appears that the following examples represent what Defendants contend to be Mr. Butler's most egregious misconduct—the violation of the Court's orders.

At the beginning of the trial, Plaintiffs' presentation software showed the filename for each exhibit, which for some photographs included the date taken.  When IEA's counsel objected on this ground, the Court confirmed that the witness had taken the photograph and knew the date it was taken.  The Court concluded that including the date on the exhibits was inadvertent and harmless.

IEA contends that Plaintiffs' counsel repeatedly ignored the Court's instructions not to lead witnesses during his direct examinations.  Preliminarily, the Court notes that no counsel in this case is immune from the accusation of asking leading questions.  The Court further observes that ascertaining whether a question is impermissibly leading, *i.e.*, suggests the answer to the witness, or is appropriate, *i.e.*, "necessary to develop the witness's testimony," Fed. R. Evid. 611(c), is sometimes more art than science.  While the Court certainly is not perfect, it is convinced that the result in this case cannot be blamed upon the style of questions asked by counsel.

IEA argues that Plaintiffs' counsel referred to and misrepresented certain pleadings and discovery issues, but IEA did not persuasively explain how these matters prevented a fair trial or had any impact on the jury verdict.

IEA asserts that Plaintiffs' counsel, in asking who took Mr. Harris's deposition, materially violated the order ruling that Plaintiffs were not allowed to introduce evidence that IEA employed multiple firms during the litigation. Nothing about this question revealed that the lawyer was from another firm or whether he had been accused of discovery misconduct—which is the type of evidence the order granting the motion in limine was intended to prohibit.

IEA also contends that Mr. Butler made unfounded suggestions of evidence tampering. The Court sustained objections made by Defendants' counsel as to these statements.

IEA further complains that Plaintiffs' counsel made inappropriate statements to inflame regional bias. But IEA did not make a persuasive argument that the Court failed to sustain any objection to such questions or statements or that it failed to give appropriate curative instructions. The jury was clearly instructed that it had to decide this case on the evidence and not based upon prejudice or sympathy for or against any party.

The trial here was not infected by misconduct from Plaintiffs' counsel. Either his zealous representation and/or

Defendants' lack of preparation resulted in a defense that had no credibility by the end of the trial, as evidenced by the evolution of Defendants' position: for the first week of trial, they denied responsibility for the pollution of Plaintiffs' lake, but by Day Nine, their executive officers admitted liability from the witness stand. The chief executive officer of SRC candidly testified that the evidence he witnessed during the trial opened his eyes as to what truly happened. Whether this testimony was truthful or simply trial strategy to keep the damages down after the writing was on the proverbial wall is unknown. But it demonstrates that Plaintiffs' presentation of the evidence was effective. While Mr. Butler's style may not have been to the liking of Defendants' counsel, zealous passion reflecting a genuine belief in a client's cause does not provide the basis for a new trial.

> B.   The Plaintiffs/Westwood "Alliance"

Defendants continue to complain that their co-defendant, Westwood, took positions aligned with Plaintiffs during the trial. These concerns were first presented to the Court before the trial when SRC, IEA, and IEA Constructors sought to depose counsel for Plaintiffs and Westwood regarding their alleged collusion against the other Defendants. These suspicions were based on speculation that counsel had reached some agreement that if Westwood would help Plaintiffs focus blame on SRC, IEA,

and IEA Constructors, then Plaintiffs would not target Westwood at trial. The Court denied Defendants' motion to explore such discovery. *See generally* Hr'g Tr. (Sept. 27, 2022), ECF No. 104. Now, Defendants maintain that their suspicions were borne out at trial when Westwood focused blame on them while Plaintiffs' counsel did not aggressively pursue Westwood. The Court remains perplexed as to how such an approach was inappropriate. Westwood's defense to Plaintiffs' claims against it was that IEA and IEA Constructors failed to adequately implement Westwood's soil and erosion control plan. Therefore, Westwood attacked the other Defendants' failure to implement the elements of the plan, and there was plenty of evidence to support this attack. The strategy worked, as confirmed by the jury verdict in favor of Westwood. Furthermore, Plaintiffs, while including Westwood as a Defendant, certainly had the right to target the other Defendants. It is preposterous to suggest that this strategy warrants a new trial.

To the extent that Defendants maintain that the Court erred by allowing Plaintiffs to treat Westwood as an adverse party during trial, it is undisputed that Plaintiffs maintained a claim for damages against Westwood and that they put up evidence against Westwood. It would have been error not to treat them as adverse parties, and quite frankly, Defendants have shown no prejudice caused by the Court recognizing the obvious—that when

17

a plaintiff sues a defendant they may be treated as adverse parties.[2]

C.   Apportionment of Fault to Non-Parties

Defendants seek reconsideration of the Court's ruling that no basis existed for apportionment of fault to four non-parties pursuant to the Georgia Apportionment Statute, O.C.G.A. § 51-12-33. These non-parties were involved in timber cutting on part of the SRC property that took place largely (if not completely) before Defendants began mass grading the SRC property so they could construct the solar facility. SRC, which owned the land at the time that the timber was cut, permitted the timber cutting.

Defendants put up evidence that during the timber operation, the loggers failed to comply with some best management practices, and Defendants' expert opined that some of the disturbed ground from the logging activities likely resulted in some amount of sediment finding its way into Plaintiffs' wetlands, streams, and lake. But this expert failed to connect

---

[2] The argument by SRC, IEA, and IEA Constructors that the jury verdict regarding Westwood is unsupported by the evidence borders on frivolous and requires no further discussion.

IEA and IEA Constructors also assert that "uneven courtroom accommodations . . . conveyed to the jury that Plaintiffs and Westwood . . . were the preferred parties." IEA Mot. J. as a Matter of Law 5, ECF No. 306. Their brief does not provide any details about how the accommodations were uneven, or what accommodations IEA and IEA Constructors requested but were not provided. Such whining is unbecoming of a member of the bar and certainly provides no basis for the relief they seek.

any of the loggers' failure to use best management practices or
other "fault" to the actual pollution of the Plaintiffs'
wetlands, streams, and lake.   There was no evidence that more
sediment ended up in Plaintiffs' wetlands, streams, and lake
than would have ended up in Plaintiffs' wetlands, streams, and
lake if the loggers had used best management practices.   It was
pure speculation that any additional sedimentation was the
"fault" of any of the non-parties involved in the timber
activities.   Thus, no credible basis existed for the jury to
apportion fault to these non-parties.   Moreover, the evidence
was overwhelming, and largely admitted by Defendants, that the
obvious pollution of Plaintiffs' lake, which caused it to turn
orange in color, was due to the nuisance, trespass, and
negligence of Defendants in connection with the construction of
the solar facility.   No basis exists for reconsideration of the
Court's refusal to allow the jury to apportion fault to the non-
parties.

> D.   IEA's Liability

IEA renews its motion for judgment as a matter of law.   It
argues that there was no evidence that it was directly involved
in any of the conduct that led to the pollution of Plaintiffs'
property or that it should be responsible for the acts of its
subsidiary, IEA Constructors.   The evidence at trial, however,
refutes this contention.   Many of the relevant documents reflect

that IEA was directly involved in the project as an independent party. Several of the individuals involved in the project were officers of IEA who listed IEA as their employer. Sufficient evidence existed from which the jury could have concluded that IEA, through its officers who did not hold positions at IEA Constructors, participated directly in the conduct giving rise to Plaintiffs' claims. Furthermore, evidence existed from which the jury could conclude that IEA was liable based on theories of joint venture and alter ego. One of IEA's senior executives essentially admitted as much during his examination. *See, e.g.*, Trial Tr. Vol. XIII 13:5-6 (Apr. 27, 2023), ECF No. 367 (IEA executive vice president stating, "IEA Inc. has the ability to control IEA Constructors, that's effectively my job."); *id.* at 21:16-17 (IEA executive vice president explaining, "there were mistakes made and there was silt leaving the site, and my job is to fix the problems"); *id.* at 61:22-63:7, 64:7-65:13, 66:16-25, 67:20-68:3 (IEA executive vice president admitting that (1) he, as a duly authorized officer of IEA who was not an employee or officer of IEA Constructors, was authorized by IEA's board of directors to manage IEA Constructors, (2) he managed the operations of IEA Constructors and had the ability to control what IEA Constructors did on a day-to-day basis, (3) he authorized IEA Constructors to enter the contract with SRC for the Lumpkin solar facility project, (4) he authorized IEA

Constructors to hire Westwood for the Lumpkin solar facility project, and (5) he was personally involved in managing the IEA Constructors team on the SRC project from bid to construction).

IEA counsel's hyperbole that finding IEA liable will disrupt the law of parent/subsidiary liability is misplaced. Corporations can protect themselves if they are truly separate legal entities and do not engage in joint ventures. But under the specific circumstances of this case, sufficient evidence was presented, most of which was not disputed factually, that supported the jury's finding of liability on the part of IEA.

## V. Damages

The headline is admittedly eye-popping—"Couple Awarded $135 Million for Muddy Pond." But as with many headlines, it does not tell the whole story. Moreover, it is not the Court's job to second-guess the jury's fact finding. The Court must determine whether the awards may be sustained under Georgia law and the United States Constitution. Georgia law provides that the "question of damages is ordinarily one for the jury; and the court should not interfere with the jury's verdict unless the damages awarded by the jury are clearly so inadequate or so excessive as to be inconsistent with the preponderance of the evidence in the case." O.C.G.A. § 51-12-12(a). "If the jury's award of damages is clearly so . . . excessive as to any party as to be inconsistent with the preponderance of the evidence,

the trial court may order a new trial as to damages only, as to any or all parties, or may condition the grant of such a new trial upon any party's refusal to accept an amount determined by the trial court."  O.C.G.A. § 51-12-12(b); *see also Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1328 (11th Cir. 1999) (noting that although a federal court does not have "general authority to reduce the amount of a jury's verdict," the court has authority to order a new trial, and a "court which believes the jury's verdict is excessive may order a new trial unless the plaintiff agrees to remit a portion of the jury's award").

A.   Compensatory Damages

Defendants maintain that the jury's award of $1,500,000.00 to H&L Farms for the cost of repairing and remediating the damage to its property is not supported by the evidence.  They also argue that the jury's award of $4,500,000.00 each to Mr. Harris and Mrs. Harris to compensate them for the loss of enjoyment of their property is excessive.

1.   *H&L Farms, LLC's Damages Evidence*

The evidence presented on the cost of repairing and remediating the damage to H&L Farms property came from Plaintiffs' expert, Vance Smith.  Mr. Smith testified that the estimated cost for repairing the lake as of the date that he did his inspection was $296,000.00.  He testified at trial that more sedimentation had been dumped into the lake and wetlands between

22

that inspection and the date of trial.  He estimated that it would cost more to dredge the lake now, and he stated that it would be "expensive" to clean the wetlands.  But he offered no updated estimate on any of the costs.

Without this additional evidence, the trial record does not support the jury's award of $1,500,000.00 to repair Plaintiffs' property.  Accordingly, the Court remits the damages award to H&L Farms to $296,000.00, the amount proven at trial.  Based on the jury's apportionment of fault, H&L Farms shall recover $88,800.00 from SRC, $118,400.00 from IEA, and $88,800.00 from IEA Constructors, assuming Plaintiffs accept the remittitur.

> ### 2. The Harrises' Damages for Loss of Use and Enjoyment

Under Georgia law, Mr. and Mrs. Harris were entitled to recover compensatory damages for the loss of use and enjoyment of their property.  This principle's roots can be traced back at least as far as the late 19th century, when the United States Supreme Court in *Baltimore & P. R. Co. v. Fifth Baptist Church,* observed: "Every man has a right to the comfortable enjoyment of his own house, in which enjoyment a neighbor cannot molest him." 108 U.S. 317, 322 (1883).  The Georgia courts have recognized this principle, holding that a jury may consider the following in determining what amount of damages is necessary to compensate someone for their loss of use and enjoyment of property caused

by a neighbor's nuisance:  discomfort, loss of peace of mind, unhappiness, and/or annoyance.  "An award of damages for discomfort and annoyance is for the enlightened conscience of the jury and should not be disturbed if there is any evidence to support it." *Oglethorpe Power Corp. v. Est. of Forrister*, 774 S.E.2d 755, 768 (Ga. Ct. App. 2015) (quoting *Segars v. Cleland*, 564 S.E.2d 874, 878 (Ga. Ct. App. 2002)).

Mr. and Mrs. Harris purchased the Kawikee Refuge property more than two years ago, investing their life savings and taking on substantial debt.  Their purchase was the culmination of their lifelong dream.  It represented the use of the fruits of their hard work through the years.  They thought they had bought a nature refuge, and for them the centerpiece of that refuge, both aesthetically and recreationally, was a trophy level fishing lake containing record size bass and bluegill.  While Defendants may consider such a lake as simply a pond filled with fish, it meant much more to Mr. and Mrs. Harris.  Suggesting that Plaintiffs' loss was mitigated because they could still use other parts of their property misunderstands the nature of what Plaintiffs purchased and its value to them.

Defendants' lack of progress in abating the nuisance that ruined the property compounded Plaintiffs' loss.  Plaintiffs had no idea how long they would have to live with the centerpiece of their property turning muddy orange every time it rained.  And

as with most of us who have likely seen more years pass by than lay ahead, each day and each season becomes more valuable. After making this substantial financial and emotional investment, they were deprived of experiencing the full value of their dream; it was an excruciatingly painful experience that was aggravated by the constant worry of not knowing when the nightmare would end.  The jury heard their story.  The jury witnessed their agony.  The jury could tell what they experienced.  And the jury had a broad range of life experiences to evaluate the appropriate dollar value to assign to such injury.

The problem with the jury's award is that it substantially exceeds the $3.3 million that Plaintiffs paid for the property only two years before.  And by the time of trial, it was essentially undisputed that the nuisance could be abated, particularly with the coercive injunctive relief to be ordered by the Court.  Had the nuisance been non-abatable, the owner of the property's measure of damages would have been the permanent diminution in the value of the property, which could not have exceeded the property's fair market value absent the nuisance. Yet, the jury awarded Plaintiffs damages for the *temporary loss of use* of that same property far exceeding the property's pre-nuisance fair market value.  The Court attributes this problematic award to the fine distinction between mental

distress caused by a nuisance (which is not recoverable under Georgia law), and unhappiness, aggravation, and loss of peace of mind, all of which may be considered in determining the amount of damages for loss of use and enjoyment of property (and which is recoverable under Georgia law).

Georgia law does not permit the recovery of damages to compensate for mental distress caused by a nuisance. Instead, in a "continuing, abatable nuisance case," the law authorizes damages to compensate for an unlawful "interference with the right of the owner to enjoy possession of his property" because of the nuisance. *City of Gainesville v. Waters*, 574 S.E.2d 638, 642-43 (Ga. Ct. App. 2002) (quoting *City of Columbus v. Myszka*, 272 S.E.2d 302, 305 (Ga. 1980)).[3] "The measure of damages for 'discomfort, loss of peace of mind, unhappiness and annoyance' of the plaintiff caused by the maintenance of a nuisance is for the enlightened conscience of the jury." *Id.* at 643 (quoting *Myszka*, 272 S.E.2d at 305). But that enlightened conscience does have limits.

In determining the extent of this loss, the jury may consider the deprivation's effect on one's happiness and peace of mind, but curiously, the law does not permit compensation for mental anguish caused by the nuisance. This fine distinction

---

[3] Contrary to Defendants' arguments, a plaintiff in a continuing, abatable nuisance case is not limited to a recovery of rental value. *Waters*, 574 S.E.2d at 642.

requires a double-take by even the most sophisticated lawyer. Asking a lay jury to make this distinction may be a bridge too far.  Here, it is problematic that the jury's award for loss of use of the property for a relatively limited time far exceeds not only what Plaintiffs paid for the property only two years before, but it exceeds the fair market value of the property at the time of trial.  While such an award may fall within a jury's enlightened conscience if made to compensate for mental anguish caused by Defendants' conduct, the Court finds that an award of damages for temporary loss of use of property (albeit of unknown duration) that exceeds the fair market value of that property is excessive.  When the Harrises purchased the property through their LLC, the market determined that the value of the use of that property until they decided to sell it was $3.3 million. Mr. and Mrs. Harris should expect at least seventeen more years of opportunity to enjoy the property.[4]  Assuming the nuisance is fully abated by October 1, 2024, the Harrises have been deprived of 3.5 years of use at a time when they are physically able to maximize their active enjoyment of the property.[5]  The Court finds that a fair and reasonable award for loss of use is

---

[4] Under the Annuity Mortality Table for 1949, Ultimate, the estimated life expectancy for a 61-year-old man like Mr. Harris is 17.76 years.
[5] It is the Court's understanding that the special master monitoring Defendants' site stabilization progress under the injunction anticipates that Defendants will achieve final site stabilization by October 1, 2024.

$975,508.00, divided evenly between Mr. and Mrs. Harris.[6]
Accordingly, the award of compensatory damages to the Harrises
is remitted to $975,508.00, with $487,754.00 allocated to Mr.
Harris and $487,754.00 allocated to Mrs. Harris. Based on the
jury's apportionment of fault, Mr. and Mrs. Harris shall each
recover $146,326.20 from SRC, $195,101.60 from IEA, and
$146,326.20 from IEA Constructors, assuming Plaintiffs accept
the remittitur.

B.   Punitive Damages

In cases where federal subject matter jurisdiction is based
on diversity of citizenship, state substantive law applies to
claims for punitive damages. And federal courts must apply that
state law to the extent that it does not violate a party's
federal constitutional rights to do so. Here, Georgia law
applies to a determination of whether punitive damages were
authorized and the amount that may be imposed. As to whether
the imposition of punitive damages was authorized under the

---

[6] For remittitur purposes, the Court calculated this amount by taking
the purchase price of the property, $3,300,000.00 and dividing it over
17.76 years to come up with a value of $185,811.00 per year for use of
the property (rounded to the nearest dollar), then multiplying a
"relative youth multiplier" of 1.5 to account for the fact that the
Harrises' active use of the property is expected to be greater while
they are younger than when they are older. Based on this approach,
the Court calculated the per year use and enjoyment value of the
property for the first few years as $278,716.56. The Court multiplied
that value by 3.5—the estimated number of years of the deprivation—to
reach the total (again rounded to the nearest dollar). The Court
recognizes that its approach can be criticized for a lack of
scientific certainty. But the standard is "enlightened conscience,"
and the Court finds this award consistent with that standard.

United States Constitution and whether the amount awarded by the jury violated Defendants' federal constitutional rights, the Court's analysis consists of two elements: (1) whether the State of Georgia has a process in place that affords the parties generally with due process; and (2) whether the application of that process in this case, assuming it is facially constitutional, nevertheless resulted in the denial of Defendants' due process rights based on the amount awarded here. The Court thus begins its discussion with the Georgia statute authorizing punitive damages under Georgia law and the process for deciding whether and the extent to which punitive damages should be awarded under that law. The Court then examines how this process was applied in this case and whether that application violated Georgia law or the United States Constitution.

Georgia law authorizes a jury to award punitive damages when aggravating circumstances exist "in order to penalize, punish, or deter a defendant." O.C.G.A. § 51-12-5.1(a). To recover punitive damages, a plaintiff must prove by "clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." *Id.* § 51-12-5.1(b). "Punitive damages shall be awarded not as compensation to a

plaintiff but solely to punish, penalize, or deter a defendant." *Id.* § 51-12-5.1(c).  If the jury finds that "the defendant acted, or failed to act, with the specific intent to cause harm . . ., there shall be no limitation regarding the amount which may be awarded as punitive damages against an active tort-feasor but such damages shall not be the liability of any defendant other than an active tort-feasor." *Id.* § 51-12-5.1(f).

"Specific intent" does not require direct proof; a jury can find such intent "through consideration of the words, conduct, demeanor, motive, and circumstances connected with the defendant's actions," or the actions of defendant's agents. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 240 F. Supp. 3d 1337, 1349 (M.D. Ga. 2017), *aff'd*, 901 F.3d 1282 (11th Cir. 2018) (applying Georgia law).  To infer "specific intent," the jury only needs to find evidence that the defendant knew it would certainly, or almost certainly, cause harm to plaintiff and yet continued in the same course of conduct despite the known consequences of its actions.  *Id.*  A finding of specific intent may be supported by either (1) "evidence that the actor desired to cause the consequences of its act," or (2) evidence that "the actor knew the consequences of his act were certain, or substantially certain, to result and still went ahead."  *Id.* (emphasis omitted).

Uncapped punitive damages may only be imposed upon a defendant who acted with a specific intent to cause harm *and* who is deemed to be an "active tort-feasor."   O.C.G.A. § 51-12-5.1(f).   "Active tortfeasor" means "a defendant who engages in an affirmative act of negligence or other tortious conduct, as opposed to a defendant whose negligence consists of an omission to act when he is under a legal duty to act."   *Reid v. Morris*, 845 S.E.2d 590, 596-97 (Ga. 2020).   Generally, the amount of punitive damages should not be disturbed unless it is so excessive that it shocks the judicial conscience and/or results in a violation of the defendant's due process rights under the United States Constitution.   *Time Warner Ent. Co. v. Six Flags Over Ga., LLC*, 563 S.E.2d 178, 183-84 (Ga. Ct. App. 2002).   Because evidence may be relevant on the issue of the amount of punitive damages that may be appropriate but not relevant to the issue of whether punitive damages should be awarded, Georgia courts must bifurcate the trial on these issues.   O.C.G.A. § 51-12-5.1(d) (requiring that the trier of fact must first resolve whether punitive damages should be awarded, then the trial shall be "recommenced" on the amount of damages).

Defendants do not appear to be making a facial attack on the Georgia statutory process for punitive damages.   That process includes the following: a heightened burden of proof standard ("clear and convincing," *id.* § 51-12-5.1(b)); a

31

definitive substantive *mens rea* standard burden ("willful misconduct, malice, fraud, wantonness, oppression, . . . that entire want of care which would raise the presumption of conscious indifference to consequences," and "specific intent to cause harm," *id.* § 51-12-5.1(b), (f)); bifurcation of the issue of whether punitive damages should be awarded from the issue of the amount that should be awarded to minimize jury consideration of irrelevant and perhaps prejudicial evidence; and a final check by the trial judge to ensure that the amount awarded under the circumstances does not shock the judicial conscience. Defendants also do not argue that the Court failed to apply this process during the trial.  Although the Defendants maintained that punitive damages should not be awarded as a matter of law, they did not object to the Court's instructions on punitive damages or to bifurcation of the proceedings as to the amount.

Instead of attacking the statutory process, Defendants argue (1) that the issue of punitive damages should have never been submitted to the jury and that the evidence does not support the jury's decision to make any award; (2) that the evidence does not support a finding of specific intent, and thus the award of punitive damages must be reduced to the statutory cap; (3) that the amounts of the awards of punitive damages are so excessive that they shock the conscience under Georgia law and must be reduced by the Court; and (4) that the amounts of

the awards are so excessive that they violate the United States Constitution.    The Court addresses the separate awards against each Defendant.

   1.    SRC

SRC argues that the evidence does not support the jury's finding that its conduct authorized an award of any punitive damages.    In the alternative, it maintains that insufficient evidence existed that it acted with a specific intent to cause harm or that it was an active tortfeasor, and therefore, any award of punitive damages against it should be capped at $250,000 under the Georgia punitive damages statute.

Evidence was presented at trial from which the jury could have concluded that SRC, as the owner of the property where the solar facility was located and as the entity with the ultimate responsibility for the completion of the project, knew that its construction contractor was mass-grading the site without taking proper precautions to protect the drainage basin that included Plaintiffs' property.    Evidence also existed from which the jury could have concluded that SRC knew that the soils were highly erodible and that Plaintiffs' wetlands and lake would be harmed if its contractor did not take appropriate erosion control measures.    Additional evidence was presented that SRC had a constricted timetable to complete the project and was motivated by financial considerations, which led to the contractor cutting

corners on the implementation of effective soil and erosion controls. The evidence also supports the conclusion that upon being made aware of the failed soil and erosion controls and the damage to Plaintiffs' property, SRC did little to protect the downstream property owners like Plaintiffs.

SRC seeks to hide behind its contract with its contractor IEA and IEA Constructors. It maintains that it was helpless to take any direct corrective action in the months and years after it became aware that the erosion controls on its property were not working. SRC argues that it could only try to enforce its contract with IEA Constructors and instruct IEA Constructors to fix the problems. This argument ignores the evidence from which the jury could have concluded that SRC could have required its contractor to suspend installation of the solar panels and focus on fixing the erosion problems instead of instructing IEA Constructors to continue installing solar panels so that the solar facility could become operational as quickly as possible, which arguably made the problems worse. Sufficient evidence existed from which the jury could have concluded that this active conduct on SRC's part demonstrates that SRC knew the consequences of this conduct—pollution of Plaintiffs' wetlands, stream, and lake—were substantially certain to result, and yet SRC went ahead with its conduct anyway. Thus, the jury's findings that punitive damages should be awarded and that SRC

acted with the requisite specific intent are supported by the evidence.

Defendants' complaint that Plaintiffs' counsel improperly argued in his closing that the jury must find specific intent to exceed the cap does not require a new trial. Perplexingly, Defendants' counsel did not object when Plaintiffs' counsel made the statement. Defendants' counsel even discussed the cap in their closing arguments. The Court thought that Defendants' counsel made some tactical decision that this helped them. Nevertheless, the Court had concerns and instructed the jury *sua sponte* as follows that they should not consider the consequences of their decision on specific intent:

> Ladies and gentlemen, you heard all the lawyers mention this business about a cap. I let it go because nobody objected and all sides mentioned it. But any cap is irrelevant to your determination. You've got to determine the amount of punitive damages you deem appropriate based on the law that I have instructed you. And then you've got to answer the specific intent question, not with regard to whether there is any kind of cap or not, but based upon the definition I gave you of specific intent under the law. And then if any cap were to apply, that's a legal question for me to then decide. Any cap is irrelevant. You've got to decide specific intent based on the standard that I have instructed you on in these jury charges. You answer those questions yes or no.

Trial Tr. Vol. XIV 90:21-91:8 (Apr. 28, 2023), ECF No. 368. After the closing arguments were complete and after the jury was instructed and excused, counsel belatedly objected to the statements by Plaintiffs' counsel about the cap. The Court is

satisfied that even if Defendants did not waive their objection by not objecting in a timely manner at trial, this curative instruction eliminated any prejudice.

The next question is whether the amount of punitive damages awarded against SRC is so excessive that it shocks the conscience and thus must be reduced under Georgia law and/or whether it is so excessive that it violates SRC's due process rights and must be reduced under federal constitutional law. After apportionment, judgment was entered against SRC in the amount of $3,150,000 for compensatory damages and $25 million in punitive damages. Thus, the punitive damages award against SRC was 7.94 times the compensatory damages awarded. That multiplier would be substantially greater when determined in light of the Court's remitted compensatory damages. The Court is skeptical of relying too heavily upon the proportion of compensatory damages to punitive damages. The Court understands that this is simply one guidepost to consider. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 424-25 (2003) (describing the ratio of compensatory to punitive damages as a "guidepost" in assessing punitive damages).

Because deterrence is an important aspect of any punitive damages award, the jury may consider the impact of their award on a defendant's financial condition. Plaintiffs presented evidence from an accounting and finance expert who provided

essentially unrebutted evidence regarding SRC's financial condition. That evidence included evidence demonstrating SRC's securities offerings and the amount of equity investment in SRC, which led the expert to conclude that SRC's corporate value was more than a billion dollars. While the amount of punitive damages awarded here certainly represents a large numerical value, the numerical value of SRC's financial condition was also substantial. The Court must evaluate the award in this context—how it compares to SRC's financial condition. An award like the one made here may be unsupportable if assessed against a small mom-and-pop operation but be defensible as to a defendant with a net worth that is as eye-popping as a nine-figure jury award.

The reprehensibility of SRC's conduct must also be considered in the analysis under both state and federal law. The jury obviously found SRC's conduct strongly reprehensible, specifically concluding that SRC acted with a specific intent to cause harm. The Court recognizes that there are gradations of conduct done with a "specific intent to cause harm." Although a jury question existed as to whether the Georgia standard was met here, the Court finds that a close question existed as to whether this conduct simply amounted to a conscious disregard of consequences, which would have resulted in a $250,000.00 cap on punitive damages, as opposed to a specific intent to cause harm to Plaintiffs. The evidence does not support a finding that the

Defendants subjectively set out to intentionally cause harm to Plaintiffs' property. Nor does the evidence demonstrate any intent to cause the Plaintiffs physical injury or emotional harm. The Court understands that neither subjective intent nor personal injury is required for uncapped punitive damages, but these considerations should not be ignored in evaluating where on the "specific intent to cause harm" continuum SRC's conduct falls.

In addition to the damages award fully compensating Plaintiffs for their damages, the Court has entered an injunction requiring Defendants to remediate the nuisance and take reasonable measures to assure that future damage to Plaintiffs' property is avoided. While this relief is remedial and not punitive, it is extraordinary and should not be ignored in the punitive damages calculus. Considering all these factors, the Court remits the punitive damages award against SRC to $1,144,357.20.[7]

---

[7] To calculate punitive damages, the Court trebled the remitted and apportioned compensatory damages as to each Defendant. As previously explained, the total remitted compensatory damages of $1,271,508.00 ($296,000 to H&L Farms and $975,508 to the Harrises) are apportioned consistent with the jury verdict as follows: $381,452.40 to Plaintiffs against SRC (30%); $508,603.20 to Plaintiffs against IEA (40%); and $381,452.40 (30%) to Plaintiffs against IEA Constructors. The Court certainly recognizes that trebling compensatory damages to calculate punitive damages is not mandated by Georgia law or the United States Constitution. Nevertheless, this type of punishment is well accepted under both Georgia and federal law. *See, e.g.*, 47 U.S.C. § 227 (permitting treble damages for willful violations of Telephone Consumer Protection Act); O.C.G.A. § 10-1-399 (providing for treble

2.   *IEA and IEA Constructors*

IEA and IEA Constructors make many of the same arguments as SRC to avoid punitive damages.   The Court finds that the evidence presented at trial supported the jury's findings that each of these Defendants engaged in conduct that authorized punitive damages under Georgia law and that each Defendant acted with a specific intent to cause harm.   The Court further finds that the evidence supports the conclusion that each was an active tortfeasor.   The evidence supporting these findings includes the following:

- At the beginning of the project, IEA Constructors was explicitly warned that Plaintiffs' lake was only 0.2 miles away from the solar facility site and that IEA Constructors would thus have to be very diligent with the erosion and sediment control measures.

- Despite the clear warning, IEA Constructors graded southern portions of the SRC property before completing or properly installing erosion controls.   Within a few days, it rained; sediment and mud and silt were discharged from the SRC property and into Plaintiffs' stream, wetlands, and lake.

- Plaintiffs notified IEA/IEA Constructors about the harm to their property, and the Georgia Environmental Protection Division issued a notice of violation regarding problems with the erosion controls.   A contractor hired to perform weekly inspections reported compliance issues with the erosion controls for at least eighteen straight weeks. During that time, IEA/IEA Constructors made little progress with site stabilization but aggressively pushed ahead with installation of the solar facility components.

---

damages for intentional violations of Georgia's Fair Business Practices Act).   And the Court finds it supported by the evidence and appropriate here.

♦ After the solar panels were installed, IEA/IEA Constructors knew that the sediment from the solar facility continued to be discharged into Plaintiffs' stream, wetlands, and lake with every rain event, but they did not take any significant action to address the erosion problems or redesign the erosion controls. They knew that their negotiations to have the original engineer redesign the erosion controls ended in September 2021, yet they did not even start to try and find another engineer until at least late spring of 2022, and they did not engage another engineer until October of 2022.

♦ Throughout the Lumpkin solar facility project, an IEA executive vice president was personally involved in managing the IEA Constructors team; he explained repeatedly that it was his job to fix the problems at the Lumpkin site, and he detailed his involvement in the project.

As to the relationship between the amount of compensatory damages and the punitive damages awarded, the punitive damages awarded against IEA were 11.90 times the compensatory damages, and the punitive damages against IEA Constructors were 15.87 times the compensatory damages award.

To help the jury evaluate what amount of punitive damages was necessary for deterrence purposes, Plaintiffs presented evidence from an accounting and finance expert regarding the financial condition of IEA. IEA was a publicly traded company until November of 2022, when it was acquired by a company called Mastech for $1.1 billion. In 2021, IEA generated more than $2 billion in revenue; in 2020, IEA generated $1.752 billion in revenue; and in 2019, IEA generated $1.459 billion in revenue. There was evidence that the amount of the SRC contract with IEA Constructors for the Lumpkin solar facility project was $76

million, that IEA's construction subsidiaries (IEA Constructors and White Construction) averaged more than twenty construction projects per year, and that they normally aimed for a 10 percent margin, with 5 1/2 percent for overhead.

Although the Court understands how a jury could conclude that a large punitive damages award was necessary to get Defendants' attention, the Court nevertheless finds the punitive awards against IEA and IEA Constructors excessive. Accordingly, the Court remits those punitive damages awards to $1,525,809.60 against IEA and $1,144,327.20 against IEA Constructors.[8]

## VI.  Plaintiffs' Rule 50(b) Motions

Plaintiffs are satisfied with the jury's verdict, but they nonetheless filed two motions for judgment as a matter of law on issues that the jury resolved in their favor: (1) that SRC, IEA, and IEA Constructors created a nuisance and caused trespass and (2) that IEA uses IEA Constructors as its alter ego and was in a joint venture with IEA Constructors. Plaintiffs moved for judgment as a matter of law on these issues at the close of Defendants' case under Federal Rule of Civil Procedure 50(a). The Court deferred ruling on these issues and submitted them to the jury. The jury returned a verdict in Plaintiffs' favor on these issues, then the Court entered judgment in Plaintiffs'

---

[8]  *See supra* note 7 for an explanation of how these amounts were calculated.

favor based on the verdict.   That jury verdict in Plaintiffs'
favor "moots the issue" raised by their Rule 50(a) motion.   Fed.
R. Civ. P. 50(b) advisory committee's note to 1991 amendment.
The Court recognizes that Rule 50(b) permits a losing party to
challenge the evidentiary basis for the jury's verdict.   But it
is not clear that Rule 50(b) can be used by a winning party to
revisit its Rule 50(a) argument that the jury need not decide
the issue.   Moreover, the Court is not convinced that there were
absolutely no genuine fact disputes for the jury to decide on
the two issues raised by Plaintiffs' Rule 50(b) motions.   The
motions (ECF Nos. 298 & 299) are denied.

## VII. Plaintiffs' Motion for Attorney's Fees

When the jury reached its verdict in favor of Plaintiffs,
Plaintiffs made a motion for damages under O.C.G.A. § 9-11-
68(e), which permits a prevailing party to recover damages—
including attorney's fees and expenses—against an opposing party
who presented a frivolous claim.   The parties agreed that the
Court would act as fact-finder on this motion and that the
motion would be decided on the briefs, without an evidentiary
hearing.   Plaintiffs contend that they are entitled to more than
$4 million in attorney's fees based on their 45% contingency fee
agreement, and $355,270.20 in litigation expenses.[9]

---

[9] Plaintiffs initially asserted a claim for attorney's fees under
O.C.G.A. § 13-6-11.   At trial, they elected to pursue attorney's fees
under O.C.G.A. § 9-11-68(e) only.

Defendants argue that Plaintiffs cannot recover under O.C.G.A. § 9-11-68(e) because they never made an offer of settlement. The Court assumes for purposes of the present motion that Georgia law permits Plaintiffs to pursue damages under O.C.G.A. § 9-11-68(e), which "compensates prevailing parties for litigation costs and other injuries endured because of an opposing party's decision to present meritless or bad-faith claims or defenses." *Showan v. Pressdee*, 922 F.3d 1211, 1225 (11th Cir. 2019). Damages may only be awarded under O.C.G.A. § 9-11-68(e) if an opposing party presented a frivolous claim or defense, such as:

> (A) A claim, defense, or other position that lacks substantial justification or that is not made in good faith or that is made with malice or a wrongful purpose . . .;

> (B) A claim, defense, or other position with respect to which there existed such a complete absence of any justiciable issue of law or fact that it could not be reasonably believed that a court would accept the asserted claim, defense, or other position; and

> (C) A claim, defense, or other position that was interposed for delay or harassment.

O.C.G.A. § 9-11-68(e)(1).

Plaintiffs contend that sixteen defenses and positions taken by Defendants are frivolous. The Court carefully reviewed Plaintiffs' arguments and concludes that Defendants did take three clearly frivolous positions during this litigation. First, Defendants' summary judgment motion included a frivolous

argument that Plaintiffs' negligence claims were barred as a matter of law because Plaintiffs assumed the risk of purchasing their property. But, as the Court observed, Defendants pointed to *zero evidence* that Plaintiffs *knew and fully appreciated* the possibility that Defendants would not take adequate measures to control erosion or that Defendants would not take action to fix problems.[10]   Thus, this portion of Defendants' summary judgment motion was frivolous.

Second, Defendants argued at the pretrial conference and in their proposed jury charges and verdict forms that the jury should be asked to consider whether Plaintiffs were responsible for their own injuries. Even as counsel made the argument, counsel could not articulate any factual basis for asserting that Plaintiffs were *at fault*. Accordingly, this argument was frivolous.

Third, Defendants sought to introduce evidence regarding private financial matters of Kawikee Two, LLC, Mr. Butler, and Mr. Wooten—including evidence of a loan secured by the property

---

[10] Rather, they simply pointed to evidence that (1) Mr. Harris inspected the Kawikee Refuge property before the purchase and saw the timber harvesting on SRC's property; (2) Mr. Harris knows how important reforestation practices are; (3) Mr. Butler offered to help Plaintiffs if there were any problems with the solar facility construction; and (4) Mr. Butler wrote a letter to SRC before the sale and, in a nutshell, told SRC that he noticed what appeared to be inadequate erosion controls on the solar facility site, asked SRC to do something about the situation before it created a muddy mess at Kawikee Refuge, and warned that there would be litigation if SRC failed to control erosion from its property.

that Kawikee Two sold to SRC.  Counsel speculated that the evidence could possibly show that Kawikee Two was under financial pressure to sell the property.  The evidence was totally irrelevant to the issues the jury had to decide, and counsel's theory about the significance of the evidence was sheer speculation.  Moreover, by the time of the trial exhibit disclosure deadlines, Defendants had no reasonable basis in law or in fact to pursue admission of this evidence, so their position on this issue was frivolous.

Plaintiffs' remaining thirteen enumerations of Defendants' frivolous defenses and positions lack merit.  The Court is not convinced that there was such a complete absence of any justiciable issue of law or fact on these matters that Defendants' positions were frivolous, nor is the Court persuaded that the defenses or positions were asserted with malice, an improper purpose, or for harassment.  Rather, all the issues are much more nuanced than Plaintiffs' briefing (and, frankly, most of Defendants' responses) suggests.

In summary, Plaintiffs established that Defendants took three frivolous positions in this litigation.  Those three frivolous positions required Plaintiffs to spend two pages of a twenty-page brief responding to a completely meritless summary judgment argument, two pages of a twenty-page brief arguing to exclude clearly irrelevant financial evidence, and a few minutes

arguing a couple of the issues during hearings. As discussed above, O.C.G.A. § 9-11-68(e) only "compensates prevailing parties for litigation costs and other injuries endured *because of* an opposing party's decision to present meritless or bad-faith claims or defenses." *Showan*, 922 F.3d at 1225 (emphasis added). Therefore, Plaintiffs are only entitled to the damages they suffered because of the three meritless defenses, not the entire amount of fees and costs that they seek. Plaintiffs presented no evidence from which the Court can determine with reasonable certainty the amount of fees and costs incurred as a result of having to address the meritless defenses. Accordingly, the Court declines to award such speculative damages.

CONCLUSION

For the reasons set forth above, the Court denies Plaintiffs' motions for judgment as a matter of law (ECF Nos. 298 & 299) and Plaintiffs' motion for attorney's fees (ECF No. 291). Defendants' motions for judgment as a matter of law and new trial (ECF Nos. 306 & 307) are denied, except the amount awarded as damages are remitted as follows:

- ♦ Compensatory damages award to H&L Farms, LLC is remitted to $296,000.00.

- ♦ Compensatory damages award to Shaun Harris is remitted to $487,754.00.

- Compensatory damages award to Amie Harris is remitted to $487,754.00.

- Punitive damages award against Silicon Ranch Corporation is remitted to $1,144,357.20.

- Punitive damages award against Infrastructure and Energy Alternatives, Inc. is remitted to $1,525,809.60.

- Punitive damages award against IEA Constructors, LLC is remitted to $1,144,357.20.

Within twenty-one (21) days from the date of today's order, Plaintiffs shall file a notice stating whether they accept the remittiturs. If the remittiturs are not accepted by Plaintiffs, the Court will grant a new trial on compensatory and punitive damages only.[11] If the remittiturs are accepted, the Court will

---

[11] To avoid future misunderstanding, the Court emphasizes that liability for compensatory damages and punitive damages, including the jury's findings on specific intent, have been established and are supported by sufficient evidence. Therefore, those issues will not be revisited in any new trial. The new trial jury will only be deciding the amounts of those damages. The Court also notifies the parties that Plaintiffs' damages awarded in a new trial will not be capped at the remitted amounts contained in today's order. The remitted amounts are based on the record from the previous trial and are intended to fall within a range of reasonable damages, not necessarily at the top of that range. Plaintiffs shall be permitted to put up additional evidence in support of their claim for repairing and remediating the damage to the lake, including any additional costs associated with removing additional silt that has accumulated and any costs for replenishing the fish habitat, even if that evidence was not admitted at the first trial. Defendants will have the opportunity to put up evidence in opposition to Plaintiffs' evidence as to the amount of damages, even if that evidence was not admitted during the previous trial. If Plaintiffs file a notice stating that they reject the remittiturs, they shall have 28 days from the date of that notice to supplement any discovery responses, including supplementation of expert reports, to provide any new information regarding damages evidence. Within 28 days of receiving Plaintiffs' supplemental responses, Defendants shall disclose their supplemental discovery responses including any supplemental expert reports. Within 21 days of service of the Defendants' supplemental discovery responses, the

direct the Clerk based on the remittiturs and the jury's apportionment of fault for purposes of compensatory damages to enter an amended judgment as follows:

♦ In favor of Shaun Harris and against Silicon Ranch Corporation in the amount of $146,326.20.

♦ In favor of Amie Harris and against Silicon Ranch Corporation in the amount of $146,326.20.

♦ In favor of H&L Farms, LLC and against Silicon Ranch Corporation in the amount of $88,800.00.

♦ In favor of Shaun Harris and against Infrastructure and Energy Alternatives, Inc. the amount of $195,101.60.

♦ In favor of Amie Harris and against Infrastructure and Energy Alternatives, Inc. in the amount of $195,101.60.

♦ In favor of H&L Farms, LLC and against Infrastructure and Energy Alternatives, Inc. in the amount of $118,400.00.

♦ In favor of Shaun Harris and against IEA Constructors, LLC in the amount of $146,326.20.

♦ In favor of Amie Harris and against IEA Constructors, LLC in the amount of $146,326.20.

♦ In favor of H&L Farms, LLC and against IEA Constructors, LLC in the amount of $88,800.00.

♦ In favor of Shaun Harris, Amie Harris and H&L Farms. LLC, jointly, and against Silicon Ranch Corporation in the amount of $1,144,357.20.

♦ In favor of Shaun Harris, Amie Harris and H&L Farms. LLC, jointly, and against Infrastructure and Energy Alternatives, inc. in the amount of $1,525,809.60.

---

parties shall confer in good faith to schedule any supplemental depositions. If the remittiturs are not accepted, **THE COURT INTENDS TO TRY THE CASE DURING ITS MARCH 2024 JURY TRIAL TERM.**

♦ In favor of Shaun Harris, Amie Harris and H&L Farms. LLC, jointly, and against Infrastructure and Energy Alternatives, Inc. in the amount of $1,144,357.20.

IT IS SO ORDERED, this 23rd day of October, 2023.

S/Clay D. Land
_____
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA